UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DEVENDRA SHUKLA,

                Plaintiff,

       - against -

SAT PRAKASH SHARMA, individually
and as Director of VISHVA SEVA
ASHRAM OF NEW YORK, GEETA
SHARMA, individually and as Director of
VISHVA SEVA ASHRAM OF NEW
YORK, VISHVA SEVA ASHRAM OF
NEW YORK D/B/A SARVA DEV
MANDIR,

              Defendants.

07-CV-2972 (CBA) (CLP)
Hon. Carol Bagley Amon

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTIONS
FOR AN ADVERSE INFERENCE, AND TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 9(b), 12(b)(6), 37(b)(2)(A)(i), (ii), (v), (vi) AND 56**

Dan Brecher (DB-5308)
Law Offices of Dan Brecher
99 Park Avenue, 16th Floor
New York, New York 10016
(212) 286-0747
Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACT AND PROCEDURAL HISTORY ........................................................2

LEGAL ARGUMENT...................................................................................................................7

      POINT I.        STANDARD OF REVIEW .........................................................7

      POINT II.      SPOLIATION OCCURRED HERE WARRANTING A
                         RECOMMENDATION THAT THE COMPLAINT BE
                         DISMISSED, WITH SANCTIONS ...........................................12

      POINT III.     DEFENDANTS ARE ENTITLED TO AN ADVERSE
                         INFERENCE AS TO PLAINTIFF'S STATE OF MIND,
                         MENTAL AND EMOTIONAL CONDITIONS .......................16

      POINT IV.     PLAINTIFF'S DILATORY AND IMPROPER BEHAVIOR IN
                         DISCOVERY MERITS SANCTIONS POINT IV....................19

      POINT V.      THE MINISTERIAL EXCEPTION DEPRIVES THIS COURT
                         OF SUBJECT MATTER JURISDICTION .............................20

      POINT VI.     THE RECORD DOES NOT SUPPORT THE NINTH AND
                         TENTH CLAIMS OF FALSE IMPRISONMENT AND
                         INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS...............26

      POINT VII.    PLAINTIFF'S FIRST AND SECOND CLAIMS OF
                         TRAFFICKING AND FORCED LABOR DO NOT SATISFY
                         STATUTORY REQUIREMENTS ...........................................28

      POINT VIII.   PLAINTIFF'S THIRD CLAIM OF INVOLUNTARY
                         SERVITUDE, BROUGHT BY AN EDUCATED, HEALTHY
                         PLAINTIFF WHO LITERALLY AND FIGURATIVELY  HELD
                         THE KEYS TO HIS OWN FREEDOM, FAILS TO STATE A
                         PROVABLE CLAIM .........................................................31

CONCLUSION...........................................................................................................................33

# TABLE OF AUTHORITIES

Page

Cases

American Cash Card Corporation v. AT&T Corporation,
184 F.R.D. 521 (S.D.N.Y. 2002) ...................................................................................15

Beer v. General Motors Corporation,
No. 97 Civ. 482, 1999 WL 325378 (S.D.N.Y. May 17, 1999).....................................14

Bell Atlantic Corporation v. Twombly,
127 S. Ct. 1955 (2007).............................................................................................8, 30

Conley v. Gibson,
355 U.S. 41 (1957)...........................................................................................................8

E.E.O.C. v. First Baptist Church,
1992 WL 247584 ............................................................................................................23

E.E.O.C. v. Roman Catholic Diocese of Raleigh,
213 F.3d 795 (4th Cir. 2000) ........................................................................................23

Fassl v. Our Lady of Perpetual Help Roman Catholic Church,
2005 WL 2455253 ..........................................................................................................23

Fernandez v. Chertoff,
471 F.3d 45 (2d Cir. 2006)..............................................................................................7

Fraser v. Salvation Army,
1998 WL 13272 (E.D. Pa.) ............................................................................................25

Guice-Mills v. Forbes,
863 N.Y.S.2d 874 (2008).................................................................................................32

Howell v. New York  Post Company,
81 N.Y.2d 115 (1993) ....................................................................................................26

In re Elevator Antitrust Litigation,
502 F.3d 47 (2d Cir. 2007)..............................................................................................8

Kraft v. Rector,
2004 WL 540327 ............................................................................................................24

Kronisch v. United States,
150 F.3d 112 (2d Cir.1998)..................................................................12, 16, 17

Leibowitz v. Bank Leumi Trust Company of New York,
548 N.Y.S.2d 513 (2nd Dept. 1989) .........................................................26

Lewis v. Seventh Day Adventists Lake Region Conference,
978 F.2d 940 ...................................................................................25

Little v. Wuerl,
929 F.2d 944 (3d Cir.1991)......................................................................21

McClure v. Salvation Army,
460 F.2d 553 (1972)...........................................................................24

Metropolitan Opera Association, Incorporated v. Local 100, et al.,
212 F.R.D. 178 (S.D.N.Y. 2003) ..............................................................15

Nader v. General Motors Corporation,
25 N.Y.2d 560 (1970)...........................................................................28

Natal v. Christian Missionary Alliance,
878 F.2d 1575 ...................................................................................25

NTL, Inc. Sec. Litig.,
244 F.R.D. 179 (S.D.N.Y. 2007) ..............................................................13

Owen v. Leventritt, et. al.,
571 N.Y.S.2d 25 (N.Y. App. Div. 1991) ......................................................27

Patsakis v. Greek Orthodox Archdiocese,
339 F. Supp.2d 689 (W.D. Pa. 2004).........................................................23

Reilly v. National Markets Group Incorporated,
181 F.3d 253 (2d Cir. 1999)....................................................................18

Residential Funding Corporation v. DeGeorge Fin. Corporation,
306 F.3d 99 (2d Cir. 2002)........................................................12, 13, 14, 16

Schleicher v. Salvation Army,
518 F.3d 472 (2008).............................................................................23

Seltzer v. Bayer,
272 A.D.2d 263..................................................................................27

Serbian E. Orthodox Diocese v. Milivojevich,
426 U.S. 696 (1976)......................................................................................................21

Shaliehsabou v. Hebrew Home of Greater Washington,
363 F.3d 299 (4th Cir. 2004) ....................................................................................23, 24

Skywark v. Isaacson,
No. 96 Civ. 2815, 1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999) ..................................15

Tomic v. Cathlolic Diocese,
442 F.3d 1036 (7th Cir 2006) ........................................................................................21

United States v. Kozminski,
487 U.S. 931 (1988)........................................................................................................31

West v. Goodyear Tire & Rubber Company,
167 F.3d 776 (2d Cir. 1999)...........................................................................................12

<u>**PRELIMINARY STATEMENT**</u>

On July 23, 2007, Plaintiff Dvendra Shukla ("Plaintiff") filed this action against Defendants Sat Prakash Sharma, Geeta Sharma, and d/b/a Sarva Dev Mandir, Vishva Seva Ashram of New York ("Defendants"). The allegations and claims in Plaintiff's Complaint relate to a condition of involuntary servitude which Plaintiff alleges commenced on August 6, 2000, by virtue of Defendants' alleged confiscation and withholding of his Indian passport, more than six years before the Complaint was filed. Plaintiff has engaged in a dilatory pattern of discovery, to such an extent that even an associate of Plaintiff's counsel complained to the Court that Plaintiff's counsel had been untruthful in his letter describing delays in Plaintiff's production in discovery, dated January 3, 2008, when shown to the associate and the Court during a conference. What is worse, Plaintiff has disobeyed this Court's Orders, and refused to produce requested documents and his computer despite repeated requests that he do so and several Court orders instructing him to make production. As a result, Magistrate Pollack has specifically permitted Defendants to make the Motion returnable before her as to spoliation, and for an adverse inference or such other remedies, including a recommendation of dismissal, which Defendants argue is appropriate here.

