UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DEVENDRA SHUKLA,

                      Plaintiff,

            - against -

SAT PRAKASH SHARMA, individually
and as Director of VISHVA SEVA ASHRAM
of NEW YORK, et al.,

                 Defendants.
----------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

07 CV 2972 (CBA)

On July 23, 2007, plaintiff Devendra Shukla commenced this action against defendant

Vishva Seva Ashram of New York, d/b/a Sarva Dev Mandir (the "Ashram"), and against Sat

Prakash Sharma ("Sat Sharma") and Geeta Sharma, individually and as directors of the

Ashram.  Plaintiff alleges that defendants tricked him into leaving India to come to the United

States and once plaintiff was here, defendants subjected him to exploitative work conditions

through psychological and emotional abuse in violation of the forced labor and trafficking

provisions of the Victims of Trafficking and Violence Protection Act of 2000, 18 U.S.C. § 1595.

In addition, plaintiff alleges violations of the Fair Labor Standards Act, 28 U.S.C. § 216(b), and

New York State wage and hour laws, based on defendants' alleged failure to pay plaintiff

minimum wages and overtime.

     Following discovery, defendants moved to dismiss plaintiff's claims and for summary

judgment, asserting that:  1) the undisputed facts demonstrate that plaintiff cannot sustain his

burden of showing that he was mistreated and underpaid; 2) the Court lacks subject matter

jurisdiction based on the "ministerial exception;" and (3) plaintiff's failure to comply with this

Court's discovery orders merits dismissal or, in the alternative, an adverse inference and other appropriate relief, as a sanction for spoliation of the evidence. For the reasons set forth below, it is respectfully recommended that defendants' motion be granted in part, denied in part.

## FACTUAL BACKGROUND

Plaintiff Shukla is a 33 year old citizen of India, who arrived in the United States on August 6, 2000, with an employment visa and Indian passport. (Defs.' 56.1 Stmnt ¶¶ 1-2; Compl. ¶¶ 1, 14, 17, 19, 22).[1] Plaintiff traveled from India on an R-1 visa for religious workers to work for the Ashram as a Hindu Priest. (Defs.' 56.1 Stmnt ¶¶ 2-3; Compl. ¶¶ 17, 18, 19, 22). Plaintiff remained in the United States continuously from his arrival until June 25, 2007. (Defs.' 56.1 Stmnt ¶¶ 4, 9; Compl. ¶¶ 7).

The Ashram is a not-for-profit[2] religious organization located at 104-38 Corona Avenue, Corona, New York. (Defs.' 56.1 Stmnt ¶ 6; Compl. ¶¶ 10, 55, 63). The individual defendants, Sat Prakash Sharma and Geeta Sharma, are officers and directors of the Ashram. (Defs.' 56.1 Stmnt ¶ 7; Compl. ¶ 63). From August 6, 2000 until June 25, 2007, plaintiff lived in the Ashram, officiated as priest over prayer services in the Ashram and in devotees' homes, and performed other services, such as coordinating weekly gatherings, ministering to the congregation, and

---

[1] Citations to "Defs.' 56.1 Stmnt" refer to the 56.1 Statement of Material Facts Not in Dispute, filed by defendants on January 28, 2009. Citations to "Compl." refer to plaintiff's Complaint, filed on July 23, 2007. Plaintiff did not submit a responsive 56.1 Statement. See discussion infra at 17.

[2] Although plaintiff alleges in his Complaint that the Ashram is a Section 501(c)(3) non-profit organization, in response to defendants' challenge to subject matter jurisdiction based on the "ministerial exception," plaintiff now disputes the Ashram's not-for-profit status. See discussion infra at 11-12.

cleaning the Ashram. (Defs.' 56.1 Stmnt ¶ 9; Compl. ¶ 25). According to defendants, plaintiff is university educated and speaks several languages. (Defs.' 56.1 Stmnt ¶ 13 (citing Pl.'s Dep.[3] at 109)). Plaintiff contends that he is conversant only in Hindi and Sanscrit, is unable to communicate in English, and is educated only in the Hindu religion. (Pl.'s Mem.[4] at 10).

Plaintiff alleges that defendants "trafficked Plaintiff to the United States ostensibly to be a Hindu priest for the congregation" of the Ashram. (Id. at 7). Once he arrived here, plaintiff claims that defendants withheld plaintiff's passport to prevent him from leaving the United States and failed to update his Visa, "compell[ing] Plaintiff" to become "an illegal alien . . . thus allowing defendants to continue treating him like a slave." (Id. at 7-8). Plaintiff further alleges that he was subjected to exploitative work conditions, "tortured, abused, and forced to live under enslaved conditions." (Id. at 8). Plaintiff claims that when he finally was able to leave the Ashram, he left with nothing but a few belongings. (Id.) He also claims that he ultimately obtained his passport from defendants through the efforts of members of the congregation and the police. (Id. (citing Ex. F)).

Defendants dispute plaintiff's claims, noting that plaintiff was in good health and mentally capable of performing his duties. (Defs.' 56.1 Stmnt ¶ 14). Defendants also claim that despite his claims of enslavement, plaintiff left the Ashram by himself to do laundry and travel to the homes and offices of other members of the congregation, unaccompanied by defendants. (Id. ¶¶ 11, 12). Defendants further note that during his first three years at the Ashram, plaintiff never

---

[3]Citations to "Pl.'s Dep." refer to the deposition taken of plaintiff on the date specified in the citation.

[4]Citations to "Pl.'s Mem." refer to the Memorandum of Law in Opposition to Defendants' Motion to Dismiss and Motion for Summary Judgment, dated April 2, 2009.

told anyone of his fears and living conditions, and he did not report any abuse to any authority until June 2007. (Id. ¶¶ 16, 17). Defendants contend that plaintiff chose to stay in the United States, that defendants told him he could return to India if there was an emergency, and that plaintiff trusted defendants as late as 2005. (Id. ¶¶ 18-19).

Defendants contend that, in accordance with accepted Hindu temple standards (id. ¶ 25), the Ashram provided plaintiff with a salary, free room and board, free medical treatment, transportation and certain clothing. (Id. ¶ 24). At plaintiff's request, defendant Geeta Sharma sent some of plaintiff's salary to plaintiff's family in India. (Id. ¶ 27). Plaintiff also received "tips" from worshipers when he visited them at their homes or offices to conduct prayer services or weddings. (Id. ¶ 26). Defendants further contend that plaintiff had full use of a cellular telephone, phone cards, and a computer with internet access, as well as his own email address. (Id. ¶ 21). During the relevant period, plaintiff sent and received emails and letters from his family, and he received other documents, such as horoscopes, over the internet. (Id. ¶ 22). During the period 2002 to 2004, he made a number of guest appearances on television and radio shows geared toward the Indian community. (Id.) Defendants claim that plaintiff chose to stay in the United States, that the first time he told his family members in India that he was unable to return to India was in 2005 or 2006, and that he did nothing to report his involuntary servitude or otherwise deal with his condition for years, even though he admits that he knew he could call 911 for help. (Id. ¶¶ 19, 33, 34, 35).

4

DISCUSSION

A.  <u>Subject Matter Jurisdiction</u>[5]

Defendants  move to dismiss plaintiff's claims in their entirety on the grounds that the "ministerial exception" doctrine deprives the Court of subject matter jurisdiction to hear plaintiff's claims.

