**United States District Court**
**Eastern District of New York**

————————————————————X

Devendra Shukla                          :      07 CV 2972 (CBA) (CLP)
                                         :
                 Plaintiff,              :      **Revised Joint Pre-Trial Order**
            vs.                          :
                                         :
Sat Prakash Sharma, Individually and as  :
Director of Vishva Seva Ashram of New    :
York, Geeta Sharma, individually and as  :
director of Vishva Seva Ashram of New    :
York, and Vishva Seva Ashram of New      :
York, D/B/A Sarva Dev Mandir             :
                                         :
                 Defendants.             :
————————————————————X

         In accordance with the Individual Rules of Practice of Hon.  Carol B. Amon,

United States District Judge, counsel for the parties hereby submit this Revised Joint

Pre-Trial Order:

1.       Parties and Counsel:

         a.       <u>Plaintiff's counsel</u>: Sanjay Chaubey, Esq., Empire State Building, 350 Fifth

                  Avenue, Suite 5013, New York, New York  10118.

                  Tel: 212 563 3223        Fax:   212 563 4534

         b.       <u>Defendants' Counsel</u>: Krishnan S.  Chittur, Esq., Chittur & Associates,

                  P.C., 286 Madison Avenue, New York, New York 10017

                  Tel:   212 370 0447      Fax:   212 370 0465

2.       <u>Jurisdiction</u>:   Subject matter jurisdiction exists under the Victims of Trafficking

         and Violence Protection Act of 2000, 18 U.S.C. §1595, *et seq.*  ("VTVPA"), and

         federal question jurisdiction, 28 U.S.C. §1331.

         Supplementary jurisdiction exists over Defendants' counterclaims under 28

1

U.S.C. §1367.

3.  <u>Claims and Damages</u>:

a.  <u>Plaintiff's Claims</u>:

Defendants knowingly recruited, transported and harbored Plaintiff so as to obtain his labor and services by threats of serious harm, scheme or pattern of behavior and/or abuse of legal process within the meaning of the Trafficking provisions of the Trafficking Victims Protection Act.  Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.  VTVPA, 18 U.S.C. §1590.

b.  <u>Defendants' Defenses and Counterclaims</u>:

Plaintiff has asserted two claims against Defendants.  The substance of both claims is that from December 13, 2003 until June 27, 2007, Defendants enslaved and imprisoned Plaintiff by treating Plaintiff in a manner that constituted mental and emotional abuse, forcing Plaintiff to remain as a priest conducting the religious work of the Defendant Ashram ("Temple"), and requiring Plaintiff to perform such activities as gardening and painting, which Plaintiff considered demeaning.  Defendants deny the allegations, and assert that Plaintiff was treated properly and respectfully at all times.

i.  *Plaintiff's Burden of Proof*

Plaintiff, in order to prevail on his VTVPA claims, has the burden of proving that the type of abuse he allegedly suffered from 2003 through June 2007 was "so extreme, offensive, and contrary to fundamental rights as to distinguish it from the type of conduct that ordinarily gives rise to violations of labor and employment laws."[1]

Plaintiff's claims are based on claims of "feelings of fear and psychological

---

[1]Report and Recommendation, at 14-15.

2

coercion."[2]  There are no allegations by Plaintiff "that defendants made any threats of bodily harm to him or his family member or restrained him in any way…"[3]

Plaintiff's evidence does not come anywhere close to approaching these standards.  While Plaintiff seeks damages, his real reason for this lawsuit is the declarative relief regarding his immigration status.  In other words, this lawsuit and the false allegations herein enabled Plaintiff to apply for a green card under federal immigration law by pretending to be a victim of "trafficking."  That appears to be the motivating factor for these fabricated claims, as evidenced by Plaintiff having remained in the United States for the three years since Plaintiff's alleged "imprisonment" ended.

ii.     *No Retroactive Application of VTVPA*

Defendants object to introduction of any claims, testimony or evidence that reference or rely upon facts or events prior to the December 13, 2003 enactment of the VTVPA as being an unsustainable and retroactive application of the VTVPA in violation of the *Ex Post Facto* clause, all of which has been fully briefed in Defendants' pending motion in limine.

iii.    *Spoliation of Material Evidence*

The Report and Recommendation of Magistrate Judge Cheryl L. Pollak dated August 14, 2009 (the "R&R") recommended that Plaintiff be sanctioned for spoliation of evidence.  The Court's Memorandum and Order, dated September 29, 2009 (the "September 2009 Order") states, in part that:  "…the Court adopts Magistrate Judge Pollack's R&R as the opinion of the Court".  The R&R concluded, in relevant part that

---

[2]*Id*., at 24.

[3]*Id*., at 24.

"…defendants' motion for an adverse inference as a sanction for spoliated evidence be granted…"[4]

Documents that "go to the heart of defendants' defense" and that "are relevant to the credibility of plaintiffs claims of abuse" were in Plaintiff's possession and disappeared after several Court orders for their production, and the disappearance of these documents was "at best, negligence."[5]  In this regard, Plaintiff's counsel has been "grossly negligent."[6]  Plaintiff's inability to provide a single contemporaneous document to show that there was any mistreatment of Plaintiff by the Defendants over the years is the result of Plaintiff's purposeful spoliation of such evidence.  The only reason for the unexplained disappearance of Plaintiff's computer and correspondence is that they would support Defendant's contention that Plaintiff received the treatment, care and support typically provided by a Hindu Temple in the United States to its priest.

The requested adverse inference for the disappearance of Plaintiff's laptop and the written correspondence (which was knowingly destroyed) is that the documents and emails on the laptop and the written correspondence contain admissions that would confirm Defendants' deposition testimony that for all these years, Defendants provided Plaintiff with food, clothing and shelter consistent with his needs, took Plaintiff to medical professionals whenever needed, provided Plaintiff with custom-made hand tailored clothing and other valuable gifts, invited Plaintiff into their home as a guest on a regular basis, and that the Defendants generally treated Plaintiff with respect and care.

---

[4]*Id.*, at 37.

[5]*Id.*, at 33.

[6]*Id.*, at 33.