Plaintiff's own sworn deposition testimony, submitted herewith, confirms that he was and is a healthy, educated man who cannot show that he was uniquely vulnerable and incapable of self-protection, which are required proofs for the involuntary servitude claim that is the nexus of the Complaint. Plaintiff's own sworn testimony also is in complete contradiction to his most recent sworn affidavit, in which Plaintiff seeks to explain why he has not complied with the discovery orders issued by the Court. Accordingly, under Rules 9(b), 12b)(6), 37(b)(2)(A)(i), (ii), (v), (vi) and 56, Plaintiff's Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

For the purposes of these Motions regarding spoliation, an adverse inference and for a recommendation to dismiss, the following facts are principally based upon the allegations contained in Plaintiff's Complaint, and Plaintiff's admissions in sworn testimony at his depositions, relevant portions of which are submitted as exhibits with these Motions and are referenced herein. The gravamen of Plaintiff's Complaint is that, in August 2000, the Defendants tricked him into leaving India, then took away his passport when he arrived in New York on August 6, 2000, and immediately placed him in slave-like conditions through the use of what he alleges to have been psychological and emotional abuse. Plaintiff contends that such conditions continued unabated for seven years, from August 6, 2000 until June 25, 2007, the date on which Plaintiff left his position as the Hindu Priest of the Defendant Vishva Seva Ashram of New York (the "Ashram"), a Hindu temple in Queens, New York, where Plaintiff lived and officiated from August 6, 2000 through June 25, 2007.

Aside from the blatant failures in discovery by Plaintiff in this action, another reason for dismissal of all of the claims asserted herein is that Plaintiff cannot show, even assuming the truth of what he claims, that Defendants' behavior rendered him so vulnerable as to be incapable of self-protection. In order to prevail here, at the least, the Plaintiff would have to show that Defendants had such de facto control over him that he was prevented from being able to protect himself by the simple act of going to a police station or embassy. These claims should be dismissed because Plaintiff cannot show that he was unable to protect himself from Defendants or that his circumstances made him uniquely vulnerable. Otherwise, other plaintiffs will flood the courts with claims that they, too, were prisoners in their minds by virtue of bizarre and undocumented allegations, as are present here.

While there are also numerous technical reasons justifying dismissal on the law that will be further discussed below, Defendants wish to emphasize to the Court that, as shown in Plaintiff's own words in the relevant portions of his deposition transcripts submitted herewith, Plaintiff admits that the so-called abuse supposedly visited on him every day by the Defendants for seven years did not keep him from leaving the Ashram and frequently traveling alone or with congregants during each year, did not keep him from regularly visiting congregants' homes and offices without the Defendants being present, and did not keep him from appearing as a guest on radio and television show broadcasts from time to time from at least 2002 to 2004. Moreover, Plaintiff admits he was able to gain weight and remained healthy during virtually the entire seven year period when Defendants supposedly sought to starve and mistreat him, and that he was never physically threatened or hit by either of the individual Defendants. Plaintiff also admits that he was regularly paid for his work, that he signed documents acknowledging receipt of such payments, and, that he additionally received payments from congregants as "tips" throughout the seven year period. Moreover, Plaintiff admits that the Defendants, at Plaintiff's request, sent more than twenty thousand dollars to Plaintiff's family in India out of his earnings as a priest during the period he worked for the Ashram.

Plaintiff is a university-educated, thirty-three year old man who speaks several languages. At all times, Plaintiff was in good health, remained mentally acute and in possession of strong intellectual capabilities. For years during his alleged enslavement, he had a cellular telephone and phone cards, enabling him to make international and local calls, he had access to his own personal laptop computer, and he had his own email address and internet access, which allowed him to send and receive emails and other documents. He admits sending and receiving emails on his laptop computer, but has produced nothing that several Court orders required Plaintiff to

3

produce. Plaintiff alleges that the Defendants' mistreatment of him and underpayment of promised wages, among other wrongs, all commenced in the summer of 2000, when he first arrived here from India. Plaintiff admits that he planned his leaving the Ashram at least one week before he left, but he would have this Court believe that when he did actually leave, he took virtually nothing but his clothing, the cellular telephone, laptop computer and one prayer book.

### (a)   The Parties

Plaintiff Devendra Shukla is a citizen of India who is currently a resident of New York (Compl. ¶ 7).

Defendant Ashram is a Hindu Temple, a not-for-profit religious organization located at 35-45 71st Street, in Jackson Heights, New York (Compl. ¶ 8).

The Individual Defendants, Sat Prakash Sharma ("Sat") and his wife, Geeta Sharma ("Geeta") are officers and directors of the Ashram and currently reside in New York (Compl. ¶¶ 8, 9 and 10).

Plaintiff predicates jurisdiction of this Court upon alleged forced labor and trafficking provisions of the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"). See 18 U.S.C. §1595 (Compl. ¶ 5).

### (b)   The Court's Discovery Orders

As discussed in Point I (b) below, pursuant to requests made by the Defendant in 2007, the Court issued several orders for production of Plaintiff's documents and then his computer in February 2008, July 2008 and again in November 2008. Exhibit A, B and C to the Declaration of Dan Brecher, dated January 27, 2009, hereinafter the "Brecher Declaration". Plaintiff has not complied with the discovery orders.

**(c)      The Plaintiff Refuses to Comply with Discovery Orders**

The December 17, 2008 letter to me from Plaintiff's attorney, Sanjay Chaubey, Esq. ("Chaubey"), and the affidavit of Plaintiff, dated December 15, 2008 are as revelatory, as they are dilatory because they exemplify Plaintiff's consistent pattern of non-cooperation (Brecher Declaration Ex. D and E).  Plaintiff's affidavit and Plaintiff's testimony confirm that:

(i)      the computer belongs to Plaintiff (Pl.'s Dep.  55:16, Jan. 16, 2008);

(ii)      the computer is Plaintiff's property and was in his possession or available to him after he left the Ashram on June 25, 2007, and at least for the first six months of 2008 (Pl.'s Dep. 26:3-8, Apr. 1, 2008);

(iii)      Plaintiff had turned over documents to his attorney, including communications with his family (Pl.'s Dep.  10:8, 12:9, Jan. 15, 2008; 67:11-69:9, Mar. 17, 2008);

(iv)       Plaintiff had turned over to his attorney checks issued by Defendant Ashram (Pl.'s Dep.  67:19-69:8, Mar. 17, 2008);

(v)      Plaintiff had retained documents that had been requested in Defendants' production requests but has not produced the documents as repeatedly ordered by the Court (Pl.'s Dep.  68:2-69:7, Jan. 15, 2008);

According to Plaintiff's counsel, it took months for Plaintiff to review and sign his deposition transcripts and Plaintiff made numerous corrections to his deposition transcripts before signing them and returning them to the Defendants' counsel, months later.  In his affidavit, Plaintiff now seeks, after the close of discovery, to completely contradict his own sworn testimony, which he had previously reviewed and approved (Brecher Declaration Ex. E).