1)  <u>Standards</u>

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, where there is a challenge to the subject matter jurisdiction of the court, the plaintiff bears the burden of proving proper jurisdiction. Fed. R. Civ. P. 12(b)(1); <u>see</u> <u>Robinson v. Overseas Military Sales Corp.</u>, 21 F.3d 502, 507 (2d Cir. 1994); <u>see also</u> <u>Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y.</u>, No. 01 CV 7871, 2004 WL 540327, *3 (S.D.N.Y. Mar. 17, 2004).  Here, where the defendants assert the "ministerial exception" defense, the proper procedural mechanism is a Rule 12(b)(1) motion.  <u>See</u> <u>Patsakis v. Greek Orthodox Archdiocese of America</u>, 339 F. Supp. 2d 689, 692-93 (W.D. Pa. 2004) (citing cases).  The plaintiff's burden depends on the procedural posture of the case; if the court holds an evidentiary hearing on the issue of jurisdiction, the plaintiff must demonstrate jurisdiction by a preponderance of the evidence.  <u>See</u> <u>Met Life Ins. Co. v. Robertson-Ceco</u>, 84 F.3d 560, 567 (2d Cir. 1996); <u>Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y.</u>, 2004 WL 540327, at *3.  Here, where neither party has requested an evidentiary hearing and the salient facts do not appear to be in dispute, the Court is free to consider and weigh the evidence in order to satisfy itself that it has the authority to hear the case.

---

[5]Although this is not the first issue defendants raise in their motion, the Court has addressed it first because the Court has no authority to consider the other claims in the absence of subject matter jurisdiction.

5

2) The Ministerial Exception

In challenging subject matter jurisdiction in this case, defendants seek to apply the "ministerial exception" defense, contending that adjudicating plaintiff's claims would violate both the Free Exercise Clause and the Establishment Clause of the First Amendment.

The ministerial exception is a common law doctrine that limits civil authorities from intruding into the internal affairs of religious associations. "Federal courts are secular agencies. They therefore do not exercise jurisdiction over the internal affairs of religious organizations." Tomic v. Catholic Diocese of Peoria, 442 F.3d 1036, 1037 (7th Cir. 2006) (citing cases).

Numerous federal courts of appeals have held that the Free Exercise Clause bars the application of federal and state anti-discrimination statutes to employment decisions made by religious organizations with respect to their ministers, including claims brought under Title VII, the Fair Labor Standards Act (the "FLSA"), the Americans with Disabilities Act, and the Age Discrimination in Employment Act. See, e.g., Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 311 (4th Cir. 2004) (extending the ministerial exception to the FLSA claims of a "mashgiach," a Jewish nursing home's kosher supervisor appointed by a board of Jewish rabbis to guard against violations of Jewish dietary laws); Gellington v. Christian Methodist Episcopal Church, Inc., 203 F.3d 1299, 1303-04 (11th Cir. 2000) (affirming dismissal of Title VII retaliation and discharge claims brought by minister who was reassigned to a new church for assisting another employee in filing a complaint against church elders); Young v. Northern Illinois Co. of United Methodist Church, 21 F.3d 184, 187-88 (7th Cir. 1994) (affirming dismissal of race and gender-based Title VII claims following church's denial of a promotion to a minister); Minker v. Baltimore Annual Conf. of the United Methodist Church, 894 F.2d 1354,

6

1358 (D.C. Cir. 1990) (affirming dismissal of minister's ADEA claims where church denied him

a pastorship); Fassl v. Our Lady of Perpetual Help Roman Catholic Church, No. 95 CV 404,

2005 WL 2455253, at *6 (E.D. Pa. Oct. 5, 2005) (explaining that because the FMLA is based on

provisions of the FLSA and tracks its language, the court would apply the ministerial exception

to the FMLA because it has routinely been applied in FLSA cases); Patsakis v. Greek Orthodox

Archdiocese of America, 339 F. Supp. 2d at 694 (citing cases).

      Given that the ministerial exception is grounded in the First Amendment, it may be

applied "to any federal or state cause of action that would otherwise impinge on the Church's

prerogative to choose its ministers." Werft v. Desert SW Annual Conf. Of United Methodist

Church, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004). See also O'Connor v. Church of St. Igantius

Loyola, 8 A.D.3d 125, 779 N.Y.S.2d 31 (1st Dep't 2004) (applying ministerial exception to state

employment discrimination claims); Faur v. Jewish Theological Seminary of America, 146

A.D.2d 566, 536 N.Y.S.2d 516 (2d Dep't 1989) (affirming dismissal of rabbinical professor's

gender-based discrimination claim under state law, because deciding such a claim would require

the court to impermissibly interfere in religious matters).

      In analyzing the Free Exercise Clause, the Supreme Court has explained that the absolute

prohibition on court interference in employment decisions concerning ministers stems from the

need to respect a church's ability to manage its own internal affairs, including the selection and

retention of its clergy. See, e.g., Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696,

724-25 (1976); Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 16 (1929).  The

courts' exercise of jurisdiction in these cases would raise concerns that the secular courts would

be evaluating or interpreting religious doctrine and that simply investigating claims by ministers

7

against their church would "necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal." Combs v. Central Texas Annual Conf. of United Methodist Church, 173 F.3d 343, 350 (5th Cir. 1990) (citations omitted).  "The relationship between an organized church and its ministers is its lifeblood." McClure v. The Salvation Army, 460 F.2d 553, 558 (5th Cir. 1972).

Thus, not only are the questions surrounding the selection of a minister matters of church governance, so too are the questions surrounding the "determination of a minister's salary, his place of assignment, the duty he is to perform in the furtherance of the religious mission of the church." Id. at 559.  Even when such decisions affect civil rights, the decisions of proper ecclesiastical tribunals are accepted by the courts as conclusive.  See Kedroff v. St. Nicholas Church, 344 U.S. 94, 116, 73 S. Ct. 143, 155, 97 L. Ed. 120 (1952).  Faced with claims of discrimination, a church is "likely to defend its employment action on grounds related to church needs rooted in church doctrine." Tomic v. Catholic Diocese of Peoria, 442 F.3d 1036, 1040 (7th Cir. 2006) (declining to consider age discrimination claim of church music director and organist in light of defense that he was dismissed for his choice of music for Easter services). Thus, courts have generally held that they lack jurisdiction to hear suits involving employment decisions by churches or other religious organizations with respect to their ministers or priests "because the Free Exercise Clause bars court involvement in the employment relationship between a minister and a church." Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y., 2004 WL 540327, at * 4.

Even where there is a written employment agreement between the minister and her church, courts have held that the Free Exercise Clause bars a court from adjudicating claims

8

related to decisions "concerning employment of ministers." See, e.g., id. at *5. However, "[i]t is important to note that the Court does not hold that the Free Exercise Clause bars a court from adjudicating every dispute that might arise in the context of an employment contract between a minister and her church. The Court's holding is limited to a church's decisions concerning employment of ministers." Id. For example, a court would not necessarily bar a claim that the church failed to pay the minister's utilities bills because such a suit does not involve a challenge to the church's decision to terminate the minister, and the ministerial exception only bars consideration of suits alleging adverse personnel actions. Id. at n.13.