4

iv.   *Plaintiff's Allegations of Seven Years of "Imprisonment" And*

*"Enslavement" Are Recent Fabrications*

Plaintiff's claims of enslavement and imprisonment are a recent fabrication brought primarily to obtain a permanent residence in the United States (green card) which Plaintiff is otherwise neither eligible nor qualified for under federal immigration laws.  For seven years, Plaintiff lived at the Temple voluntarily, where he had, in addition to food, clothing, shelter, and cable television, all modern devices for communication with anyone and at any time he chose:  a regular landline based phone, a cell phone, and his own computer with Internet access.  Plaintiff lived in the Temple alone, and used these communication facilities liberally and unsupervised at all times. In fact, Defendants were not even aware, until shortly before Plaintiff's departure in June 2007, of the existence and use by Plaintiff of (a) Plaintiff's cell phone and of (b) laptop computer with internet access.  Plaintiff admits that Defendants told him he could always return to India, if he wanted to do so.

Over the years, Plaintiff built up a congregation of worshipers at the Temple. Plaintiff's admitted professional success as a priest and counselor in religious and personal affairs, his good medical care and his frequent trips away from the Temple, including unescorted visits by Plaintiff to his friends' homes, also contradict his allegations of imprisonment and/or enslavement.  Plaintiff admits that his "imprisonment" was solely a retroactively rewritten state of his own mind, nothing more. Plaintiff motivated and led a congregation of over 100 people at the Temple over a period of several years.  Plaintiff allegedly "escaped" with the assistance of friends he admits he communicated with over several years.

5

Curiously, Plaintiff's alleged "escape" occurred soon after Defendants discovered Plaintiff's conduct of an astrology business, and Plaintiff's extensive use of a hitherto undisclosed cell phone, undisclosed laptop computer, and email.

Moreover, the increasing attendance at the Temple was not being matched with increasing revenues.  This raised suspicions of the Temple trustees about pilferage/defalcation, and they decided to install surveillance cameras.  The day after the Temple installed surveillance cameras in the Temple, Plaintiff left the Temple.

Plaintiff's "escape" consisted of Plaintiff handing over the keys to the Temple to Mr. Sharma.  Plaintiff could have done so at any time from 2000 to 2007.  But he simply failed to take personal responsibility, for which he now blames Defendants.

Defendants did not violate the Trafficking Act.  Plaintiff has fabricated allegations of mistreatment and emotional abuse.  Plaintiff admitted that he had, within himself, the "key" to his own release, but felt too afraid to free himself.  Further, even Plaintiff's his friends, allegedly aware of his enslavement and imprisonment since 2003, did nothing in 2003, 2004, 2005, 2006 and through June 2007.  In fact, even on June 25, 2007, Plaintiff and his friends finally went to the local police precinct only to report that Defendants would not return his passport, cell phone or computer to him.

The evidence will further reveal that Plaintiff's claims are not predicated upon any conduct of the Defendants, which might be conceivably illegal or actionable under the VTVPA.

However, because of Plaintiff's willful spoliation of his laptop and written communications, Defendants are substantially handicapped in proving the absence of emotional abuse or psychological fear.  This is highlighted by the fact that Plaintiff

6

staged the charade of going to the police shortly after Defendants became aware of his extensive use of computer and cell phone, and his ongoing business, and one day after surveillance cameras were installed at the Temple.  Plaintiff then actively launched a campaign of slander against Defendants, notified local newspapers and the Indian community's television broadcast channel of Plaintiff's claims of imprisonment.  Plaintiff knew that his allegations against Defendants were false.  The slanderous allegations caused substantial damages to the Defendants.

Plaintiff was in control or possession of his own passport at all times. Given "the contradictory and confusing information plaintiff has provided and his blatant disregard for the Court's orders,"[7] the spoliated evidence should be assumed to confirm Defendants' testimony, consistent with documented evidence and confirmed in substantial part by Plaintiff's own testimony, that no enslavement or imprisonment occurred at all.  Indeed, Plaintiff admitted that Defendants offered to assist him in returning to India.  Plaintiff's continued stay at the Temple was his own decision to stay in this country and not return to India.

Plaintiff's claims as to events preceding the october 2003 enactment of VPVPA cannot be the basis for or proof of plaintiff's claims.  The Court is referred to Defendants' pending Motion *in Limine* in this regard.

      v.    *Defendants' Counterclaims*

        *(1)    Libel*

A claim of defamation requires proof that a person made "a false statement, published that statement to a third party without privilege, with fault measured by at

---

[7]*Id.*, at 32.

least a negligence standard, and the statement caused special damages or constituted defamation per se". *Dickson v. Slezak*, 2010 WL 1791137, 1 (3 Dept. May 6, 2010).

Defendants assert that Plaintiff's allegations were false to his knowledge, and were widely disseminated in the community and in the press.  Plaintiff made them wilfully, and the statements constituted defamation *per se*.

(2)    *Conversion*

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights" (*Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105 (1927)). The basis of an action for conversion is the denial or violation of the complainant's dominion over, rights to, or possession of property. *Mirvish v. Mott*, 901 N.Y.S.2d 603, 607 (1 Dept. May 27, 2010).

Defendant Temple asserts that Plaintiff converted Eleven Holy Books, five 22-carat gold statues of Hindu deities, three 22-carat gold chains, and two 22-carat gold necklaces from the Temple.  These were donated by devotees to the Temple, but converted by Plaintiff.

(3)    *Breach of Contract*

The essential elements of a cause of action to recover damages for breach of contract, are the existence of a contract, the Defendant Temple's performance under the contract, Plaintiff's breach of that contract, and resulting damages. *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803 (2 Dept. 2010).  "[T]he essential elements of a claim for breach of the implied covenant of good faith and fair dealing ... [are] arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract'." *JFK Family Ltd.*

8

*Partnership v. Millbrae Natural Gas Development Fund 2005, L.P.*, 2008 WL 4308289, 22 (N.Y.Sup. Sep 16, 2008) (citations omitted).

Defendant Temple asserts that Plaintiff and the Temple had a contract whereunder (a) Defendant was to provide room and board, and $500 per month to Plaintiff, in return for which (b) Plaintiff was to function as a priest honorably and in good faith, and build the Temple's reputation and stature in the community.   The Temple performed its part of the contract, while Plaintiff failed to do so.  As a result, the Temple was damaged.