In contradicting his own sworn testimony, Plaintiff has clearly and severely damaged his own credibility on the material issue in his case: whether or not he was held in involuntary servitude for seven years by Defendants' acts, which allegedly put him in such a mental state that he believed he had no choice but to remain in his "prison" of no walls, no chains and no handcuffs, neither real nor virtual.

There is no basis for these allegations when viewed in conjunction with Plaintiff's own conflicting testimony. Specifically, Plaintiff has testified that:

(i)     for most of the seven years of "imprisonment," Plaintiff had a cellular telephone, phone cards for international and local calling, and a laptop computer with internet access, all of which he used when he chose to do so (Pl.'s Dep. 66:20 – 67:9, 77:25‐ 80:24, 129:12 – 130:21, Apr. 1, 2008);

(ii)    for years, Plaintiff had an email address and Plaintiff used his computer and his email address to send and receive emails (Pl.'s Dep. 50:21-23, Feb. 8, 2008; 77:25, 80:24, Apr. 1, 2008; 176:11-177:6, June 16, 2008).

(iii)   throughout the seven years of "imprisonment," Plaintiff left the Ashram, unescorted, to:

a.      visit congregants (Compl. ¶ 25);

b.      do laundry and go shopping (Pl.'s Dep. 95:2- 96:9, Apr. 1, 2008);

c.      conduct religious services outside the Ashram at the homes and offices of congregants and others (Compl. ¶ 25; Pl.'s Dep. 50:20-61:4, Mar. 17, 2008);

<table>
<tr><td>(iv)</td><td>from 2002 through 2004, Plaintiff was a frequent participant on a religious radio show hosted by his friend (Pl.'s Dep. 30:22-36:25, 44:7-45:11, Mar. 17, 2008);</td></tr>
<tr><td>(v)</td><td>Defendants told Plaintiff that if there was an emergency requiring that he go to India he could always go (Pl.'s Dep. 125:17-19, May 6, 2008).</td></tr>
</table>

## LEGAL ARGUMENT

## POINT I.

## <u>STANDARD OF REVIEW</u>

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rules of Civil Procedure ("FRCP") 12(b)(6), the Court is to accept as true all well-pleaded facts alleged in the Complaint and draw all reasonable inferences in favor of the Plaintiff. <u>See</u> <u>Fernandez v. Chertoff</u>, 471 F.3d 45, 51(2d Cir. 2006). However, in the instant action, Plaintiff's several intentional, knowing and purposeful refusals to comply with Magistrate Pollack's Orders to produce documents and the laptop computer mandate a finding of spoliation, that an adverse inference be drawn, and, should serve to negate acceptance as true the allegations of seven years of involuntary servitude, all of which turn on nothing more than the mental and emotional state of Plaintiff from August 6, 2000 through June 25, 2007. Plaintiff's bizarre claim is that during those seven years there was no point in time at which he could do anything to help himself because of his own state of mind; all while faithfully and completely fulfilling his professional duties as priest ministering fully to his growing congregation of observers of the Hindu religion.

The Second Circuit has followed the new and heightened pleading standard recently enunciated by the U.S. Supreme Court in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007). In Twombly, the Supreme Court "explicitly disavowed . . . 'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id. at 1968 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Second Circuit has acknowledged that in order to survive a motion to dismiss, a complaint must set forth sufficient facts so as to make a plaintiff's claims plausible, not merely conceivable. See In re Elevator Antitrust Litigation, 502 F.3d 47 (2d Cir. 2007) (citing Twombly, 127 S. Ct. at 1974). Plaintiff's claims, in light of his testimony, are not plausible.

(a) **THE PLAINTIFF'S ALLEGATIONS ALL RELATE TO HIS MENTAL AND EMOTIONAL STATE**

The gravamen of the instant Complaint is that in August 2000 the Defendants appropriated Plaintiff's Indian passport upon Plaintiff's arrival to the U.S.A to serve as a priest at the Defendant Ashram. Allegedly, the Defendants:

(i) confiscated and withheld Plaintiff's passport from August 6, 2000 through June 25, 2007 (Compl. ¶¶ 19, 22);

(ii) refused to pay Plaintiff $15-20 per hour, the compensation that was allegedly negotiated and promised by a third party, from August 2000 through June 2007 (Compl. ¶15);

(iii) forced Plaintiff to work virtually every waking hour of the day, every day of every year, beginning August 6, 2000 through June, 2007, including janitorial and maintenance services for the individual Defendants' private residence (Compl. ¶¶ 24, 27, 29); and

(iv)     coerced Plaintiff's labor through a practice and pattern of psychological abuse, isolation and exploitation (Compl. ¶¶ 30, 33).

Plaintiff has acknowledged that Defendants never struck him or threatened him physically (Pl.'s Dep. 6:16, Jan. 15, 2008). Plaintiff contends that his emotional state and his subjective feeling of being trapped were caused solely by the alleged withholding of his passport and threats related to the passport issue alone, and were continuous from August 6, 2000 until June 25, 2007 (Compl. ¶ 22). Plaintiff acknowledged that he did not ask anyone for help, despite being held "prisoner" for more than a year preceding September 11, 2001. During this entire time preceding September 11, 2001, Plaintiff remained in status as a person legally in this country, which meant that he could have simply left this country and returned to India without hindrance or penalty of any sort, with or without the original of his passport, purportedly withheld from him by the Defendants. His explanation for failing to leave his enslaved condition in 2000 or 2001 was that he was too afraid to try to leave this country and return home to his wife and newborn son. What was this educated healthy man afraid of, if, as he admits, the Defendants did not threaten him physical harm?

Plaintiff also acknowledges that when he did contact the Indian embassy in 2007, he was told that that they would assist him in getting legal status (Pl.'s Dep. 87:21, Mar. 17, 2008). Plaintiff failed to take advantage of the Indian Embassy's resources available to him since 2000, and instead has opted to seek a windfall by instituting this baseless claim. Additionally, Plaintiff admits that, for several years, he told no one of his alleged enslavement or of Defendants' failures to pay him as promised (Pl.'s Dep.140:20-142:17, Mar. 17, 2008).

**PLAINTIFF'S REPEATED FAILURES TO**
**COMPLY WITH THIS COURT'S DISCOVERY ORDERS**

Plaintiff made his mental and emotional state from August 2000 through June 2007 the linchpin of his Complaint. As a result, Defendants sought production of all written communications between Plaintiff and his family, friends and congregants during this period. Plaintiff admitted he had such communications (Pl.'s Dep. 10:8-12:9, Jan. 15, 2008; 67:11-69:9, Mar. 17, 2008). When Plaintiff failed to produce anything at all in response to discovery demands, Defendants sought an order from Magistrate Pollack, directing Plaintiff to produce outstanding discovery. The Order was issued on February 28, 2008 (Brecher Declaration Ex. A). Plaintiff opposed that application with a letter to the Court from Plaintiff's counsel that Plaintiff's own associate complained to Magistrate Pollack at a January 2008 conference was false (Brecher Declaration Ex. G).