Courts have also addressed whether "religious institution" in the context of the "ministerial exception" applies only to churches or church-operated entities. Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d at 309. Courts have held that religiously affiliated schools, hospitals and corporations qualify as "religious institutions" for purposes of the ministerial exception. See, e.g., EEOC v. Catholic Univ., 83 F.3d 455, 461 (D.C. Cir. 1996) (church affiliated university); Natal v. Christian & Missionary Alliance, 878 F.2d 1575, 1578 (1st Cir. 1989) (non-profit religious corporation). In Scharon v. St. Luke's Episcopal Presbyterian Hosp., the court found that the chaplain of a church-affiliated hospital fell within the ministerial exception because the hospital was acting as "an institution with 'substantial religious character.'" 929 F.2d 360, 362 (8th Cir. 1991) (citing Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S. Ct. 2105, 2113, 29 L. Ed. 2d 745 (1971)). Similarly, the court in Shaliehsabou v. Hebrew Home of Greater Wash., Inc. found that even though the Hebrew Home's mission was to provide elder care, it was a religious institution because its mission was "marked by clear or obvious religious characteristics." 363 F.3d at 310.

9

Defendants also rely on the Establishment Clause of the First Amendment to argue that the Court lacks jurisdiction to hear plaintiff's claims.  The Establishment Clause bars the exercise of jurisdiction "where resolution of the dispute would result in the 'entanglement' of government with religion." Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y., 2004 WL 540327, at *5 (citing Gargano v. Diocese of Rockville Centre, 80 F.3d 87, 90 (2d Cir. 1996)). As the court in Kraft, noted, "[t]he key difference between a Free Exercise Clause analysis and an Establishment Clause analysis, is that the former focuses on the nature of the parties involved in the dispute, whereas the latter focuses on the issues that would have to be addressed in order to resolve the suit." 2004 WL 540327, at *3.

3) Analysis

In responding to defendants' arguments, plaintiff concedes that he is a Hindu priest, who was admitted to the United States on an R-1 visa for religious workers, and that he administered to the congregation of the Ashram, leading all devotional prayers at the Ashram and congregants' homes.  (Compl. ¶¶ 14, 16, 17, 18, 25).  He argues, however, that the ministerial exception does not preclude his claims because:  1) the Second Circuit does not recognize the ministerial exception; and 2) "the Ashram is a For-Profit Domestic Business Corporation, unlike other religious organizations."  (Pl.'s Mem. at 20).  With respect to his first argument, the Second Circuit recently affirmed the vitality of the ministerial exception doctrine, noting that in the context of discrimination suits brought by employees, the "ministerial exception is constitutionally required by various doctrinal underpinnings of the First Amendment." Riveyemamu v. Cote, 520 F.3d 198, 207 (2d Cir. 2008).

With respect to the second argument, plaintiff asserts that the Ashram is not a charitable

or religious organization because it is a for-profit domestic business corporation, and therefore

the ministerial exception does not bar the court from exercising jurisdiction over plaintiff's

claims. (Pl.'s Mem. at 21). According to plaintiff, defendant Sat Prakash Sharma admitted on

pages 21 through 23 of his August 9, 2008 deposition that the Ashram is a for-profit domestic

business corporation. (Pl.'s Mem. at 20). However, these pages make no mention of the

corporate status of the Ashram and, in fact, at another point in the same deposition, Sat Prakash

Sharma unequivocally stated that the Ashram: "is a not-for-profit." (Sat Aug. 9, 2008 Dep.[6] at

7).

Furthermore, defendants dispute plaintiff's otherwise unsupported claim that the Ashram

is a for-profit business organization, citing not only the aforementioned testimony of defendant

Sat, but also other documentary evidence, including official correspondence from the Internal

Revenue Service ("IRS"), dated April 23, 2008, which verifies the Ashram's tax exempt status.

(Brecher Reply Dec.[7] Ex. Q). The April 2008 IRS letter states: "[o]ur records indicate that a

determination letter was issued in August 1980, that recognized you as exempt from Federal

income tax, and discloses that you are currently exempt under section 501(c)(3) of the Internal

Revenue Code" (the "Code"). (Id.) Defendants have also submitted a copy of the Ashram's

Exempt Organization Certificate from the State of New York, dated November 19, 1991

(Brecher Reply Dec. Ex. Q), and an additional letter from the IRS, dated January 7, 2005,

---

[6]Citations to "Sat Dep." refer to the deposition taken of defendant Sat Prakash Sharma on the date specified in the citation.

[7]Citations to "Brecher Rep. Dec." refer to the Reply Declaration of Dan Brecher In Support of Defendants' Motions for Spoliation, Adverse Inferences, and To Dismiss the Complaint, dated April 16, 2009.

returning the Ashram's Form 990 and confirming that the Ashram is a "religious organization exempt from income tax under Section 170(b)(1)(A)(I)" of the Code.  (Brecher Reply Dec. Ex. R).

Apart from asserting an unsubstantiated allegation that the Ashram is a for-profit organization, plaintiff has failed to cite a single authority that supports the proposition that an entity's not-for-profit status is determinative of whether it is a religious organization entitled to invoke the ministerial exception.  Clearly, plaintiff's own allegations regarding his role as priest, presiding over religious services and ministering to his congregants, demonstrates that the primary mission of the Ashram is to act as an institution with "'substantial religious character,'" Scharon v. St. Lukes Episcopal Presbyterian Hosp., 929 F.2d at 362 (citing Lemon v. Kurtzman, 403 U.S. at 616, 91 S. Ct. at 2113), and to provide religious and spiritual support to its congregants.  Similarly, there is no dispute that plaintiff is a Hindu priest and that his main duties place him clearly within the definition of "clergy" to whom the exception would normally apply.

Moreover, the aspects of this case relating to the duties plaintiff was required to perform as priest of the Ashram implicate many of the concerns that have motivated courts to hesitate in interfering in the relationship between religious organizations and their clergy.  As plaintiff notes in his Memorandum of Law, among the issues he believes are in dispute and must be tried are whether defendants "utilized Plaintiff's services beyond the scope of appointment of priest" and whether defendants are in violation of federal and state wage laws.  (Pl.'s Mem. at 11-12).

Certainly, the case law is clear that plaintiff's claims relating to overtime wage law violations under the FLSA and state law fall clearly within the ministerial exception.  See, e.g., Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d at 306-07; Patsakis v. Greek

12

Orthodox Archdicese of America, 339 F. Supp. 2d at 694. Under the FLSA, there are two requirements that must be met before the wage and overtime provisions apply to any claim: 1) the employer must be an "[e]nterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s)(1); and 2) the person seeking coverage must be an "employee." 29 U.S.C. § 203(e). The Wage and Hour guidelines issued by the Department of Labor specifically provide that "[p]ersons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious orders who serve pursuant to their religious obligations in schools, hospitals and other institutions operated by their church or religious order shall not be considered to be 'employees.'" Field Operations Handbook, Wage and Hour Division, U.S. Dep't of Labor, Ch. 10b03(b) (1967). Thus, given the undisputed fact that plaintiff is a Hindu priest who was hired to perform ministerial services for the Ashram, the Court finds that the plaintiff's FLSA and state law claims fall directly within the ministerial exception and respectfully recommends that they be dismissed for lack of subject matter jurisdiction.

Whether the ministerial exception applies to the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 et seq., however, is an open question.[8] Indeed, the parties have not cited, nor has the Court found, any cases discussing the ministerial exception in this context. Briefly, the TVPA is a relatively new statute, signed into law by President Clinton in 2000, that, among other things, bans forced labor, human trafficking into involuntary servitude, and sex

---

[8] Note that the Trafficking Victims Protection Act is a subsection of the more comprehensive Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, Div. A, §§ 101-113, 114 Stat. 1464 (2000).

13

trafficking.  See id. § 1589-91.[9]  Congress passed the law pursuant to its enforcement powers under Section 2 of the Thirteenth Amendment.