(4)    <em>Compensatory Damages</em>

In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to complainant's reputation, a jury may properly consider a number of factors.  Such factors may include the complainant's standing in the community, the nature of statements made about the complainant, the extent to which the statements were circulated, the tendency of the statement to injure a person such as the complainant, and all of the other facts and circumstances in the case.  *N.Y. Pattern Jury Instr. Civil* 3:29; *Crane v. N.Y. World Telegram Corp.*, 308 N.Y. 470, 476 (1955); *Bishop v. New York Times Co.*, 233 N.Y. 446, 460 (1922) (complainant "may ... show the nature of his business ... as bearing upon the hurtful tendency of the libel."); *Morsette v. The Final Call*, 309 A.D.2d 249, 257 (1st Dep't 2003) (considering complainant's "education and professional attainment" in evaluating the appropriate amount of damages for "harm to reputation"); Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 10.5.1 (2008); *Cantu v. Flanigan*, 2010 WL 1486433, 6 (E.D.N.Y. Apr 14, 2010).

Defendants assert that Mr. Sharma and Mrs. Sharma, the individual Defendants, suffered immense humiliation, mental suffering and anguish. All the Defendants suffered serious damage to their reputation, and economic and non-economic losses.

(5)    *Punitive Damages*

Punitive damages are also appropriate when the conduct is so flagrant that it transcends mere carelessness, or when it contains elements of spite or malice. *Wilson v. The City of New York*, 7 A.D.3d 266 (1st Dept. 2004). *Accord, Lott-Coakley ex rel. Lott-Coakley v. Ann-Gur Realty Corp.*, 2009 WL 1099468, 10 (N.Y.Sup. Apr 23, 2009).

Plaintiff's false allegations, his publication of the slanderous allegations, and his misconduct were so flagrant and spiteful/malicious that Defendants should be awarded punitive damages.

4.    Damages And Other Relief:

a.    *Plaintiff's Claims*:

Plaintiff claims punitive damages in an amount to be determined at trail that would punish defendant for its willful, wanton, and reckless conduct and that would effectively deter defendant from engaging in similar conduct in future. Besides this, plaintiff seeks other relief including pre-judgment interest and reasonable attorney fees as detailed in the complaint. Plaintiff also claims compensatory and punitive damages.

b.    Defendant' Damage and Other Relief:

In addition to an award of attorneys' fees and expenses pursuant to the September 2009 order, Defendants seek dismissal of Plaintiff's claims with costs, damages on their counterclaims, and attorneys' fees and expenses under Rule 11, Fed.

R. Civ. P., and 28 U.S.C. §1927.

Defendants will claim damages on their counterclaims, subject to the jury's assessment, as follows:

    i.      $1 million in compensatory damages for Defendant Sat Prakash Sharma towards compensatory damages for libel;

    ii.     $1 million in compensatory damages for Defendant Geeta Sharma towards compensatory damages for libel;

    iii.    $5 million in compensatory damages for Defendant Temple towards compensatory damages for libel;

    iv.     $50,000 in compensatory damages for the Defendant Temple towards compensatory damages for conversion;

    v.      $10 million in punitive damages for each Defendant.

5.  <u>Jury or Bench Trial</u>: This is a jury trial, which has been scheduled for a week commencing September 13, 2010.

6.  <u>Consent to Trial by Magistrate</u>: The parties do not consent to trial by a Magistrate Judge.

7.  <u>Stipulations of Fact</u>

    a.  *Background*

        i.      Plaintiff is a 35 year old citizen of India with advanced degrees in Hindi and Sanskrit.

        ii.     Prior to 2000, Plaintiff was living with his joint family in India, consisting of his parents; his wife and child; and his two older brothers and one younger brother and their respective families.

      iii.    In 2000, Plaintiff was a priest in India making about 2,000 rupees (about $45) a month.

      iv.    In 2000, Plaintiff came to the United States to be a priest in the Temple.

      v.    The Sharmas left for India on the date that Plaintiff arrived in the United States in August 2000.

      vi.    Soon after his arrival in the United States, Plaintiff wrote and signed, in his own handwriting in Hindi, a document acknowledging that for his services in the Temple, he would be paid a monthly salary of $500, in addition to room and board at the Temple.

b.    *Temple Premises*

      i.    The Temple has two entrances in Corona Avenue.

      ii.    The Temple has a basement, which has a kitchen with cooking facilities, a large dining hall, a mens' restroom, a ladies' restroom, a bedroom, and a private bathroom.

      iii.    The large dining hall is used for feeding meals to devotees on religious festivals or private ceremonies.

      iv.    The entrance to and exit from the basement is through a stairway from the main floor, which has a door which opens directly on the street at Corona Avenue.

      v.    The main floor of the Temple has the deities and a large hall for functions, ceremonies, and rituals.

      vi.    The Temple has a small bedroom in a mezzanine floor.

vii.    A stairway from the mezzanine floor opens up in a small backyard.

viii.   The Temple has a second floor which has three units, two of which
        are rented out to tenants.

ix.     The third unit in the second floor may also be used as a bedroom.

x.      From 2000 to 2007, Plaintiff lived alone in the Temple premises,
        and two of the three units upstairs in the second floor were rented
        out to tenants.

xi.     From 2000 to 2007, Plaintiff had the keys to each of the entrances
        and doors to the Temple.

xii.    From 2000 to 2007, the Sharmas did not live in the Temple.

xiii.   From 2000 to 2007, the Sharmas lived at 3545 71st Street,
        Jackson Heights, NY 11372.

xiv.    The Sharmas' residence was about a 15-minute drive from the
        Temple, assuming no  traffic-jams and assuming good weather.

xv.     From 2000 to 2007, Plaintiff was never physically restrained or
        prevented in any manner by Defendants.

c.      *Phone, Radio, Television, VCR, DVR, Cable*

i.      From 2000 to 2007, the Temple had a phone which was working at
        all times.

ii.     From 2000 to 2007, Plaintiff had access to the phone.

iii.    From 2000 to 2007, Plaintiff used the Temple's phone for making
        phone calls to various persons.

iv.     From 2000 to 2007, Plaintiff used the Temple's phone for receiving

13

phone calls from various persons.

v.      Neither of the Sharmas were present during most of Plaintiff's phone conversations.

vi.     From 2000 to 2007, Plaintiff made phone calls to India by using phone cards.

vii.    From 2000 to 2007, Plaintiff spoke to his wife in India on the phone frequently, sometimes on consecutive days.

viii.   From 2000 to 2007, Plaintiff spoke to his brother in India on the phone frequently, sometimes on consecutive days.

ix.     From 2000 to 2007, Plaintiff spoke to his family members in India on the phone.

x.      On several occasions, Plaintiff spoke to his family members for several hours at a stretch.

xi.     From 2000 to 2007, Plaintiff could have spoken by phone to anyone in the world that he chose.

xii.    From 2000 to 2007, Plaintiff had a Television in his room in the Temple.

xiii.   From 2000 to 2007, Plaintiff could and did watch Television in his room in the Temple.

xiv.    From 2000 to 2007, Plaintiff had a video-cassette recorder in his room in the Temple.

xv.     From 2000 to 2007, Plaintiff could and did watch Hindi movies in the VCR in his room in the Temple.