To this day, despite the very clear orders of the Court to produce documents and the laptop computer, Plaintiff has failed to produce them and has not reasonably explained such failures. As directed by the Magistrate's November 7, 2008 Order, on November 21, 2008 Defendant's counsel wrote, yet again, to Plaintiff's counsel indicating the missing production that was ordered by the Court to be produced by Plaintiff (Brecher Declaration Ex. F). And, yet again, Plaintiff failed to produce anything, refusing to provide any reply whatsoever to Plaintiff, prior to the December 3, 2008 close of discovery directed by the Court, until Plaintiff's reply on December 17, 2008 (Brecher Declaration D). As discussed hereinabove, the Plaintiff's December 15, 2008 affidavit is a fabrication that only serves to reinforce Defendants' argument as to Plaintiff's bad faith and lack of credibility (Brecher Declaration E).

As of today, discovery having been closed on December 3, 2008, the Defendants have not received a single document of any kind from the Plaintiff that the Court ordered to be

produced. Plaintiff has not produced the laptop computer. Plaintiff has not provided reasonable justification for this total failure of production.

The record, including the statements and actions of Plaintiff and his counsel at depositions and before Magistrate Pollack, evidence the Plaintiff's willingness to lie to the Court, to make contradictory statements in discovery, to act in a dilatory manner, and document Plaintiff's willful refusal to produce material evidence despite several orders of this Court requiring such production. Lacking any written evidence to support his claims, and Plaintiff's credibility being central to his allegations of his subjective internal feelings of entrapment in slave-like conditions, Plaintiff's contradictory statements and discovery failures support an order finding spoliation, that an adverse inference be drawn as to Plaintiff's mental and emotional state from August 6, 2000 through June 25, 2007, and recommending the dismissal of the Complaint with prejudice, costs and such sanctions as this Court may deem appropriate.

There is no reason for the Defendant Ashram to have been put to the substantial expense and time involved in defending Plaintiff's specious claims and having to overcome Plaintiff's dilatory behavior in discovery. Plaintiff has engaged in a campaign to embarrass and demean the Defendants as evidenced by the filing of this Complaint and statements made in the press and media (See, e.g., Brecher Declaration Ex. I). The damage already done to the Ashram will take time to mitigate. The continuation of this baseless and unnecessarily time consuming and expensive proceeding only exacerbates the damages to the Defendants and serves the Plaintiff's improper purpose here, manifest in his discovery failures, and in the bizarre requests for relief.

**POINT II.**

**SPOLIATION OCCURRED HERE WARRANTING A RECOMMENDATION
THAT THE COMPLAINT BE DISMISSED, WITH SANCTIONS**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). The requisite elements of a spoliation claim are: (i) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (ii) the evidence was destroyed with a culpable state of mind; and (iii) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks and citation omitted).

In Kronisch v. United States, the Court asserted that a party is obligated to safeguard evidence when it "has notice that the evidence is relevant to litigation . . . [or] should have known that the evidence may be relevant to future litigation." Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir.1998). From the outset, the sole basis of Plaintiff's allegations has been that he could do nothing to help himself because, for seven years, he was imprisoned by his own internal to mental anguish, stemming from his feelings of being trapped in slave-like conditions of involuntary servitude. A determination of the Plaintiff's claims requires proofs regarding the Plaintiff's state of mind during this period, and clearly, some of the best proofs as to this critical issue would be Plaintiff's contemporaneous written communications with third parties. Defendants made requests for production of these written communications on November 26, 2007, specifically requesting all written communications between Plaintiff and his family, friends and congregants, including those that were stored on Plaintiff's computer, Exhibit H to

the Brecher Declaration. At the very latest, in November 2007, Plaintiff knew that evidence contained on his computer and in letters from his family would be relevant and material to his allegations and to the Defendants' defenses in this action and, therefore, Plaintiff knew in 2007 that he had an obligation to preserve that evidence.

The second element of a spoliation claim is the requisite showing of culpability. The Second Circuit has found that negligence is a sufficiently culpable state of mind to satisfy this element. See Residential Funding Corp., 306 F.3d at 108; NTL, Inc. Sec. Litig., 244 F.R.D. 179, 197-98 (S.D.N.Y. 2007). The Plaintiff's recent explanation for his failure to comply with that portion of the Court's Orders regarding his laptop computer is that the computer is in the possession of one of the Ashram's former devotees, who has since relocated to India. Even if the Court is to assume that this explanation is true, allowing a third party to take possession of evidence that Plaintiff knew would be relevant to the defendant's case and that had been ordered produced is negligent.

The third prong of a spoliation claim is the demonstration that evidence would have been relevant to a party's claims or defenses. One example of relevance is presented in Plaintiff's own sworn testimony, in which he expressly discussed the contents of the emails he sent to his niece during the relevant period: "[w]e just used to ask each other, 'how are you' and 'how everything is, how are you doing,' these types of things….". (Pl.'s Dep. 183:4-6, June 16, 2008). Clearly, if Plaintiff was in as much mental distress as he claims, this would be reflected in his responses to emails from his family asking how he was doing. Therefore, the contents of these missing emails and other missing communications are relevant and material here, since they would discuss Plaintiff's state of mind during his period of alleged slavery and abuse and would

shed light on Plaintiff's own contemporaneous perception of his surroundings, the linchpin of Plaintiff's case.

Courts have also found that the moving party is not necessarily required to show relevance if the opposing party acted in bad faith because "bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." Residential Funding Corp., 306 F.3d at 109. Plaintiff's dilatory and improper behavior is well documented. The Plaintiff's direct contravention of several Court Orders demonstrates the extent to which the Plaintiff has acted in bad faith not only in regard to his failure to produce documents and laptop computer requested in production, but throughout the entire litigation.

New York Courts have found that dismissal of a case is particularly appropriate in cases involving willfulness, bad faith, or fault by the spoliators. Beer v. General Motors Corp., No. 97 Civ. 482, 1999 WL 325378 at *4 (S.D.N.Y. May 17, 1999). It is clear that in the instant action, Plaintiff has manifested a pattern of bad faith throughout the entire discovery process. Plaintiff had a duty to preserve the documents and the laptop computer at the onset of litigation, and this duty was further emphasized with each document request and Court Order. At the least, Plaintiff acted negligently and in breach of this duty by allowing, as Plaintiff claims, a third party to take possession of the laptop computer and transport it to India. In Beer, the court found that a lesser sanction than dismissal of the case "would not likely remedy the wrong [defendant] has suffered," Id. at *6. The evidence contained on the Plaintiff's laptop computer was necessary to develop the parties' claims and defenses. In the absence of the ordered documents and computer, Defendants will not know "what sanction it wants the court to impose because it will never know of defenses an inspection may have revealed." Id.

Similarly, in <u>Metropolitan Opera Ass'n, Inc. v. Local 100, et al.</u>, 212 F.R.D. 178 (S.D.N.Y. 2003) the court entered a default judgment against a party because it found that "it is beyond peradventure that many documents have been destroyed that related directly to events taking place during the most critical time period in this action." <u>Id.</u> at 229. Moreover, that court found that lesser sanctions such as a finding of adverse inference or preclusion would not be sufficient because "wholesale destruction of documents, by omission or commission, [which] has made that preferred path impossible." <u>Id.</u> at 230. <u>See</u> <u>also</u> <u>Skywark v. Isaacson</u>, No. 96 Civ. 2815, 1999 WL 1489038, at *16 (S.D.N.Y. Oct. 14, 1999) (where the court granted judgment against the plaintiff who "rather than having fully corrected his misdeeds, ... filled the record with desperate excuses and additional lies to try to cover-up earlier wrongdoings."); <u>American Cash Card Corp. v. AT&T Corp.</u>, 184 F.R.D. 521, 525 (S.D.N.Y. 2002) (where the court granted summary judgment after the defendants failed to comply with the numerous discovery orders, because the court found any other sanctions would be inadequate).