Here, as a preliminary matter, the standards that govern what constitutes trafficking and forced labor do not depend on the interpretation of religious doctrine; rather they are secular standards that guarantee that employers cannot deprive employees of fundamental human rights. Thus, unlike analyzing suits brought under federal and state employment laws, exploring the ills that the TVPA is meant to combat – namely, trafficking and forced labor – does not require courts to unduly interfere with the internal affairs of religious organizations or get involved in the selection or retention of ministers.  Furthermore, a suit under the TVPA is not analogous to a suit under federal and state employment laws, because it is not brought in response to an adverse employment action.  As the Court in Kraft noted, the ministerial exception only bars suits relating to adverse personnel actions, not "every dispute that might arise in the context of an employment [relationship]."  Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y., 2004 WL 540327, at * 5.

Although labor and employment laws seek to eradicate certain societal evils, such as poverty and discrimination, the TVPA seeks to address the evil of human trafficking and *forced* labor, both of which strike directly at the core individual liberty.  That is, the TVPA protects infringement upon an individual's liberty from unlawful restraint in an attempt to eradicate modern-day slavery.  The type of abuse addressed by the TVPA is so extreme, offensive, and contrary to fundamental human rights as to distinguish it from the type of conduct that ordinarily

---

[9]The relevant text of the statute, along with an analysis of its provisions, is provided supra page 19.

gives rise to violations of labor and employment laws.   Given the relative magnitude of the deprivation of individual liberty in cases covered by the TVPA, and the international scope and significance of human trafficking, the TVPA transcends the boundaries of the ministerial exception. See Riveyemamu v. Cote, 520 F.3d 198, 209 (noting that boundaries to the exception exist, but declining to delineate the boundaries).

Accordingly, the Court declines to apply the ministerial exception to P's claim under the TVPA and concludes that the Court has subject matter jurisdiction to decide plaintiff's claims under the TVPA.


B. Plaintiff's Exploitation Claims

Defendants have also moved to dismiss[10] these TVPA claims, arguing that even assuming the truth of plaintiff's claims, plaintiff has not provided any evidence that would entitle him to relief under the TVPA. (Defs.' Mem.[11] at 30).

---

[10]Although defendants have styled their arguments against the First and Second Claims of the Complaint as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), for failure to comply with the requirements of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545-56, 127 S. Ct. 1955, 1959 (2007) (holding that to survive a motion to dismiss, a plaintiff must set forth sufficient facts to make the plaintiff's case plausible, not merely possible), defendants have referred in their motion papers to plaintiff's deposition testimony and other information beyond the four corners of the Complaint.  Accordingly, the motion is more appropriately considered under the standards set forth in Fed. R. Civ. P. 56.  In converting the motion to a motion for summary judgment, the Court has considered the evidence cited by the parties and not just the allegations in the Complaint.

[11]Citations to "Defs.' Mem." refer to the Memorandum Of Law In Support Of Defendants' Motions For An Adverse Inference, And To Dismiss Plaintiff's Complaint Pursuant To Fed. R. Civ. P. 9(b), 12(b)(6), 37(b)(2)(A)(I), (ii), (v), (vi), And 56, dated January 27, 2009.

1) <u>Summary Judgment Standards</u>

It is well-settled that a party moving for summary judgment has the burden of establishing

that there is no genuine issue of material fact in dispute and that the moving party is entitled to

judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 256 (1986); <u>Thompson v. Gjivoje</u>, 896 F.2d 716, 720 (2d Cir. 1990).  Since summary

judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case

to the jury, <u>see</u> <u>Egelston v. State Univ. Coll. at Geneseo</u>, 535 F.2d 752, 754 (2d Cir. 1976);

<u>Gibralter v. City of New York</u>, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary

judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant

summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains

for trial." <u>Auletta v. Tully</u>, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and

citations omitted), <u>aff'd</u>, 732 F.2d 142 (2d Cir. 1984).  In addition, "'the inferences to be drawn

from the underlying facts . . . must be viewed in the light most favorable to the party opposing

the motion.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88

(1986) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)); <u>see also</u> <u>Richardson v.</u>

<u>New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen

considering a motion for summary judgment the court must draw all factual inferences and

resolve all ambiguities in favor of the nonmoving party").

Once the moving party discharges its burden of proof under Rule 56(c), the party

opposing summary judgment "has the burden of coming forward with 'specific facts showing

that there is a genuine issue for trial.'" <u>Phillips v. Kidder, Peabody & Co.</u>, 782 F. Supp. 854, 858

(S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)).  Rule 56(e) "provides that a party opposing a

16

properly supported motion for summary judgment may not rest upon mere allegation or denials

of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  Indeed, "the mere existence

of *some* alleged factual dispute between the parties" alone will not defeat a properly supported

motion for summary judgment. Id. at 247-48 (emphasis in original).  Rather, enough evidence

must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at

248 (internal citation omitted).

    2) Non-Compliance with Local Rule 56.1

    As an initial matter, plaintiff does not appear to have complied with Local Rule 56.1 by

filing a response to Defendants' Statement of Undisputed Facts.

    Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern

and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary

judgment to submit "a separate, short and concise statement" of the allegedly undisputed material

facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is

no genuine issue to be tried. See Local Rule 56.1(a); see also Giannullo v. City of New York,

322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir.

2001).  The Rule further requires that the statement of undisputed facts contain citations to

admissible evidence supporting each asserted material fact.  Local Rule 56.1(d); see Giannullo v.

City of New York, 322 F.3d at 143 (reversing the district court's grant of summary judgment

because there was insufficient evidence in the record to support certain critical assertions in the

moving party's statement of material facts); see also Watt v. New York Botanical Garden, No. 98

CV 1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000).

    The party opposing a motion for summary judgment is also required to submit a

counter-statement controverting the moving party's statement of material facts, indicating which facts are in dispute that would require a trial.  Local Rule 56.1(b).  Under the Local Rule, "[i]f the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." Giannullo v. City of New York, 322 F.3d at 140 (citing Local Rule 56.1(c)).  Where the party opposing a motion for summary judgment fails to submit a proper counter-statement of material facts, controverting the moving party's statement, courts have deemed the moving party's statement of facts to be admitted and have granted summary judgment in favor of the moving party on the basis of the uncontroverted facts.  See, e.g., Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000) (affirming grant of summary judgment based on plaintiff's failure to submit a statement pursuant to Rule 56.1); Sawyer v. Wight, 196 F. Supp. 2d 220, 225 (E.D.N.Y. 2002) (noting that "[t]he Second Circuit permits District Courts to grant summary judgment to moving parties on the basis of their uncontroverted 56.1 Statements").

        In the instant case, because plaintiff failed to file a counter-statement of material fact in response the Statement of Material Facts filed by defendants in support of their motion for summary judgment, that failure alone would justify deeming the defendants' statement of facts to be admitted.  Local Rule 56.1(a); see also Millus v. D'Angelo, 224 F.3d at 138; Sawyer v. Wight, 196 F. Supp. 2d at 225; cf. MSF Holding Ltd. v. Fiduciary Trust Co., Inter., 435 F. Supp. 2d 285, 304-05 (S.D.N.Y. 2006) (denying motion for summary judgment for failure to submit a 56.1 statement); Searight v. Doherty Enterprises, Inc., No. 02 CV 0604, 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005) (denying motion for summary judgment for failure to submit a 56.1 statement).  Thus, the Court could choose to evaluate defendants' motion for summary judgment

18

based on a finding that the factual allegations of defendants are uncontroverted. See Millus v. D'Angelo, 224 F.3d at 138.