14

xvi.    From 2000 to 2007, Plaintiff had a DVR in his room in the Temple.

xvii.    From 2000 to 2007, Plaintiff could and did watch Hindi movies in the DVR in his room in the Temple.

xviii.    While Plaintiff was living in the Temple, Mr. Sharma gave a radio to Plaintiff so that Plaintiff could listen to programs and broadcasts in Hindi.

xix.    While Plaintiff was living in the Temple, Plaintiff listened to radio programs in Hindi.

d.    *Temple Visitors, Plaintiff's Preachings*

i.    From 2000 to 2007, devotees came to the Temple every morning and every evening, with more people visiting on Saturdays and Sundays.

ii.    From 2000 to 2007, Plaintiff preached at the Temple at every religious festival.

iii.    There are 16 religious festivals celebrated in the Temple every year, including four major festivals.

iv.    In 2000-2001, about 40 people attended the Temple's celebration of the festival of Navratri, which took place twice a year.

v.    Temple visitors liked and respected Plaintiff, and his prayers and worship, and as a result, attendance increased considerably.

vi.    By 2004, upto 100 people attended the festival of Navratri, which took place twice a year.

vii.    From 2000 to 2007, visitors to the Temple heard Plaintiff preach,

15

liked his preaching, and started coming to the Temple more frequently.

        viii.    From 2000 to 2007, visitors to the Temple respected Plaintiff.

        ix.    From 2000 until Plaintiff's departure from the Temple in June 2007, many people regularly invited Plaintiff to conduct prayers at their house.

e.    *Plaintiff's Visits to Devotees' Residences*

        i.    From 2000 - 2007, many persons invited Plaintiff to conduct prayers at their homes or offices.

        ii.    Many persons who invited Plaintiff to conduct prayers at their homes or offices arranged to pick him up from, and drop him back at, the Temple.

        iii.    Many persons who invited Plaintiff to conduct prayers at their homes or offices paid him taxi fare for transportation to and from the Temple.

        iv.    Such conduct of prayers at persons' homes/offices could and did take place any day of the week.

        v.    On many such occasions, neither Mr. Sharma nor Mrs. Geeta Sharma accompanied Plaintiff on visits to person's homes.

        vi.    On many such occasions, Plaintiff traveled alone, by subway, taxi, train, and/or bus.

f.    *Plaintiff's Lifestyle*

        i.    From 2000 to 2007, Plaintiff received appropriate clothing at all

16

times.

    ii.      From 2000 to 2007, Plaintiff did his laundry in the laundromat in the neighborhood.

    iii.     Plaintiff always went alone to do his laundry.

    iv.     Plaintiff cooked his own food in the Temple kitchen.

    v.      Plaintiff consumed food donated by devotees, or provided by the Sharmas, in furtherance of Hindu religious belief that feeding the priest was a pious act.

    vi.     When necessary, Plaintiff bought condiments and other necessities for his cooking in the neighborhood grocery store.

    vii.    Plaintiff always went alone to buy groceries.

    viii.   Plaintiff went to a neighborhood barbershop alone.

    ix.     On many occasions, Plaintiff went to devotees' homes or offices alone.

    x.      On many occasions, Plaintiff went to the Sharmas' residence as a guest.

    xi.     On many occasions, Plaintiff had dinner at the Sharmas' residence.

    xii.    On such occasions, Plaintiff would lock up the Temple, and leave a note on the door as to when he would be returning.

    xiii.   These notes were handwritten by Plaintiff.

g.    *Plaintiff's Advising Devotees*

    i.      From 2000 to 2007, Temple devotees came to Plaintiff regularly for advice on personal problems.

ii.   From 2000 to 2007, Plaintiff advised many people on personal problems.

iii.   From 2000 to 2007, many persons thanked Plaintiff for his advice on their personal problems.

iv.   From 2000 to 2007, many people came repeatedly to Plaintiff for advice on personal problems.

h.   *Plaintiff's Complaints To Mr.  Arish Sahni, Mr.  Gurnam Singh, and Others*

i.   Plaintiff complained to Mr.  Arish Sahni regularly about his conditions in the Temple from as early as 2000.

ii.   From 2000 to 2007, Plaintiff visited Mr.  Arish Sahni at Mr.  Arish Sahni's residence many times.

iii.   Mr.  Arish Sahni's residence is about 2 ½ blocks from the Temple.

iv.   Plaintiff went to Mr.  Arish Sahni's residence for Diwali in 2000.

v.   Plaintiff went to Mr.  Arish Sahni's residence for Diwali in 2001.

vi.   Plaintiff went to Mr.  Arish Sahni's residence for Diwali in 2002.

vii.   Plaintiff spoke to Mr.  Arish Sahni regularly by cell phone from 2002 until at least 2007.

viii.   Mr.  Arish Sahni stopped attending the Temple Programs in 2004, but continued meeting Plaintiff regularly at the Temple.

ix.   Plaintiff met Mr.  Gurnam Singh in 2001.

x.   From 2001, Plaintiff visited Mr.  Gurnam Singh's house many times.

xi.   Neither Mr.  Sharma nor Mrs.  Geeta Sharma accompanied Plaintiff

18

in his visits to Mr. Gurnam Singh's house.

xii.     On all such visits, Mr.  Gurnam Singh picked up Plaintiff from the Temple.

xiii.    On all such visits, Mr.  Gurnam Singh dropped Plaintiff back in the Temple.