Plaintiff's uncorroborated and belated explanation for his failure to comply with the Court's several discovery orders, viewed in conjunction with the general untrustworthiness, and inconsistent and dilatory manner in which Plaintiff and his counsel have conducted themselves throughout the duration of this action support a positive finding of spoliation. Based on a finding of spoliation, it is respectfully requested that the Court dismiss the instant complaint and assess remedial sanctions against the Plaintiff.

# POINT III

## DEFENDANTS ARE ENTITLED TO AN ADVERSE INFERENCE AS TO PLAINTIFF'S STATE OF MIND, MENTAL AND EMOTIONAL CONDITIONS

The Second Circuit has determined that when there is a "breach of a discovery obligation, [and this breach] is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including . . . an adverse inference." Residential Funding Corp. v. Degeorge Financial Corp., 306 F.3d 99, 100 (2d Cir. 2002). An adverse inference is an equitable device that serves the remedial purpose, "insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party". Kronisch at 126 (2d Cir. 1998).

An adverse inference "provides [a] necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." Residential Funding Corp. at 108. An adverse inference is available not only where the evidence at issue has been destroyed, but also where it has not been timely produced or not produced at all. In such situations, the party seeking the instructions is required to show:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Id. at 107.

It is respectfully submitted that Defendants can carry their burden as to each of these three prongs and are entitled to the adverse inference.

As to the first two prongs, the numerous requests and Court orders confirm Plaintiff's obligation to produce the documents and the computer. (See Brecher Declaration Ex. A, B, and

C).  Copies of relevant portions of Deposition transcripts are filed with the Brecher Declaration. Yet, without a reasonable or believable explanation, Plaintiff repeatedly failed to produce any of the ordered documents and failed to produce the computer.  Furthermore, Plaintiff possessed the requisite culpability, as evidenced by statements made by Plaintiff's counsel's associate at a conference held with Magistrate Pollack.  During the conference Mr. Chaubey's associate stated that the letter sent by Mr. Chaubey, blaming his former associate for discovery delay, was false. (Brecher Declaration Ex. G). The statement by the associate, made before Magistrate Pollack, clearly corroborates the onset of a pattern of purposely dilatory and improper behavior by the Plaintiff that is complained of here.

As to the third prong, the Plaintiff's alleged mental state, that is, his subjective feeling of being trapped and not knowing what to do resulting from the alleged slave-like conditions of his employment from August 6, 2000 through June 25, 2007, is the key issue to be determined here by the trier of fact.  Therefore, the ordered missing documents and the laptop computer that Plaintiff has failed to produce are clearly relevant to the Defendants' defenses. That is, a reasonable trier of fact could find that this missing evidence would support the defenses that are asserted here. Specifically these defenses include that Plaintiff had his passport, that he was not treated like a slave, that he was not living in slave-like conditions, that he was free to leave whenever he wished, and other denials stated in Defendants' Answer.

Courts have been mindful not to hold the prejudiced party to a standard that is too strict because "doing so would subvert the purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from their destruction." Kronisch at 128.  That is, even if the relevance of the missing computer and documents is not obvious to the Court, the Second Circuit has found that "a judge's finding that a party acted with gross negligence or in bad faith

with respect to discovery obligations is ordinarily sufficient to support a finding that the missing or destroyed evidence would have been harmful to that party, even if the destruction or unavailability of the evidence was not caused by the acts constituting bad faith or gross negligence." Id.

The Second Circuit has endorsed a "case by case approach to the failure to produce relevant evidence," because "such failures occur along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality." Reilly v. National Markets Group Inc., 181 F3d 253, 267 (2d Cir. 1999). This Court has "leeway to tailor sanctions to ensure that spoliators do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." Id. at 267.

"[I]t makes little sense to confine promotion of [the adverse inference's] remedial purpose to cases involving only outrageous culpability, where the party victimized by the spoliation is prejudiced irrespective of whether the spoliator acted with intent or gross negligence." Id. at 267-68. In other words, while the court in Reilly made it clear that something less than intentional conduct could suffice, it did not establish a hard-and-fast rule setting a minimum level of gross negligence. In the instant case, the Court can see that, at the very least, Plaintiff has been grossly negligent. We argue that the record shows that Plaintiff has withheld the ordered discovery intentionally and in bad faith.

For these reasons, Defendants are entitled to the requested adverse inference that the discovery that was repeatedly requested, ordered to be produced but ultimately not produced would support Defendants' defenses and would contradict Plaintiffs allegations of forced labor, involuntary servitude, false imprisonment and severe emotional distress. Moreover, Plaintiff's dilatory and improper behavior in discovery also warrants such sanction. With such an adverse

inference, it is respectfully submitted, the entire Complaint fails to state a claim and it should, therefore, be dismissed.

## POINT IV

### PLAINTIFF'S DILATORY AND IMPROPER BEHAVIOR IN DISCOVERY MERITS SANCTIONS

Plaintiff and his counsel engaged in a pattern of dilatory behavior that is manifest in Plaintiff's counsel's own letters and false statements to the Court. Examples of such improper behavior include: a letter that Plaintiff's counsel's own associate informed the Court was false (Brecher Declaration Ex. G); repeated failures and refusals to produce ordered documents; failures and refusals to answer questions at depositions; and Plaintiff's counsel's repeated interruptions and improper speaking objections, which are apparent upon review of the deposition transcripts, submitted herewith. Cited portions of the deposition transcripts are particularly relevant because they present examples of counsel's improper speaking objections and Plaintiff's changed answers and refusals to answer that are patently purposeful, ridiculous and dilatory.

An example of Plaintiff's counsel's repeated interruptions is illustrated on page 36 of the transcript of the May 6, 2008 deposition of the Plaintiff. Here, Mr. Chaubey made a speaking objection and the Plaintiff then promptly changed his testimony in accord with Mr. Chaubey's speaking objection (Pl.'s Dep. 36: 6-19, May 6, 2008). Specifically, when the Plaintiff was asked about Sahni, his initial response was that "Sahni told Sharma" (Pl.'s Dep. 36: 9, May 6, 2008). However, immediately subsequent to Mr. Chaubey's drawn-out six page objection, Plaintiff changed his response to "I'm just guessing" and "I don't know what went on . . ." (Pl.'s Dep. 42:24-43:13, May 6, 2008).

Another example of Plaintiff's counsel's inappropriate behavior is illustrated beginning on page 66 of the May 2008 deposition where Plaintiff refused to answer a question. (Pl.'s Dep. 66:5-24, May 6, 2008). Mr. Chaubey was asked to instruct his client to answer a question in accordance with the instructions of Magistrate Pollack, who had given these specific instructions to avoid this precise problem. However, Mr. Chaubey refused to instruct his client on the record. (Pl.'s Dep. 66:25-82:51). This was followed by a telephone conference with Magistrate Pollack. (Pl.'s Dep. 83- 91, May 6, 2008). This pattern of behavior is consistent with many other instances throughout the depositions. (See also, Pl.'s Dep. 48:18-55:11, Jan. 16, 2008; 38:23-39:4, 41:10-43:5, 67:20-80; 100:22-101:25, Mar. 17, 2008; 89:10-90:22, Apr. 1, 2008; 20:24-32-3, Apr. 14, 2008).