However, district courts are given "broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001); Healthfirst, Inc. v. Medco Health Solutions, Inc., No. 03 CV 5164, 2006 WL 3711567, at *5 (S.D.N.Y. Dec. 15, 2006). Where parties fail to file a Rule 56.1 Statement of Fact or a responsive counter-statement, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion for summary judgment, or may alternately "opt to conduct an assiduous review of the record." Id. (internal quotations and citations omitted); see also Sawyer v. Wight, 196 F. Supp. 2d at 225 (noting that where Rule 56.1 has not been properly followed, courts "may discretionarily choose to search the record of their own accord") (citations omitted).

In this case, counsel for plaintiff submitted his client's affidavit and his own affirmation and exhibits in support of the motion for summary judgment. His papers provide clear reference to the record, which the Court has thoroughly reviewed. Given that the issues raised here are thoroughly explored in the motion papers and the record, the Court declines to accept the factual assertions of defendants as uncontroverted and considers plaintiff's submissions on this motion for summary judgment despite his failure to strictly comply with Local Rule 56.1.

3) Standards for Claim Under TVPA

Defendants contends that the First and Second Claims of plaintiff's Complaint fail to adequately allege the elements necessary to pursue claims under either Section 1589 or 1590 of the TVPA. (Defs.' Mem. at 29). Under the TVPA, a party who is a victim of human trafficking

19

may assert a private right of action under sections 1589 and 1590 of the Act,[12]  Section 1589

provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by
> any one of, or by any combination of, the following means -- (1) by means of
> force, threats of force, physical restraint, or threats of physical restraint to that
> person or another person; (2) by means of serious harm or threats of serious harm
> to that person or another person; (3) by means of the abuse or threatened abuse of
> law or legal process; or (4) by means of any scheme, plan, or pattern intended to
> cause the person to believe that, if that person did not perform such labor or
> services, that person or another person would suffer serious harm or physical
> restraint, shall be punished . . . .

Section 1590 of the Act provides:

> (a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any
> means, any person for labor or services in violation of this chapter shall be fined
> under this title or imprisoned not more than 20 years, or both.

As an initial matter, the Court notes that there do not appear to be any cases discussing

the type of evidence necessary before civil liability may be imposed upon a defendant.

Accordingly, the Court looks to criminal prosecutions under the statute to provide some

guidance.

In this context, courts have made clear that the TVPA applies in cases where defendants

inflict non-physical, psychological harm, as well as physical harm. See generally Kathleen Kim,

Symposium, *Psychological Coercion in the Context of Modern-Day Involuntary Labor:*

*Revisiting* United States v. Kozminski *and Understanding Human Trafficking*, 30 U. Tol. L. Rev.

---

[12]Section 1595 of the TVPA states: "(a) An individual who is a victim of a violation may
bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by
receiving anything of value from participation in a venture which that person knew or should
have known has engaged in an act in violation of this chapter) in an appropriate district court of
the United States and may recover damages and reasonable attorneys fees." 18 U.S.C.A. § 1595.

941, 965 (2007).  In <u>United States v. Garcia</u>, for instance, the court noted that "Section 1589 is
intended to address the increasingly subtle methods of traffickers who place their victims in
modern-day slavery, such as where traffickers threaten harm to third persons, restrain their
victims without physical violence or injury, or threaten dire consequences by means other than
overt violence." No. 02 CR 110S-01, 2003 WL 22956917, at *4 (W.D.N.Y. Dec. 2, 2003)
(citing H.R. Conf. Rep. No. 106-939 at 101 (2000), 2000 SL 1479163 (Oct. 5, 2000)); <u>see also</u>
<u>United States v. Bradley</u>, 390 F.3d 145, 150 (1st Cir. 2004), <u>vacated on other grounds</u> 545 U.S.
1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005) (opining that "'serious harm' was intended to
encompass not only physical violence, but also more subtle psychological methods of coercion").

   In <u>Bradley</u>, defendants were convicted under the TVPA for allegedly obtaining the
services of Jamaican immigrants for their tree removal company by threats of serious harm,
including psychological coercion. <u>United States v. Bradley</u>, 390 F.3d at 148.  Among other
things, the government introduced evidence that the immigrants were subjected to "yells, curses
and intimidation at work," and that one of the defendants "occasionally pushed [the employee]
down" at work.  When one of the men fled, defendants threatened that they would "'kick his
ass,'" and call the police, the FBI, and the immigration service. <u>Id.</u>  Defendants implied that
they had ordered the murder of previous employees and one of the defendants stated that he
would "'take his gun and go to New York and look for [the individual who had fled].'" <u>Id</u>.
Defendants also took the employees' passports, kept tabs on the men's whereabouts even though
they were able to travel on their own, and hindered their ability to seek medical treatment. <u>Id.</u>

   In evaluating the district court's jury instruction, the First Circuit noted that the statutory
term "serious harm" was intended to encompass more than just physical violence, but also non-

21

physical coercion. Id. The lower court's instruction read:

> The government. . .need not prove physical restraint; such as, the
> use of chains, barbed wire, or locked doors, in order to establish
> the offense of forced labor. The fact that [the employees] may
> have had an opportunity to flee is not determinative of the question
> of forced labor if either or both of the defendants placed Mr. Hutchinson
> or Mr. Flynn in such fear or circumstances that he did not reasonably
> believe he could leave."

The test of whether an employee faces undue psychological pressure is objective, "asking how a reasonable employee would have believed." United States v. Bradley, 390 F.3d at 153. However, known objective conditions that make the victim especially vulnerable to pressure, such as youth or immigrant status, bear on whether the employer obtained the labor from the employee by forbidden means. Id.

In another one of the few recorded TVPA prosecutions, United States v. Marcus, the court held that evidence that the defendant coerced the victim into providing labor or services for a pornographic website was sufficient to support a conviction for violating Section 1589 of the TVPA, even though the victim and the defendant had an ongoing domestic relationship. 487 F. Supp. 2d 289, 310-311 (E.D.N.Y. 2007), vacated on other grounds, 538 F.3d 97 (2d Cir. 2008). The evidence presented at trial to establish that the defendant had coerced the victim into forced labor included not only the victim's testimony about the serious physical and sexual abuse the defendant imposed on her, but also her testimony about threats that the defendant made of sending sexually explicit videotapes to her father and killing her godson. Id. at 296.

4) Analysis

Here, defendants contend that the Complaint fails to plead with specificity any details as to how the defendants allegedly recruited plaintiff through threats of serious harm or abuse of the

22

legal process or how plaintiff was transported or harbored through such means. (Defs.' Mem. at

29). Although plaintiff's Complaint alleges that he was forced to work at the Ashram "through a

pattern of psychological abuse, isolation, and exploitation" (Compl. ¶ 30), defendants argue that

his deposition testimony directly contradicts these allegations. (Defs.' Mem. at 29).

Defendants cite plaintiff's own testimony establishing that plaintiff "was free to come and

go from the Ashram as he pleased." (Defs.' Mem. at 27). Specifically, plaintiff testified that he

frequently traveled outside the Ashram to visit congregants or friends at their homes or offices

unaccompanied by either of the defendants (Pl.'s Mar. 17, 2008 Dep. at 58, 61); that he left the

Ashram by himself to conduct personal errands, such as shopping and laundry (Pl.'s Apr. 1, 2008

Dep. at 95-96); and that he was a regular participant in a religious radio talk show and on a

television show. (Pl.'s Mar. 17, 2008 Dep. at 30-36, 39-40). Plaintiff also acknowledged that

defendants told him that if there was an emergency requiring him to go to India, he could always

go. (Pl.'s May 6, 2008 Dep. at 125).