i.   *Plaintiff's Appearance in Radio and Television Programs*

i.      Mr.  Arish Sahni conducted a radio program in Hindi in RBC Radio.

ii.     Between 2001 and 2005, Plaintiff appeared on Mr.  Arish Sahni's radio program every Sunday.

iii.    Plaintiff appeared on a television show with Mr.  Ashok Vyas.

iv.     Plaintiff appeared on a television show with Ms.  Renu Lobo.

j.   *Plaintiff's Passport*

i.      In 2003 or 2004, Plaintiff told Mr.  Arish Sahni that Plaintiff did not have his passport.

ii.     In 2003 or 2004, Plaintiff told Mr.  Gurnam Singh that Plaintiff did not have his passport.

iii.    In 2003 or 2004, many people told Plaintiff that he should write to the passport authorities for a duplicate passport.

iv.     Plaintiff knew that there was an Indian Consulate in New York.

v.      Plaintiff called the Indian Consulate in 2007.

vi.     Plaintiff never called the Indian Consulate prior to 2007.

vii.    The Indian Consulate informed Plaintiff that they would help him get his papers.

19

        viii.     Plaintiff did not go to the Indian Consulate to get any help.

k.    *Medical Care for Plaintiff*

        i.     Between 2000 and 2007, Plaintiff was taken to physicians and hospitals by the Sharmas whenever he needed it.

        ii.     Plaintiff never had to pay personally for any such visits or treatments.

        iii.     Sometime between 2000 and 2005, Plaintiff was taken to the hospital by Mr. Sharma for attending to chest pains.

        iv.     Sometime between 2000 and 2005, when Plaintiff suffered from toothache and Mr. Sharma delayed in taking Plaintiff to a dentist, Plaintiff threatened to go by himself.

        v.     Between 2001 and 2007, about 40 or 50 persons other than Mr. Sharma would have been willing to take Plaintiff to the dentist.

        vi.     Plaintiff was taken to see a dentist by Mr. Sharma for a tooth extraction.

        vii.     Plaintiff has never seen any psychologist or psychiatrist at any time till today.

        viii.     Until 2005, Plaintiff was not concerned about going to India.

        ix.     From 2000 to 2007, Plaintiff could go to India any time he chose.

        x.     From 2000 to 2007, the Sharmas offered to help Plaintiff go to India on many occasions, but Plaintiff declined.

        xi.     From 2000 to 2007, Plaintiff was not stopped or prevented from going to India at any time by any person.

l.    *Plaintiff's Departure From The Temple in 2007*

    i.       On June 25, 2007, Plaintiff left the Temple with his followers.

    ii.     On June 25, 2007, Plaintiff went with Mr.  Arish Sahni to the police precinct.

    iii.   About seven or eight people accompanied Plaintiff when he visited the police precinct on June 25, 2007.

    iv.   The police recorded a report on June 25, 2007.

    v.     The police did not accompany Plaintiff back to the Temple on June 25, 2007.

    vi.   Plaintiff called Mr.  Sharma, and turned over the keys to the Temple on June 25, 2007.

    vii.  After he left the Temple, Plaintiff lived with his followers.

m.    *Plaintiff's Use of Cell Phone*

    i.       Sometime after 2000, Mr.  Gurnam Singh gave Plaintiff a cell phone to use.

    ii.     The cell phone numbers were 646 724 5718, and subsequently, 917 609 1992.

    iii.   From 2003 to May 2007, Plaintiff used that cell phone regularly.

    iv.   Plaintiff made phone calls to people on that cell phone.

    v.     Plaintiff received phone calls from people on that cell phone.

    vi.   Until May 2007, the Sharmas were not aware that Plaintiff had such a cell phone.

    vii.  In May 2007, Mr.  Sharma gave a cell phone to Plaintiff.

viii.   Plaintiff used the cell phone given by Mr. Sharma until he left the Temple in June 2007.

ix.   Cell phone records reveal that Plaintiff regularly spent several hours on the phone every day.

x.   Cell phone records reveal that Plaintiff spent, on an average, over 700 hours on the cellphone every month.

xi.   Cell phone records reveal that Plaintiff made several phone calls to 718 217 5477 (Long Island Railroad), 800-325 6000 and 800 432 2226 (Western Union), 718 699 5959 (Car service), and 718 446 0505 (Beverly Hills Skin Care).

xii.   Cell phone records also reveal that Plaintiff made and received hundreds of other phone calls to or from other persons.

n.   *Visa Extension*

i.   On or about July 1, 2001, the Temple applied to the federal immigration authorities for extension of Plaintiff's visa, and paid the requisite application fee of $110.00.

ii.   By letter dated September 28, 2001, the federal immigration authorities requested the Temple and Plaintiff to provide additional documentation in order to process the Temple's request for extension of Plaintiff's visa.

iii.   In 2001, Mr. Sharma asked Plaintiff to provide the additional documents sought by the federal immigration authorities.

iv.   In 2001, Mr. Sharma asked Plaintiff for Plaintiff's birth certificate

22

and religious school records.

v.    In 2001, Plaintiff spoke to his brother in India over the phone, and asked him to send Plaintiff's birth certificate and religious school records.

vi.    By letter dated November 12, 2001, the Temple sent the additional documentation which had been provided by Plaintiff to the federal immigration authorities.

vii.    By letter dated February 12, 2002, the federal immigration authorities informed the Temple that the Temple's application for extension of Plaintiff's visa was deemed abandoned for failure to submit all the requisite documentation requested.

viii.    The federal immigration authorities had also requested Plaintiff's qualifications and birth certificates, which was his responsibility but he failed to submit them.

o.    *Temple Diaries*

i.    Plaintiff maintained, in his own handwriting, the Temple diary for 2001.

ii.    The 2001 diary is accurate.

iii.    Plaintiff maintained, in his own handwriting, the Temple diary for 2002.

iv.    The 2002 diary is accurate.

v.    Plaintiff maintained, in his own handwriting, the Temple diary for 2003.