It is respectfully submitted that the continuing pattern of dilatory behavior here merits such additional sanctions as this Court deems appropriate.

## POINT V

### THE MINISTERIAL EXCEPTION DEPRIVES THIS COURT OF SUBJECT MATTER JURISDICTION

#### (A)    THE MINISTERIAL EXCEPTION APPLIES TO THE ALLEGATIONS OF THIS COMPLAINT

In addition to the foregoing reasons why Plaintiff's claims should be dismissed in their entirety, it is respectfully submitted that, pursuant to FRCP 12(b)(1), this Court is precluded from asserting jurisdiction over this matter because the ministerial exception deprives the Court of subject matter jurisdiction to hear Plaintiff's claims. The ministerial exception is a common law doctrine rooted in the Free-Exercise Clause and the Establishment Clause of the First Amendment that "severely circumscribes the role that civil courts play in adjudicating disputes

that involve internal church affairs."  See e.g., Serbian E. Orthodox Diocese v. Milivojevich, 426

U.S. 696 (1976).  It is a constitutionally compelled limitation on civil authority that ensures that

no branch of government intrudes on "the most spiritually intimate grounds of a religious

community's existence." E.E.O.C. v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 800

(4th Cir. 2000).

The Free Exercise Clause under the First Amendment strictly protects the rights of

religious organizations from judicial intervention and adjudication of disputes involving religious

doctrine and practice. In relevant part, the First Amendment provides that "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . . "

U.S. Const., Amend. I. That is, "[t]he Free Exercise Clause protects not only the individual's

right to believe and profess whatever religious doctrine one desires but also a religious

institution's right to decide matters of faith, doctrine and church governance." Little v. Wuerl,

929 F.2d 944, 947 (3d Cir.1991).  By interfering with the internal affairs of a church, the

government places an impermissible burden on religious beliefs.

Other courts have stated their concerns by implicating the Establishment Clause of

Article III.  These courts base the ministerial exception in the need to avoid excessive state

interference in church matters that would inevitably occur if courts are forced to take sides in

religious disputes. See e.g., Tomic v. Catholic Diocese, 442 F.3d 1036, 1038 (7th Cir 2006).  In

the instant action, where the relationship between the parties is completely within the religious

context of the priest and his church-employer, an inquiry into the plausibility of the sweeping

and nonspecific allegations that Plaintiff acknowledged were all in relation to his employment by

the Defendant Ashram, would certainly have constitutional implications.  Moreover, Plaintiff's

own testimony confirms that his alleged mistreatment and underpayment, as well as the totally

psychological basis of his supposed imprisonment, are all related to how he viewed the Defendants' treatment of him as breaching the teachings of their Hindu religion. (Pl.'s Dep. 118:16-122:11, Mar. 17, 2008).  Similarly, assessment of the payments made to the Plaintiff for private services held in homes of the congregants of the Defendant Ashram, the appropriateness of tasks assigned to the Plaintiff by Defendants, and his underpayment for his alleged excessively long hours of work inside the Ashram property would involve the Court in exactly the type of matters that the Establishment Clause and Free Exercise Clause are meant to prevent.

**(B)      THE MINISTERIAL EXCEPTION BARS PLAINTIFF'S FIRST AND SECOND CLAIMS OF TRAFFICKING IN PERSONS AND FORCED LABOR**

The crux of Plaintiff's First and Second Claims is that Defendants violated the Trafficking and Violence Protection Action ("TVPA") and the Fair Labor Standards Act ("FLSA") because they forced Plaintiff to commence his daily devotional prayers at 6 a.m., and on certain holy days of the year, these prayers would last until after 10 p.m.  (Compl. ¶ 25). Additionally, Plaintiff claims that "[o]n numerous religious holy days, programs and religious festivals would continue throughout the night until morning." (Compl. ¶ 26) Plaintiff complains that, in seven years, the Ashram never allowed him a vacation (Compl. ¶27), that "on numerous occasions" the Defendants did not allow him to keep his honorarium given to him by congregants (Compl. ¶ 39), and that he was underpaid (Compl. ¶ 40). These are precisely the types of issues of religious practice and doctrine that the Free Exercise and Establishment Clause were designed to protect. If these allegations survive a motion to dismiss, this Court will inevitably be forced to make a decision regarding the appropriateness of Hindu religion practice by the Defendant Ashram and its officials, the Individual Defendants.  The Court would become excessively entangled in matters of religion if it is called upon to make judgments regarding appropriateness of the

duration or specific hours of prayer.  Plaintiff asks the Court to delve into how payments and donations made by congregants should be divided between a priest and his church. These types of assessments by the courts are precisely what the Establishment Clause seeks to avoid.

Similar to the present case, the plaintiffs in <u>Schleicher v. Salvation Army</u>, 518 F.3d 472 (2008), brought a claim against the Salvation Army Church, charging violations of minimum wage and overtime provisions of the FLSA.  The suit was dismissed on the basis of the ministerial exception.  In <u>Schleicher</u>, plaintiffs received a weekly allowance, which they contended was below the federal minimum wage, given the number of hours they worked.  <u>Id.</u> at 474.  The Seventh Circuit Court unequivocally stated that there is a "presumption that clerical personnel are not covered by the Fair Labor Standards Act." <u>Id.</u> at 477.

The holding in <u>Schleicher</u> is consistent with the holdings of other courts that have been presented with similar issues of the applicability of the FLSA to ministerial employees.  For example, the Fourth Circuit in <u>Shaliehsabou v. Hebrew Home of Greater Washington,</u> 363 F.3d 299 (4th Cir. 2004) "recognized that there is a ministerial exception to the FLSA." <u>See</u> <u>also</u>, <u>Fassl v. Our Lady of Perpetual Help Roman Catholic Church,</u> 2005 WL 2455253, at *10 (E.D. Pa. Oct. 5, 2005) ("Federal courts have routinely applied the ministerial exception in FLSA cases."); <u>Patsakis v. Greek Orthodox Archdiocese,</u> 339 F.Supp.2d 689, 694 (W.D. Pa. 2004) ("[T]his court is unaware of any case that has declined to apply the ministerial exception to other federal employment statutes such as . . . the Fair Labor Standards Act."); <u>E.E.O.C v. First Baptist Church</u>, 1992 WL 247584, at *10 (N.D. Ind. June 8, 1992) (recognizing ministerial exception's application to FLSA claim).  Even the U.S. Department Labor, the agency responsible for enforcing the FLSA, has recognized this exception: "[p]ersons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious orders who serve pursuant to their

religious obligations in the schools, hospitals, and other institutions operated by their church or religious order shall not be considered to be "employees." See Shaliehsabou, 363 F.3d at 306.

Based on similar logic utilized by courts in their application of the ministerial exception toward the FLSA, this Court must resist adjudicating Plaintiff's TVPA claims. More specifically, as the Fifth Circuit explained, "[t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose." McClure v. Salvation Army, 460 F.2d 553, 558-59 (1972). In the instant action, all of what Plaintiff complains of were activities directed by the Defendant Ashram. If the Court decides to scrutinize these baseless allegations, unsupported by a single document, and events testified to in unspecific terms as to unspecified dates, it will ultimately lead to the very type of interference that the First Amendment proscribes, namely deciding issues of religious doctrine and internal church governance.