Defendants point out that despite his claims of feeling trapped and being held as a

"prisoner" from August 6, 2000 until June 25, 2007, plaintiff acknowledges that for the first three

years, he told no one of his feelings of fear and slave-like conditions, nor did he report his poor

treatment to any authority until June 2007. (Pl.'s Mar. 17, 2008 Dep. at 64-66, 141). Plaintiff

did not ask anyone for help, even though during a substantial portion of his time at the Ashram,

he had possession and full use of a cellular telephone, phone cards, and a computer with internet

access including a personal email address. (Pl's Mar. 17, 2008 Dep. at 98-100; Pl.'s Apr. 1, 2008

Dep. at 66-67, 129-30). Furthermore, he knew he could call 911 for help. (Pl.'s Apr. 1, 2008

Dep. at 64).

23

A review of the plaintiff's deposition[13] indicates that, like the employees in <u>United States v. Bradley</u>, plaintiff's claims are largely based on feelings of fear and psychological coercion. Shortly after arriving in the United States, the defendants spoke to him by telephone from India and they told him not to go out with anyone, that "[i]f you go out, it won't be good for you." (Pl's Mar. 17, 2008 Dep. at 11). Although plaintiff did testify that he left the Ashram on various occasions to visit congregants and to do his laundry, plaintiff testified that he would either be accompanied by one of the defendants or other people would pick him up and drop him off again; he was given three hours and he claims that if was not back in time, Geeta Sharma would yell and scream at him. (<u>Id.</u> at 53; see Pl.'s April 14, 2008 Dep. at 67). She allegedly told him: "You could. . . end up going to a jail if you don't listen to me, whatever I tell you to do." (<u>Id.</u>)

Plaintiff testified that upon his arrival in the United States, defendants took plaintiff's passport (which plaintiff claims was his only form of identification) and then failed to update his visa, so he was forced to become undocumented. Although he does not allege that defendants made any threats of bodily harm to him or his family members or restrained him in any way, he testified that threats were made to him that caused him to be afraid to go to the police or to the Embassy. (<u>Id.</u> at 87). He testified that even though he knew he could go to the Embassy, "I was under so much fear, I was scared to go anywhere by myself." (<u>Id.</u>)

Among other things, plaintiff testified that defendants recorded his telephone conversations with his wife, and used to "track him." (<u>Id.</u> at 99; Pl.'s April 1, 2008 Dep. at 8).

---

[13]As noted <u>supra</u>, plaintiff has failed to respond to the defendants' Rule 56.1 Statement and has not cited to any pages in the deposition transcript to refute defendants' arguments. Having conducted a review of the transcript, the Court finds that plaintiff's responses to certain of defendants' counsel's questions are not as clear as defendants' motion suggests they may be.

Specifically, plaintiff claims that defendant Sharma did the following:

> He used to track me. He used to show me news and he used to let
> me know what's going on, like after the 911 incident they arrested
> so many people and he used to track me like that, if you don't listen
> to me and you do as I tell you, I have a lot of friends, I have attorney,
> lawyers, you can be in a lot of trouble. You have to listen to me as I
> tell you.

(Pl.'s April 1, 2008 Dep. at 8). Sharma allegedly told him, "I can get you deported and also I can

put you in jail." (Id. at 9). At one point, when he asked for his money, the defendants told him,

"If you don't sign this, you know there will be very bad outcome for you and you don't know

how powerful we are." (Pl's Mar. 17, 2008 Dep. at 12).

Beyond the psychological coercion which plaintiff alleges, plaintiff also alleges that there

were acts of physical harm inflicted against him. Specifically, plaintiff claims that defendant

Sharma's brother slapped him on one occasion when plaintiff did not cook for him, and he

claims he was forced to sleep on the floor when Sharma's brother came to visit. (Pl.'s May 6,

2008 Dep. at 32, 147). He claims that the basement room in which he was assigned to sleep was

flooded with dirty black water in 2001, destroying his mattress and requiring him to sleep on a

piece of plywood covered with blankets, because defendants refused to replace the mattress (id.

at 152-53). He also complains that there was inadequate air conditioning and heat in the Temple.

(April 14, 2008 Dep. at 38, 59).

Although plaintiff does not claim that he was suffering any mentally infirmity during this

period, there are issues of fact in dispute regarding defendants' claims that he had access to the

outside world that was unregulated by the defendants.   Similarly, to the extent that defendants

contend that he was fully integrated into the community of congregants and served as their

25

spiritual advisor without any identified problems, plaintiff has testified that he was so afraid of

the defendants that he could not reveal to the other congregants or to his family how he was

being treated.  If the jury credits his testimony that he was shown videos of September 11, 2001

and told that he would be mistreated if defendants revealed to authorities his undocumented

status,[14] the jury may find that this was sufficient psychological coercion, coupled with the taking

of his passport, his lack of command of the English language, and the threats made by defendants

to constitute a violation of the TVPA.

Accordingly, given that the resolution of the plaintiff's claims depends on an assessment

of the credibility of the various parties, it is respectfully recommended that summary judgment be

denied on these remaining claims in the Complaint.


C.  Sanctions for Alleged Spoliation

In the event that the court denies summary judgment on the grounds discussed above,

defendants have also moved to dismiss the Complaint as a sanction for plaintiff's failure to

comply with this Court's discovery orders.  (Defs.' Mem. at 12).  In the alternative, defendants

seek an adverse inference instruction based on plaintiff's failure to produce his laptop computer

and other personal correspondence, as well as costs and other appropriate relief.  (Id. at 16).

1)  Standards for Spoliation

Rule 37 of the Federal Rules of Civil Procedure authorizes a court to impose various

sanctions when a party "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P.

---

[14]The Court notes that defendants vigorously dispute the veracity of some of these claims
and deny that there was any evidence whatsoever of force or coercion.

37(b)(2); see also Transatlantic Bulk Shipping Ltd. v. Saudi Chartering, S.A., 112 F.R.D. 185,

189 (S.D.N.Y. 1986) (noting that Rule 37(b) "provides for sanctions where a party fails to honor

its disclosure obligations, especially after court orders").  It is clear that sanctions may be

imposed when a party spoliates evidence in violation of a court order.  See, e.g., West v.

Goodyear Tire & Rubber Co. 167 F.3d 776, 779 (2d Cir. 1999) (citing John B. Hull, Inc. v.

Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).  Even where there has

been no explicit discovery order issued, the court has the inherent power to preserve the integrity

of proceedings by, among other things, imposing sanctions for the spoliation.  See id.; Kronisch

v. United States, 150 F.3d 122, 126-27 (2d Cir. 1998); Barsoum v. N.Y.C. Hous. Auth., 202

F.R.D. 396, 399 (S.D.N.Y. 2001).

        The Second Circuit has defined spoliation as "the destruction or significant alteration of

evidence, or the failure to preserve property for another's use as evidence in pending or

reasonably forseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d at 779; accord

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001).  A party has the

obligation to preserve evidence when the party is on notice "that the evidence is relevant to

litigation or when a party should have known that the evidence may be relevant to future

litigation."  Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citing

Kronisch v. United States, 150 F.3d at 126); Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400

(holding that a party is under an obligation to retain documents and other evidence that it knows

may be relevant to a pending or future litigation).  This obligation to preserve relevant documents

exists whether or not the documents have been specifically requested in a demand for discovery.

Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400.

                                              27

A party seeking sanctions for spoliation of evidence must establish that three elements are present:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002); Farella v. City of New York, No. 05 CV 5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007); see also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 108-09; Fujitsu Ltd. v. Federal Express Corp., 247 F.3d at 436; Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). It is unclear exactly what degree of culpability is required under the second prong of the test; some courts in this Circuit have required a showing of bad faith, some have required proof of intentional destruction, and others have drawn an inference based on gross negligence. See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 107-08 (citing Reilly v. NatWest Mkts. Group Inc., 181 F.3d 253, 267 (2d Cir. 1999), cert. denied, 528 U.S. 1119 (2000)). Thus, the Second Circuit has concluded that "a case by case approach is appropriate." Id. at 108.

    2) Analysis

In this case, defendants sought discovery of all written communications between plaintiff and his family, friends and congregants. Among other things, defendants sought discovery of the contents of a laptop computer that plaintiff testified belonged to him and which was in his possession or available to him for at least six months after he left the Ashram on June 25, 2007. (Defs.' Mem. at 5 (citing Pl.'s Jan. 16, 2008 Dep. at 55; Pl.'s Apr. 1, 2008 Dep. at 26)).

According to defendants, when plaintiff failed to produce anything at all in response to discovery demands, defendants sought an Order from the Court directing plaintiff to produce outstanding discovery. (Id. at 10; see also Defs.' Jan. 23, 2008 Letter, Docket No. 15). On February 28, 2008, this Court issued an Order directing plaintiff to submit sworn responses to document requests indicating that all documents have been produced, including all documents from the laptop computer, and that there are no other documents in plaintiff's possession, custody, or control. (Brecher Dec.[15] Ex. A).

As directed by the Court's November 7, 2008 Order, defendants' counsel sent plaintiff's counsel a letter on November 21, 2008 detailing defendants' remaining discovery requests. (Id. Ex. F). Plaintiff's counsel did not respond before the close of discovery on December 5, 2008.[16] (Defs.' Mem. at 10). On December 17, 2008, plaintiff's counsel responded, indicating that plaintiff made "all possible search" but was unable to locate the requested documents or the laptop computer, and enclosing an affidavit from plaintiff stating the same. (Brecher Dec. Exs. D, E).

Defendants assert that not only has plaintiff failed to produce the laptop, but also he has provided no reasonable explanation for his failure to comply. (Defs.' Mem. at 11). In addition, defendants complain that they "have not received a single document of any kind from the

---

[15]Citations to "Brecher Dec." refer to the Amended Declaration of Dan Brecher in Support of Defendants' Motions for Spoliation, Adverse Inferences, and to Dismiss the Complaint, submitted on January 28, 2009.

[16]While defendants indicate in their brief that discovery closed on December 3, 2008, the Court's November 7, 2008 Minute Entry indicates that discovery in fact closed on December 5, 2008. (Brecher Dec. Ex. C). The Court notes that this apparent typographical error does not affect defendants' argument.

Plaintiff that the Court ordered to be produced." (Id. at 10-11). Given that the information contained in plaintiff's computer files, specifically emails to his friends and family members, may provide critical evidence relevant to plaintiff's state of mind during the time that he was allegedly held captive as a slave, defendants argue that his failure to produce any of this information justifies the imposition of sanctions.

Turning to the first element of the spoliation test, defendants argue that plaintiff should have known that he had an obligation to preserve letters and emails to and from his family at least as early as November 26, 2007, when defendants served their request for all written communications and emails stored on his computer. At that time, plaintiff had a clear obligation to maintain any and all documents relating to his claim. See, e.g., Fujitsu Ltd. v. Federal Express Corp., 247 F.3d at 436. Indeed, at that time, it was represented that plaintiff still possessed the laptop computer and would produce the requested information. However, despite repeated requests from defendants' counsel and court orders, plaintiff never produced anything.

Defendants contend that the missing evidence is relevant to plaintiff's claims of mental distress and his state of mind during this period of alleged abuse and slavery. Indeed, during his deposition, plaintiff testified that in the emails to his niece, he discussed how he was doing. He testified: "[w]e just used to ask each other, 'how are you' and 'how everything is, how are you doing,' these types of things." (Pl.'s June 16, 2008 Dep. at 183). Defendants contend that had plaintiff really been suffering the type and extent of abuse alleged, he would have mentioned it in this correspondence with his family. The absence of such complaints in his emails arguably belies the claims of abuse that he is now attempting to pursue. Thus, the information sought is clearly relevant.

Having determined that the documents are relevant and that plaintiff had an obligation to maintain these documents, defendants still have the burden to show that the information on the laptop and the written correspondence was destroyed knowingly or negligently. See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 109. With respect to plaintiff's state of mind at the time of the destruction, plaintiff now offers the explanation that the laptop computer did not belong to plaintiff; it belonged to another member of the congregation, who lost his job, moved to India, and "presumably took the laptop with him." (Pl.'s Mem. at 17 (citing Shukla Aff.[17])). As defendants' Reply Memorandum of Law points out, there are several problems with this explanation. First, at the time of plaintiff's deposition on April 1, 2008, plaintiff testified that the computer was his property and that he still had possession of the computer at a time almost two months after the Court's February 28, 2008 Order[18] requiring the production of all documents on the computer. (Defs.' Rep. Mem.[19] at 7 (citing Pl.'s Apr. 1, 2008 Dep. at 26). Plaintiff offers no explanation for why he could not and did not produce the laptop prior to his deposition.

Moreover, the explanation that plaintiff now offers fails to indicate the name, address, or other contact information for the congregant whom he claims has the laptop, despite requests for that information. Nor does his affidavit state when he returned the laptop to this still unidentified

---

[17]Citations to "Shukla Aff." refer to the Affidavit of Devandra Shukla, dated April 2, 2009, and submitted as Exhibit G to the Declaration of Sanjay Chaubey, Esq. in Support of Memorandum of Law in Opposition to Defendants' Motion to Dismiss and Motion for Summary Judgment.

[18]Defendants' Reply Memorandum of Law indicates that the Court issued this Order on February 8, 2008. However, the Court in fact issued this Order on February 28, 2008.

[19]Citations to "Defs.' Rep. Mem." refer to Defendants' Reply Memorandum of Law in Support of their motion for Summary Judgment, dated April 16, 2009.

congregant, when the individual went to India, why plaintiff did not print out and produce the documents before returning the laptop to the congregant, and what, if any, efforts plaintiff has made to contact the congregant. The Court is troubled by the contradictory and confusing information plaintiff has provided and his blatant disregard for the Court's orders.

Even where it cannot be shown that the destruction of evidence was done willfully or in bad faith, sanctions may still be imposed upon a finding of negligence. See Indemnity Ins. Co. of N. Am. v. Liebert Corp., No. 96 CV 6675, 1998 WL 363834, at *3 (S.D.N.Y. June 29, 1998) (holding that sanctions may be awarded for spoliation not just "where the evidence was destroyed willfully or in bad faith, since a party's negligent loss of evidence can be just as fatal to the other party's ability to present a defense") (internal citation omitted); see also Great Northern Ins. Co. v. Power Cooling, Inc., No. 06 CV 874, 2007 WL 2687666, at *9 (E.D.N.Y. Sept. 10, 2007); Smith v. City of New York, 388 F. Supp. 2d 179, 189 (S.D.N.Y. 2005). Where the documents were alleged to have been destroyed due to a party's negligence, there must be a showing that the destroyed evidence would have been favorable to the party seeking sanctions. De Espana v. Am. Bureau of Shipping, No. 03 CV 3573, 2007 WL 1686327, at *6 (S.D.N.Y. June 6, 2007) (noting that "where the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party"); Zubulake v. UBS Warburg LLC, 220 F.R.D. at 221. While there must be "'some showing indicating that the destroyed evidence would have been relevant to the contested issue,'" Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400 (quoting Kronisch v. United States, 150 F.3d at 127), the relevance factor is primarily concerned with whether there has been prejudice to the party seeking sanctions. Id.; see also Kronisch v. United States, 150 F.3d at 127; Sovulj v.