23

vi.    The 2003 diary is accurate.

vii.   Plaintiff maintained, in his own handwriting, the Temple diary for 2004.

viii.  The 2004 diary is accurate.

ix.    Plaintiff maintained, in his own handwriting, the Temple diary for 2005.

x.     The 2005 diary is accurate.

xi.    Plaintiff maintained, in his own handwriting, the Temple diary for 2006.

xii.   The 2006 diary is accurate.

xiii.  Plaintiff maintained, in his own handwriting, the Temple diary for 2007 until June 25, 2007.

xiv.   The 2007 diary is accurate until June 25, 2007.

p.    *Coat Provided By Mr.  Ramchandani*

i.     Plaintiff performed the Diwali Pujas at Mr.  Ramchandani every year until 2006.

ii.    In 2003-04, Mr.  Ramchandani provided two custom-tailored coats for Plaintiff.

iii.   On October 23, 2006, Plaintiff went to Mr.  Ramchandani's office in Manhattan so that Mr.  Ramchandani could take measurements for a coat.

iv.    Mr.  Ramchandani's office in Manhattan is at Lincoln Building, now called One Grand Central Place.

24

       v.      In 2006, the Lincoln Building security would not allow any visitors to the building without a government issued photo identity such as a driver's license or passport.

q.    *Temple's Installation of Surveillance Cameras*

       i.       The Temple installed internal surveillance cameras on June 24, 2007.

       ii.     Four surveillance cameras were installed in the main floor of the Temple.

r.    *Plaintiff's Use of Computer, Learning English*

       i.       In 2001, Plaintiff started learning English.

       ii.     In 2001, Plaintiff was being taught English by worshippers in the Temple.

       iii.    From 2000 to 2007, Plaintiff asked some worshippers for help in learning English

       iv.    From around 2004, Plaintiff had a computer.

       v.      In 2004-2007, Plaintiff sent and received emails through the computer.

       vi.    The email address nikitivari@hotmail.com belongs to Plaintiff.

       vii.   Plaintiff also had an email address of devastrology@gmail.com.

       viii.  Plaintiff also had an email address of Devendra.shukla@ssloksabha.org.

       ix.    Plaintiff communicated with various people through these email addresses.

25

    x.    Plaintiff knew at least by 2004 that he could call 911 and get help from the police.

    xi.    From 2003, Plaintiff had and used a pocket tape recorder.

s.    *Plaintiff's Lack of Knowledge About Repairs*

    i.    Plaintiff does not know how to repair furniture.

    ii.    Plaintiff does not know how to repair plumbing leaks.

    iii.    Plaintiff does not know how to fix broken fixtures.

t.    *Plaintiff's Statements to the Public*

    i.    Between June - August 2007, Plaintiff told several persons, including Ms. Kathianne Bonniello of the New York Post and Mr. George Joseph of India Abroad that since 2000

        (1)    Defendants had kept Plaintiff as a "slave";

        (2)    Defendants had forced Plaintiff to work 16-hour days;

        (3)    Defendants had forbidden Plaintiff from leaving the Temple;

        (4)    Defendants had forced Plaintiff to perform domestic work at the Sharma's residence;

        (5)    Defendants had forced Plaintiff to paint the tenants' apartment in Temple property;

        (6)    Defendants had forced Plaintiff to do plumbing repairs;

        (7)    Defendants had forced Plaintiff to repair furniture;

        (8)    Defendants had constantly threatened Plaintiff;

        (9)    Defendants had forcibly taken away Plaintiff's passport and had refused to return it to him;

(10)   Defendants had paid Plaintiff wages below what he had been promised;

(11)   Defendants refused to provide Plaintiff with any means of obtaining food, and thereby forced him to survive on donations of food left as offerings by devotees;

(12)   Defendants forced Plaintiff to turn over his tips to the Temple;

(13)   Defendants pocketed money which had been donated to the Temple by devotees.

8.   <u>Witnesses, Together with a Brief Narrative of Expected Testimony</u>

a.   *Plaintiff's Witnesses*

i.   Devendra Shukla, residing at c/o Law Offices of Sanjay Chaubey350 Fifth Avenue, Suite 5013, New York, NY 10118.  His expected testimony to include that plaintiff was kept as a slave and was treated with disrespectand & inhumane ways, as well as to provide testimony relating to posseision of passport with defendants.

ii.   Arish Sahani, residing at 54-15 108 Street, Corona, NY 11368.

iii.   Gurnam Singh, residing at 111-16 66 Avenue, Apt 1B, Forest Hills, NY 11375.

iv.   Priya Sahani, residing at 54-15 108 Street, Corona, NY 11368.

v.   Manishi Agarwal, residing at 94-11 60th Avenue, Apt 6D, Elmhurst, NY 11373

    vi.        Yogesh Anand, residing at 1410 Broadway, Suite 1204, New York, NY 10018

    vii.      <u>D.S. Tuli, residing at:</u>                <u>Address to be provided</u>

b.    *Defendants' Witnesses*

    i.        Mr. Sat Prakash Sharma, residing at 3545 71st Street, Jackson Heights, NY 11372.  Mr. Sharma will testify about the subject-matter of the pleadings, including Defendants' lifestyle from 2000 to 2007, Defendants' relations with Plaintiff, Defendants' treatment of Plaintiff, Plaintiff's libelous statements and damage to Defendants' reputation, damages, conversion of Temple property, and breach of contract.

    ii.      Mrs. Geeta Sharma, residing at 3545 71st Street, Jackson Heights, NY 11372.  Mrs. Sharma will testify about the subject-matter of the pleadings, including Defendants' lifestyle from 2000 to 2007, Defendants' relations with Plaintiff, Defendants' treatment of Plaintiff, Plaintiff's libelous statements and damage to Defendants' reputation, damages, conversion of Temple property, and breach of contract.

    iii.     Mr. Amit Sharma, residing at 3545 71st Street, Jackson Heights, NY 11372.  Mr. Sharma will testify about the Sharmas' relations with Plaintiff, Defendants' treatment of Plaintiff, Plaintiff's

publication of libelous statements and damage to Defendants'
reputation, and the emotional distress caused by those statements.

iv.    Ms. Ruchi Sharma residing at 3545 71st Street, Jackson Heights,
NY 11372.  Ms. Sharma will testify about the Sharmas' relations
with Plaintiff, Defendants' treatment of Plaintiff, Plaintiff's
publication of libelous statements and damage to Defendants'
reputation, and the emotional distress caused by those statements.