(C)     **THE MINISTERIAL EXCEPTION ALSO
BARS ALL OF PLAINTIFF'S COMMON LAW CLAIMS**

Since the basis of the ministerial exception is rooted in the Constitution, the Free Exercise Clause and the Establishment Clause similarly bar common law employment-related and tort claims. For example, in Kraft v. Rector, 2004 WL 540327, plaintiff brought a claim against her former employer, asserting various common law claims, which included breach of contract, tortious interference with contract, wrongful discharge, wrongful denial of employment benefits and defamation. Plaintiff argued that she was terminated without cause and did not receive the benefits to which she was entitled. Defendants argued that plaintiff was terminated for cause; namely, that certain expenditures made by plaintiff from her discretionary fund and on the church credit card were improper and in violation of canon law. The court found that it was barred from adjudicating this type of dispute because it involved assessing the reasons for a

24

church's decision to terminate one of its ministers. More importantly, however, the court specifically refused to examine whether challenged expenditures furthered plaintiff's ministry or whether they complied with canon law, as it would likely entangle the court in a religious dispute. Id., at *1. See also Lewis v. Seventh Day Adventists Lake Region Conference, 978 F.2d 940 (1992) (The Sixth Circuit held that a minister's claims for breach of contract, promissory estoppel, intentional infliction of emotional distress and his spouse's claim for loss of consortium were barred by First Amendment considerations.); Natal v. Christian Missionary Alliance, 878 F.2d 1575 (The First Circuit held that a wrongful termination claim by a religious employee asserting breach of contract, damage to reputation and emotional distress was barred by the Free Exercise Clause.); Fraser v. Salvation Army, 1998 WL 13272 (E.D. Pa.) (The district court held that the First Amendment precluded it from adjudicating a complaint containing a variety of contract and tort claims.).

In the instant action, Plaintiff acknowledges that he was, at all relevant times, a priest at the Ashram.[1] In his claims of involuntary servitude, FLSA violations, breach of contract, quantum meruit, unjust enrichment, fraud and constructive fraud, false imprisonment, infliction of emotional distress and civil conspiracy, the Third through Thirteenth claims in the Complaint, Plaintiff requests that this Court make determinations regarding his duties and supervision, as well as compensation and salary allegedly owed to him, which necessarily would require the Court to scrutinize the internal management of this and similar ashrams in the community. Moreover, Defendants have asserted that Plaintiff brought this claim after they discovered that Plaintiff was competing with his own church and diverting funds and services that the Ashram provided. For the reasons explained above, the Free Exercise Clause bars the Court from the

---

[1] See Compl. ¶ 18 ("Plaintiff came to the United States . . . and began administering to his congregation, as per his legal, spiritual, and moral duty as a Hindu Priest.").

common law disputes alleged in the Complaint.

In keeping with Supreme Court and Circuit Court precedent, it is respectfully requested that this Court find that the ministerial exception prohibits this Court from adjudicating Plaintiff's claims against the Defendants because resolution of the dispute would encroach upon the constitutionally protected relationship between a church, its minister and his supervisors.

**POINT VI**

**THE RECORD DOES NOT SUPPORT THE NINTH AND TENTH CLAIMS
OF FALSE IMPRISONMENT AND INTENTIONAL INFLICTION
<u>OF EMOTIONAL DISTRESS</u>**

A successful claim for intentional infliction of emotional distress requires a showing:

> (i) that defendant's conduct was extreme and outrageous, (ii) intended to cause severe emotional distress, (iii) formed the nexus between the conduct and injury, and (iv) resulted in severe emotional distress.  <u>Howell v. N.Y. Post Co.</u>, 81 N.Y.2d 115, 121(1993).

In the instant action, Plaintiff is unable to make the minimum showing of proof of extreme and outrageous conduct required to withstand a motion for summary disposition and Plaintiff's repeated and purposeful failures in discovery further serve to undermine these claims. Therefore, Plaintiff cannot prove severe emotional distress.

New York courts have set a high threshold for conduct that qualifies as "extreme and outrageous."  Mere insults, indignities and annoyances have consistently failed to meet the standard for conduct that rises to the level of extreme and outrageous. <u>See</u> <u>Leibowitz v. Bank Leumi Trust Co. of New York</u>, 548 NYS2d 513 (2nd Dept. 1989).  Nor have death threats been held to be sufficiently extreme and outrageous to survive a motion to dismiss a complaint

alleging intentional infliction of emotional distress. <u>Owen v. Leventritt, et. al.</u>, 571 N.Y.S.2d 25 (N.Y. App. Div. 1991). Even in instances where the plaintiff has alleged a deliberate and malicious campaign of harassment, courts have been reluctant to uphold a plaintiff's verdict for intentional infliction of emotional distress. <u>Seltzer v. Bayer</u>, 272 AD2d 263, 265 (2000). Therefore, it is clear that in order to survive a motion to dismiss, allegations of intentional infliction of emotional distress have to be supported by conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> at 264.

Plaintiff in the present case does not state any specific facts or behavior that could possibly qualify as "extreme and outrageous" or that present a genuine issue for trial. Plaintiff's own testimony at the depositions confirms that Defendants' actions fail to even remotely satisfy the extreme and outrageous conduct required for a successful intentional infliction of emotion distress claim and Plaintiff's bizarre claim of a seven year period of false imprisonment is not credible.

The basis of the Plaintiff's entire Complaint is his admittedly wholly subjective sense of feeling trapped, which is unsupported by any evidence that suggests that there was physical constraint or abuse of the Plaintiff by the Defendants. On the contrary, Plaintiff's testimony confirms that Plaintiff was free to come and go from the Ashram as he pleased, evidenced by his shopping, personal errands, visits to congregants outside of the Ashram, and his participation in religious radio and television shows on numerous occasions over the course of several years. Moreover, Plaintiff's general good health and weight gain during the alleged period of abuse supports the conclusion that not only was he not being physically and emotionally abused, but that he was provided with luxuries he did not have before coming to the Ashram. This includes

amenities such as cable television, a laptop computer with internet access, cellular telephone, international calling cards and even custom made clothing.

Plaintiff's own testimony contradicts his allegations of extreme and outrageous behavior. For example, Plaintiff claims that in 2004 he told certain congregants about the Defendants' mistreatment of him and that, by 2005, he had told so many congregants that he was not able to even remember the names of all the congregants to whom he reported the Defendants' mistreatment (See Pl.'s Dep. 19:10-22:17, May 6, 2008). If the Defendants' behavior was so outrageous, it is implausible that not a single worshiper chose to take any affirmative action to assist Plaintiff for over three years. In reality, Plaintiff only left the Ashram after Defendants had discovered that Plaintiff was competing with his own church.

The record is devoid of any conduct that rises to the level of having been extreme and outrageous as Plaintiff has failed to show any conduct that would qualify as harassment, let alone a deliberate or malicious campaign of intimidation. See, e.g., Nader v. General Motors Corp., 25 N.Y.2d 560, 569 (1970) (where the court states that the conduct must rise to "an extreme or outrageous level where severe mental pain or anguish [was] inflicted through a deliberate and malicious campaign of harassment or intimidation"). Absent such a showing, Plaintiff's claim of intentional infliction of emotional distress should be dismissed.