32

United States, No 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005).

As discussed above, the documents at issue are relevant to the credibility of plaintiff's claims of abuse and go to the heart of defendants' defense. Although plaintiff concedes that he did not go to the police about the alleged abuse for seven years, the absence of any mention whatsoever of the defendants' alleged mistreatment in his personal emails would be highly relevant to and favorable to defendants' case. Plaintiff's behavior in allowing these records to be removed from this country without first making copies or at the very least providing them to his attorney so that copies could be made was, at best, negligent. Morever, counsel had the responsibility to advise plaintiff of his obligation to maintain these records and ensure retention of these documents. See Chan v. Triple 8 Palace, Inc., No. 03 CV 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) (noting that the "utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent").

Plaintiff has not disputed defendants' arguments that the requested information was relevant. However, given the plaintiff's admission that he made no effort to report the abuse to anyone, it is not clear whether defendants have in fact suffered such a degree of prejudice by being denied access to these documents as to warrant the extreme sanction of dismissal. Nevertheless, because there appears to be a complete and utter failure on the part of plaintiff to comply with the Court's Orders, if the district court were to find that plaintiff's claims should not be dismissed for the reasons set forth above, the Court respectfully recommends that defendants' motion for an adverse inference would be warranted as a sanction for the spoliation of this information. In addition, the Court awards defendants reasonable attorneys' fees and costs incurred in connection with defendants' counsel's repeated efforts to obtain this discovery and in

33

preparing this section of the instant motion.  Defendants are directed to submit an affidavit and supporting time records on or before September 14, 2009 if they wish to obtain reimbursement for fees.

### D. Plaintiff's Claims of Discovery Abuse

In his response to defendants' motion, plaintiff raises his own complaints about discovery, asserting that the motion for summary judgment is premature and that he needs additional discovery before the motion can be heard.  In his Memorandum of Law, plaintiff lists certain documents which he contends have been repeatedly requested during the depositions of Sat Prakash Sharma and Geeta Sharma, but which have not been provided to date.  These include: (1) the name and address of the attorney "who did paperwork for Ms. Sujata Maden;"[20] (2) a two page letter from the IRS that states that the Ashram is not required to file a form 990;[21] (3) a translation of a phone conversation between Mr. Shukla and Ms. Geeta Sharma (no date provided); (4) a complete record of payments to plaintiff; (5) copies of "donation books;" (6) copies of letters written in support of plaintiff's visa application; and (7) copies of checks written to plaintiff from the Ashram.  (Pl.'s Mem. at 13-14).  Furthermore, plaintiff contends that he has been unable to obtain a copy of his own deposition and therefore defendants should be precluded from referring to the transcript in support of their motion.

---

[20]Plaintiff has not provided any information as to the identity of "Ms. Sujata Maden" or her relationship to the plaintiff's case.

[21]It is unclear whether the item sought is the same letter and certificate that was provided to the Court, attached as Exhibit Q to the Reply Declaration of Dan Brecher in Support of Defendants' Motions for Spoliation, Adverse Inferences, and to Dismiss the Complaint, dated April 16, 2009.

In response to these complaints, defendants note that plaintiff is raising these issues for the first time now, more than six months after the close of discovery, and that plaintiff never raised these claims in November 2008, despite an Order from this Court to exchange letters detailing any open discovery items by November 21, 2008. (Brecher Dec. Ex. C). More importantly, defendants dispute the substance of several of plaintiff's claims, contending that the address of attorney Gallagher was provided in writing on March 26, 2009; that the IRS correspondence was used by plaintiff's own counsel during the deposition of defendant Sat Sharma; and that not only are the complete deposition transcripts filed electronically with the Court (Docket No. 36), but counsel was provided with the opportunity, beginning in January 2009, to review the depositions in defendants' office, but plaintiff's counsel never took advantage of this offer.[22] Thus, it appears that plaintiff's counsel already has a number of the items which plaintiff claims were not produced during discovery.

Furthermore, the Court finds that plaintiff has failed to carry his burden under Fed. R. Civ. P. 56(f). Although not formally styled as a motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, this Court has construed plaintiff's request for further discovery as a motion pursuant to Rule 56(f). A party seeking to delay consideration of a motion for summary judgment based on Rule 56(f) must supply an affidavit identifying four elements with specificity: (1) the facts sought by the discovery and how they will be obtained; (2) how the discovery sought will demonstrate a material issue of fact; (3) previous efforts to obtain the facts; and (4) why those efforts were unsuccessful. See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891

---

[22]The Court notes that this issue was also raised during a conference with the Court, and the parties discussed the option of ordering copies of the transcripts directly from the court reporters.

F.2d 414, 422 (2d Cir. 1989). Here, plaintiff has not only failed to provide an affidavit with respect to this aspect of his motion, but more importantly, he has simply listed the information sought and has failed to explain in any way how the requested information demonstrates that a material issue of fact is in dispute. Given the numerous conferences that this Court has held in this case and the fact that plaintiff never during any of these conferences raised the need for any of these items except the deposition transcripts, the Court respectfully recommends that plaintiff's motion to delay consideration of the defendants' motion to allow him to conduct further discovery be denied.

F. Interpreters

Plaintiff also raises an issue regarding the reliability of the Hindi interpreters that were used to take plaintiff's deposition. Specifically, plaintiff complains that the interpreter services provided to plaintiff were deficient and that three out of four interpreters were not qualified. This issue was previously reviewed by the Court, and it is undisputed that defendants attempted to depose plaintiff on three separate occasions on January 15, 2008, January 16, 2008, and February 16, 2008, with three different Hindi translators whom plaintiff found unacceptable. On each occasion when the plaintiff expressed dissatisfaction with the interpreter, the depositions were halted and rescheduled. On the fourth occasion, commencing on March 17, 2008, the plaintiff found the interpreter Pria Bala to be acceptable. Plaintiff's counsel, Mr. Chaubey, confirmed at the depositions where Ms. Bala acted as interpreter that her translations were accurate. In fact, plaintiff's counsel used her to take defendants' depositions. According to defendants' counsel, plaintiff ultimately agreed that the transcripts to each deposition were correct, and he signed and notarized them.

36

Given the plaintiff's failure to demonstrate how the translations are now inaccurate or how these inaccuracies would affect consideration of the motion pending before the Court, this Court declines to recommend that the motion for summary judgment be delayed at this time.

CONCLUSION

For the foregoing reasons, the Court hereby recommends that defendants' motion for summary judgment be granted as to all claims with the exception of those arising under the TVPA; that defendants' motion for an adverse inference as a sanction for the spoliation of evidence be granted in the event that the district court denies the motion for summary judgment, that defendants' motion for attorneys' fees as a sanction for the spoliation of evidence be granted; and that plaintiff's motion to delay consideration of the defendants' motion to allow him to conduct further discovery be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 14, 2009

_____
CHERYL L. POLLAK
United States Magistrate Judge

37