v.    Mohan N. Ramchandani, One Grand Central Place Suite 1432,
New York, New York 10165.  Mr. Ramchandani will testify about
Plaintiff's lifestyle in the Temple from 2000 to 2007, Mr.
Ramchandani's provision of custom-tailored coats to Plaintiff,
Plaintiff's possession of his passport, and Plaintiff's relations with
the temple and the congregation.

vi.    Chandra Shah, residing at 100-16 39 Avenue, Corona, NY 11368.
Ms. Shah will testify about Plaintiff's lifestyle from 2000 to 2007, his
cell phone bills, functioning in the Temple, Plaintiff's possession of
his own passport, conversion of Temple property, and his
relationship with Temple congregants and Mr. Gurnam Singh.

vii.    Harbans Kaur, residing at 100-16 39 Ave., Corona NY 11368.  Ms.
Kaur will testify about Plaintiff's lifestyle from 2000 to 2007, his
possession of his passport, functioning in the Temple, and
relationship with congregants.

viii.    Ron Luther, 117-14 Atlantic Ave. , Richmond Hill, NY 11418.  Mr.

29

Luther will testify about Plaintiff's possession of his passport, Plaintiff's living conditions, photographs, Plaintiff's private business, Plaintiff's libelous statements.

ix.    Balwinder Kaur, 44-16  Munich Street,  Apt. 4d, Elmhurst, NY 11377.  Ms. Kaur will testify about Plaintiff's lifestyle from 2000 to 2007, his possession of his passport, functioning in the Temple, and relationship with congregants, Plaintiff's publication of libelous statements and damage to Defendants' reputation.

x.    Swami Harish Chander Puri, Founder, Shiv Shakti Peeth,  196-43 Foothill Avenue Hollis, New York 11423.  Swami will testify about the relationship between the parties, Defendants' repeated suggestions to Plaintiff to return to India, the propriety of the employment relationship and remuneration paid to Plaintiff by the Temple, Plaintiff's publication of libelous statements and damage to Defendants' reputation.

xi.    Anil Dua, 79-54 Long Dale Street, New Hyde Park, New York, 11040.  Mr. Dua will testify about the relationship between the parties, Plaintiff's living conditions,  and damage to Defendants' reputation caused by Plaintiff.

xii.    Alka Mehta, 94-16 40th Road, Elmhurst, NY  11373.  Ms. Mehta will testify about the relationship between the parties, and Plaintiff's living conditions.

xiii.    Vijay Kumar, 471 Burn Side Ave., in Wood, NY 11096.  Mr. Kumar

will testify about the relationship between the parties, Plaintiff's

functioning in the Temple, Plaintiff's relationship with the

congregants, and damage to Defendants' reputation caused by

Plaintiff.

xiv.  Tara Dolsi Sen, 32-50 55 Street, Woodside, NY 11377.  Mr. Sen

will testify about the relationship between the parties, Plaintiff's

living conditions.

xv.  Swami Mahesh Shastri, Ph.D, Founder of Shiv Temple , 195, W.

Nicholai St, Hicksville, NY 11801.  Swami will testify about the

propriety of the employment relationship between Plaintiff and the

Temple and the remuneration paid to Plaintiff.

xvi.  Pandit Ram Lall B.A. Dip.Ed, Founder of Arya Spiritual Center,inc.,

129-20 Hookcreek Blvd. Rosedale, NY 11422.  Mr. Lall will testify

about the propriety of the employment relationship between Plaintiff

and the Temple and the remuneration paid to Plaintiff.

xvii.  Sri Guru Ravidass Temple of New York, 61-01 Broadway, Wood

Side, NY11377.  The Temple representative will testify about the

propriety of the employment relationship between Plaintiff and the

Temple and the remuneration paid to Plaintiff.

xviii.  Candi Rivera, 104-38 Corona Avenue, Queens, New York.  Ms.

Rivera will testify about Plaintiff's living conditions and lifestyle, his

cable television viewing of XXX rated movies, her cleaning the

kitchen and bathroom of the Temple, and the condition in which

31

Plaintiff kept his living quarters.

xix.   W&H Properties, One Grand Central Place, New York, New York. W&H will testify about their security procedures in place from 2002.

xx.   Tharsame Singh: 100-16 39th avenue, Apt 2, Corona NY 11368. Mr. Singh will testify about Plantiff Lifestyle from 2000-2007, Plaintiff's possession of his own passport, plaintiff's functioning in the temple, and relations with the congregants.

xxi.   Jeet Singh: 44-11 Munich Street, Elmhurst NY 11373.  Mr. Singh will testify about Plaintiff's publication of libelous statements, and damages caused to Defendants' reputation.

xxii.   Kuldeep Kaur: 44-11 Munich Street, Elmhurst NY 11373.  Ms. Kaur will testify about Plaintiff's publication of libelous statements, and damages caused to Defendants' reputation.

xxiii.   Joga Singh: 471 Burnside Avenue, Inwood NY 11096.  Mr. Singh will testify about Plaintiff's visits to his shop and purchase of phone cards.

xxiv.   Sikh Cultural Society, Inc., 95-30 118th Street, Richmond Hill New York 11419.  The Society's representative will testify about the wages for priests, and their duties in temples in the community.

xxv.   Gopal Durga: 103-04 118th street, 11419.  Mr. Durga will testify about Plaintiff's relationhip with Defendants, Working/Living Conditions.

xxvi.   Hindu Samaj Mandir, 247 West Ramapo Avenue, Mahwah, NJ

32

07430.  The Mandir's representative will testify about Plaintiff's functioning, duties, and wages.

xxvii.  India Abroad Publications, Inc., 42 Broadway Suite 1836, New York, New York 10004.  The representative will testify about Plaintiff's libelous statements which were reproduced and published in India Abroad.

xxviii.  George Joseph, 42 Broadway Suite 1836, New York, New York 10004.  The representative will testify about Plaintiff's libelous statements which were reproduced and published in India Abroad.

xxix.  The New York Post, Manhattan, New York.  The representative will testify about Plaintiff's libelous statements which were reproduced and published in New York Post.

xxx.  Ms.  Kathianne Bonniello The New York Post, Manhattan, New York.  The representative will testify about Plaintiff's libelous statements which were reproduced and published in New York Post.

xxxi.  Sucha Singh: 94-19 124th St Richmond Hill, NY 11419.  He will testify about his having done all repairs to the plumbing, and all the maintenance work that Plaintiff claimed to have done.