**POINT VII**

**PLAINTIFF'S FIRST AND SECOND CLAIMS OF TRAFFICKING
AND FORCED LABOR DO NOT SATISFY STATUTORY REQUIREMENTS**

Congress enacted the Victim Protection Reauthorization Act of 2003 (VPRA) in the U.S.A.'s continued effort to eradicate modern day slavery and exploitation that persists as a result of human trafficking. One of the main objectives of the VPRA was to create a private right

of action for victims of human trafficking. Plaintiff's First and Second Claims allege violations of §§1590 and 1589 of the TVPA. Yet, Plaintiff does not offer any support to sustain these claims.

Specifically, § 1589 of the TVPA states:

> Whoever knowingly provides or obtains the labor or services
> of a person—
> (1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) by means of the abuse or threatened abuse of law or the legal process, shall be fined under this title or imprisoned not more than 20 years, or both.

Plaintiff has failed to plead with any specificity that any of the three elements have been met. Instead, the Complaint contains wholly conclusory allegations that are unsubstantiated by any evidence. For example, the entirety of Plaintiff's claim in this regard is contained in ¶¶ 43 and 45, which respectively state:

> Individual Defendants knowingly recruited, transported, and harbored the Plaintiff so as to obtain his labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Trafficking provisions of the Trafficking Victims Protection Act, 18 U.S.C §1590. . . . As a proximate result of Individual Defendants' conduct, Plaintiff has suffered damage.

Plaintiff does not plead specific details that indicate how the Plaintiff was allegedly recruited through threats of serious harm or abuse of the legal process, how Plaintiff was transported and harbored through such means, or how he suffered any damage.

Plaintiff's allegation is that he was forced to work at the Ashram "through a practice and pattern of psychological abuse, isolation, and exploitation." (Compl. ¶ 30) Not only does the Complaint fail to offer sufficient substantiation for this claim, but Plaintiff's testimony during his deposition is in direct contradiction to this allegation. Plaintiff testified that he frequently traveled outside the Ashram to visit congregants or friends at their homes and offices. Plaintiff

also testified that he regularly left the Ashram to do his personal errands such as shopping and laundry and that he was a regular participant on a religious radio talk show and had appeared on a television show. These admissions are in direct contradiction to Plaintiff's claim that he was kept isolated and exploited by the Defendants.

Similarly, Plaintiff's other TVPA claim alleges a violation of §1590, which states that: "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be [liable under this article]." However, this claim suffers from the same critical flaw described above, in that there is no support for these sweeping allegations.

Both the First and Second Claims cannot survive a motion to dismiss for failure to state a claim upon which relief may be granted, under Rule 12(b)(6) of FRCP. Plaintiff has not provided any conceivable facts which would entitle him to relief under TVPA. A plaintiff has an obligation under Rule 8(a)(2) to provide the grounds of his or her entitlement to relief. <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955 (2007). This "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do". <u>Id</u>. at 1965. Factual allegations must be enough to raise a right to relief above the speculative level, treating the factual allegations as true. <u>Id</u>. Plaintiff admitted in his deposition testimony that there is no evidence to support the contention that Plaintiff was a victim of any sort of mental or physical threats, other than the manifestations of his own imagination.

The record is barren of any indication that Defendants were perpetuating any type of scheme that was intended to intimidate or scare the Plaintiff. Therefore, the First and Second claims should be dismissed.

**PLAINTIFF'S THIRD CLAIM OF INVOLUNTARY
SERVITUDE, BROUGHT BY AN EDUCATED, HEALTHY PLAINTIFF
WHO LITERALLY AND FIGURATIVELY HELD THE KEYS
TO HIS OWN FREEDOM, FAILS TO STATE A PROVABLE CLAIM**

The Thirteenth Amendment and 18 U.S. § 1584 contain broad prohibitions against involuntary servitude. However, Plaintiff's claim should be dismissed because it fails to prove an essential element of an involuntary servitude claim. The Supreme Court in U.S. v. Kozminski, 487 U.S. 931 (1988), expressly asserted "that the language and legislative history of § 1584 both indicate that its reach should be limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion. Congress chose to use the language of the Thirteenth Amendment in § 1584 and this was the scope of that constitutional provision at the time § 1584 was enacted." Id. at 948.

In Kozminski, the Government supported an expansive definition of involuntary servitude, which would include almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work through psychological coercion, judged from the alleged victim's subjective point of view. The Supreme Court, however, was unconvinced by the Government's reasoning and stated:

> This interpretation would appear to criminalize a broad range of day-to-day activity . . . . the type of coercion prohibited would depend entirely upon the victim's state of mind. Under such a view, the statutes would provide almost no objective indication of the conduct or condition they prohibit, and thus would fail to provide fair notice to ordinary people who are required to conform their conduct to the law. Id. at 949-50.

The Supreme Court's interpretation of § 1584 supports a finding in favor of Defendants' Motion to dismiss because this claim is based entirely on Plaintiff's state of mind. Plaintiff's allegations and his testimony are devoid of any showing of physical threats instituted by Defendants to

coerce Plaintiff into continuing to work at the Ashram. On the contrary, Plaintiff admits that he was allowed to leave the Ashram as he wished, communicated with the outside world using a cellular telephone, international calling cards and email, and regularly made guest appearances on television and radio talk shows.

The instant case is even more persuasive than <u>Kozminski</u> because in <u>Kozminski</u> the allegations were against defendants who were holding two mentally retarded farm workers. In the present case, by his own admission, Plaintiff is a healthy and highly educated man, with sound intellectual capacity and there is no reason to believe that he was in any way vulnerable or prohibited from enjoying the right and privilege conferred on him by the Thirteenth Amendment and laws of the U.S.A. to be free from involuntary servitude. In his deposition testimony, Plaintiff claimed that, throughout the period of August 6, 2000 through June 25, 2007, Plaintiff gave advice and counsel to others. Plaintiff also alleged that he competently conducted all of his duties as a priest ministering to a congregation. Therefore, Plaintiff cannot possibly prove he was "uniquely vulnerable and incapable of self-protection," <u>Guice Mills v. Forbes</u>, 863 N.Y.S.2d 874, 878 (2008), wording utilized by the Court in a different but analogous fact pattern. Plaintiff's claim is undermined by his own testimony, and this is dramatically clear in the transcripts of Plaintiff's depositions. (Signature, notarization and correction pages of Plaintiff's deposition transcripts are annexed hereto as Exhibit J.)

Plaintiff has failed to show the requisite element of physical coercion necessary for a successful claim of involuntary servitude and therefore, Plaintiff's third claim of relief should be dismissed.

## CONCLUSION

The Complaint is not worthy of belief, and Plaintiff's pattern of willful failures in discovery would merit dismissal of a complaint that had less bizarre allegations and that turned less on issues of credibility. Therefore, Defendants' Motion to dismiss should be granted with prejudice and with sanctions.

Dated:        January 27, 2009
               New York, New York

By:         _____
             Dan Brecher, Esq.
             Law Offices of Dan Brecher
             Attorney for Claimants
             99 Park Avenue, 16th Floor
             New York, New York 10016
             (212) 286-0747