xxxii.  Subash Patel, 110-30 63 ave, Forest Hills NY 11375.  Plaintiff's publication of libelous statements and damage to Defendants' reputation.

xxxiii.  Mr. Mehta, 94-16 40th Road, Elmhurst 11373.  Mr. Mehta will testify

33

about Plaintiff's living condition, and relationship with the
Defendants.

xxxiv.  Geeta Joshi : 18-24 Linden St, Apt 3L Ridgewood, NY.  Ms. Joshi
will testify about Plaintiff's living conditions and his relationship with
the Defendants.

xxxv.  Satya Pal Sachdeva: 89-38 238 st Bellerose, NY, 11426.  Mr.
Sachdeva will testify about Plaintiff's living conditions and his
relationship with the Defendants.

xxxvi.  Mintu Verma: 18 CherryLane, Hicksville Jerusalem, NY 11801 will
testify about Plaintiff's living conditions and his relationship with the
Defendants, and Plaintiff's astrology business.

xxxvii. Vijay Verma 19 West Cherry St, Hicksville NY 11801.  Mr. Verma
will testify about Plaintiff's living conditions and his relationship with
the Defendants, and Plaintiff's astrology business

xxxviii.  Ashu K. Vaid: 5 South 11st, New Hyde Park, NY 11040.  Mr.
Vaid will testify about Plaintiff's living conditions and his
relationship with the Defendants, and Plaintiff's astrology
business.

xxxix.  Ms. Shakuntala Mehta: 94-16 40th Road, Elmhurst NY 11373.  Ms.
Mehta will testify about Plaintiff's living conditions and his
relationship with the Defendants, and Plaintiff's astrology business.

xl.  Gurmeet Chabra 10 Cherry St, Hicksville NY 11801.  Mr. Chabra
will testify about Plaintiff's living conditions and his relationship with

34

the Defendants, and Plaintiff's astrology business.

xli.  Margaret Kaul: 84 Avenue 0 Brooklyn NY 11204.  Ms. Kaul will testify about Plaintiff's living conditions and his relationship with the Defendants, and Plaintiff's astrology business.

xlii.  S Chopra: 79-39 268 st Floral Park, NY 11004.  Mr. Chopra will testify about Plaintiff's living conditions and his relationship with the Defendants, and Plaintiff's astrology business.

xliii.  Raul Fernandez (address currently unknown, but will be provided later).  Mr. Fernandez was a tenant of the Temple, and will testify about Plaintiff's living conditions and his relationship with the Defendants, and Plaintiff's astrology business.

xliv.  Karam Vir, currently in Canada.  Mr. Karam Vir worked for the Temple, but left because there was no income in the Temple due to the libelous statements by Plaintiff

xlv.  Pandit Poornan Chand: 104-38 Corona Avenue, Corona NY 11368. He will testify about his work for the Temple, there is no income for the Temple, and Plaintiff's publication of libelous statements and damage inflicted upon Defendants.

xlvi.  Rich Krauss: 6152 State Route 52, Cochecton NY 12726.  Mr. Krauss will testify about the installation of camera.

xlvii.  Tara's Daughter (full name and address to be provided).  She will testify about Plaintiff's living Conditions, about her cleaning the Temple.

xlviii.   Raj-Kumari Naipal 58-29 Waldron St Corona NY 11368.  Ms. Naipal will testify about Plaintiff's publication of libelous statements and damages to Defendants, and gave substantial donations (tips) to Plaintiff.

xlix.   Ida – (Address to be provided).  Ms. Ida will testify about Plaintiff's publication of libelous statements and damages to Defendants, and gave substantial donations (tips) to Plaintiff.

l.   Pradeep Kaur – 100-16 39th avenue, Corona NY 11368.  Mr. Kaur will testify about certain videos that he took, which reflect Plaintiff's demeanor and mood negating his alleged "enslavement."

li.   Avtar Lal 100-16 39th avenue, Corona NY 11368.  Mr. Lal will testify about certain videos that he took, which reflect Plaintiff's demeanor and mood negating his alleged "enslavement."

lii.   Mahant Yogender Puri: (Geeta Temple of NY 9211 Corona Avenue Elmhurst, NY 11373.  Mr. Puri will testify about Plaintiff's publication of libelous statements and damage to Defendants.

liii.   RBC Radio Station, New York.  The corporate representative will testify about Plaintiff's radio programs in Hindi which were broadcast by the station.

9.   <u>Exhibits</u>:

a.   *Plaintiff's Exhibits* - Annexed Schedule, Exhibits identified by number

b.   *Defendants' Exhibits* - Annexed Schedule, Exhibits identified by letters.

c.   *Plaintiff's Objections to Defendants' Exhibits*:

d.    *Defendants' Objections to Plaintiff's Exhibits*

i.    Exhibit No. 5 (Affidavit of Devendra Shukla sworn on December 15, 2008) - Hearsay, relevance.

ii.   Exhibit No. 6 (Certificate from New York State Department of State Division of Corporation showing Vishva Seva Ashram of New York, Inc. as Active Domestic Business Corporation with initial filing date of January 23, 2003) - Hearsay, Authentication, Relevance, "Law of the Case."

iii.  Exhibit No. 7 (Certificate from New York State Department of State Division of Corporation showing Vishva Seva Ashram of New York, Inc. as Inactive Domestic Business Corporation with effect from October 28, 2009) - Hearsay, Authentication, Relevance, "Law of the Case.".

iv.   Exhibit No. 10 (Photographs of Plaintiff showing living conditions, and performance of his duties) - Hearsay, Authentication, Relevance, "Law of the Case."

v.    Exhibit No.  11 (R-1 visa instructions and form).  Hearsay, Authentication, Relevance.

37

Dated: New York, New York
      July 6, 2010

                             **Chittur & Associates, P.C.**

                             _____Sd/_____
                             Krishnan S. Chittur, Esq.
                             286 Madison Avenue Suite 1100
                             New York, New York 10017
                             Tel: (212) 370-0447

                             Attorneys for Defendants

                             **Law Offices of Sanjay Chaubey**

                             _____
                             Sanjay Chaubey, Esq.
                             350 Fifth Avenue
                             Empire State Building
                             New York, New York 10118
                             Tel: (212) 563 3223

                             Attorneys for Plaintiff

38