UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DEVENDRA SHUKLA,

                Plaintiff,

-against-                                  NOT FOR PUBLICATION
                                        **MEMORANDUM  & ORDER**
SAT PRAKASH SHARMA, individually        07-CV-2972 (CBA) (CLP)
and as Director of VISHVA SEVA ASHRAM
of NEW YORK, et al.,

                Defendants.
----------------------------------------------------------------x

**AMON, Chief United States District Judge**

      Between December 6, 2010 and December 15, 2010, the Court held a jury trial in the

above-captioned action.   On December 15, 2010, the jury returned a verdict, finding, by a

preponderance of the evidence, that defendants Sat Prakash Sharma ("Sat Sharma"), Geeta

Sharma, and the Vishva Seva Ashram of New York ("the Ashram" or "the Temple") were liable

for forced labor and trafficking for the purpose of involuntary servitude or forced labor.  The jury

also found for defendants on a counter-claim, that plaintiff libeled the defendants.   The jury

awarded $250,000.00 in compensatory damages for the forced labor claim, $750,000.00 in

compensatory damages for the trafficking claim, and $2.5 million in punitive damages for the

trafficking claim.   The jury awarded $300,000.00 in compensatory damages to Sat Sharma,

$150,000.00 to Geeta Sharma, and $50,000.00 to the Ashram for the libel claim.  Defendants Sat

Sharma, Geeta Shrama, and the Ashram now move for judgment as a matter of law under Fed. R.

Civ. P. 50 or, alternatively, a new trial and reduced damages pursuant to Fed. R. Civ. P. 59.

    **I.**        ***Motion of Judgment as a Matter of Law***

      Defendants move for judgment as a matter of law on each of plaintiff's claims, arguing

that: (1) no reasonable juror could conclude that a reasonable person of the plaintiff's

background and circumstances would continue to perform labor or services in order to avoid the alleged "serious harm;" (2) no reasonable juror could conclude that defendants' alleged acts actually caused plaintiff to perform any labor or services; (3) certain of plaintiff's allegations are too vague for a reasonable juror to conclude that the allegations are either "threats" or constitute "serious harm;" (4) certain of the alleged threats cannot be attributed to the Sharmas or the Ashram or were not directed at plaintiff; and (5) plaintiff's alleged cleaning duties were not forced labor but were in fact part of his contractual obligations.

Under Rule 50, "[j]udgment as a matter of law is proper when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" United States v. Space Hunters, Inc., 429 F.3d 416, 428 (2d Cir. 2005) (citing Fed. R. Civ. P. 50(a)(1)). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Space Hunters, Inc., 429 F.3d at 429 (internal quotation marks and citation omitted). Thus, a Rule 50 motion may be granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998). In making its evaluation, the court should "review all of the evidence in the record." Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)

Defendants argue that the evidence introduced at trial is legally insufficient to sustain a finding of liability for forced labor, 18 U.S.C § 1589, and trafficking for the purpose of forced labor or involuntary servitude, 18 U.S.C. § 1590, under the Trafficking Victims Protection Act ("TVPA"). In arguing that motion, defendants break the evidence in the record into categories, explaining why each category does not itself support the verdict. On a Rule 50(b) motion,

however, the Court cannot isolate bits of evidence, but must instead "view the evidence as a whole . . . ." Tolbert, 242 F.3d at 70 (remanding for failure to consider evidence as a whole). For the reasons stated below, the Court finds that the evidence as a whole, taken in the light most favorable to plaintiff, is sufficient to support the jury's verdicts.

### 1.   *Forced Labor*

Civil liability for forced labor under 18 U.S.C. 1589 requires a finding by a preponderance of the evidence that (1) the defendant obtained the labor or services of another person; (2) the defendant did so through one of the following prohibited means (a) through serious harm or threats of serious harm to . . . that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to . . . that person or any other person; or (c) through the abuse or threatened abuse of the law or the legal process; and (3) the defendant acted knowingly. United States v. Sabhnani, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008).

"Serious harm" "includes threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or to continue providing labor or services." United States v. Bradley, 390 F.3d 145, 151 (1st Cir. 2004), vacated on sentencing grounds, 545 U.S. 1101 (2005); see also 18 U.S.C. § 1589, as amended by Pub. L. 110-457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law). "Abuse of the law or legal process" is the use of threats of legal action, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed in order to coerce someone into working against that person's will. United States v. Garcia, No. 02-CR-110S-01, 2003 WL 22956917, at *4-5 (W.D.N.Y. Dec. 2, 2003) (quoting Restatement (Second) of Torts § 682); see also 18 U.S.C.

§ 1589, as amended by Pub. L. 110-457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law).

A worker's "employment and living conditions" may provide support for a jury's conclusion that a defendant's threats "plausibly . . . compelled the victim[] to serve." United States v. Farrell, 563 F.3d 364, 373 (8th Cir. 2009) (quotations omitted); see also United States v. Veerapol, 312 F.3d 1128, 1130-21 (9th Cir. 2002) (considering working conditions, including "excessive working hours," in analyzing involuntary servitude claim); Sabhnani, 539 F. Supp. 2d at 620 (discussing working conditions). Thus, for example, where a worker testified that his rigorous work schedule "precluded sleep at least four times a week," the court in Farrell found that fact relevant to the question of whether the victim's labor was compelled. 563 F.3d at 373.

Defendants do not dispute that they obtained plaintiff's labor or services. Nor is there any dispute, for purposes of this motion, that defendants acted knowingly. Instead, defendants challenge the sufficiency of the harm at issue. Here, viewing all of the facts in the light most favorable to plaintiff, the harm or threatened harm alleged was sufficient for a reasonable jury to conclude that plaintiff was subjected to forced labor.

According to plaintiff's testimony, he was first approached in India by Satya Dev Sharma ("Satya Dev"), defendant Sat Sharma's brother, in January or February of 2000 about coming to the United States to work at the Ashram.[1] (Tr. 49). Sat's brother made certain assurances to plaintiff about his living conditions and salary. (Tr. 51). When he arrived, plaintiff found that these assurances were untrue. The room he was promised turned out to be a cramped, dirty, rat-infested, windowless space next to a public bathroom. (Tr. 59-61; 458). And, although the

---

[1] Defendants could not be held liable for any conduct prior to the enactment of the Trafficking Victims Protection Reauthorization Act in late 2003, which added a civil cause of action. The jury was instructed as such. As the jury was also instructed, however, the evidence can be considered as background and context for the alleged post-amendment conduct.

veracity of this claim is contested, plaintiff claims that his bed was positioned directly below a truncated pipe. (Tr. 60).

Plaintiff testified that throughout his time at the Temple, his typical work day began at 5:00 a.m. and ended at 10:00 p.m. (Tr. 98-99). He testified that he would not be able to eat dinner until after 11:00 p.m. (Tr. 99). In addition to his responsibilities as priest, the Sharmas required him to perform janitorial work. He would clean the basement and bathroom, provide maintenance for the Temple, and wash the dishes, pans, and pots. (Tr. 98). He was put to work painting several apartments on the second floor of the Temple that were rented out to tenants (Tr. 104-05), and was told to do the plumbing. (Tr. 105). Additionally, plaintiff testified that over the course of the seven years he lived at the Temple, Sat Sharma put him to work doing construction and yard work at the Sharma's house. (Tr. 103).

According to plaintiff, the defendants also restricted his freedom and privacy. He was under strict instructions to report to Geeta Sharma what had happened every day. (Tr. 98). Plaintiff also testified that at least one of his phone conversations with his wife was recorded and played back to him by another of Sat Sharma's brothers. (Tr. 220-21).

Plaintiff testified that when he first arrived in the United States, the Sharmas confiscated his passport. (Tr. 156; see also Tr. 414-19, 430, 461, 476, 501-02 (testimony of other witnesses)). According to plaintiff, the passport was not returned until June 2007 when he decided to leave the Temple and went to the police. (Tr. 67, 162, 165-68). Plaintiff testified that in 2006, Geeta Sharma informed him that his residence in the United States was not legal. (Tr. 153). He testified that subsequently, Geeta Sharma and Satya Dev, Sat Sharma's brother, warned him "that they own bars and they are friends with judges, that the police commissioner comes to their bar and that if [plaintiff] took a step in the wrong direction, just like he sent

[plaintiff's] brother away, he will have [plaintiff] sent away, just like that." (Tr. 154).

Plaintiff further testified that in April or May 2007, defendants took his possessions. He explained that one night, from around 7:00 p.m. to 10:00 p.m., Sat Sharma took him to a Home Depot. (Tr. 133). When they returned, they found the door ajar, and plaintiff's personal effects, including his computer and cell phone, had been removed. (Tr. 133-34). Although the incident appeared to be a burglary, plaintiff then found his belongings in a garbage bag elsewhere in the Temple. (Tr. 133). Plaintiff told Sat Sharma that they should call the police, but Sharma responded that it was already too late in the night. (Tr. 136). Sat said he would take the bag home with him for fingerprinting. (Tr. 136). Plaintiff testified that he did not get his telephone back until he confronted the Sharmas and left the Temple in June. (Tr. 136).

One of the items taken from plaintiff at the time of the alleged burglary was a laptop computer. (Tr. 136). The computer was lent to him by a devotee, Amit Buree. (Tr. 136). Plaintiff testified that after Sat Sharma took plaintiff's possessions, Buree told Sat Sharma that the computer in fact belonged to him. (Tr. 137). Plaintiff testified that when Buree spoke to Sat Sharma, the following occurred in his presence: "[T]hey were both, Mr. Sharma and Mrs. Sharma, they were yelling at Amit there and accusing him for his courage in making a gift to me. And both of them, Mr. Sharma's son is also Amit, they together beat up on the other Amit." (Tr. 138).

Crediting plaintiff's allegations, as it must, the Court now turns to their legal sufficiency. The threat of deportation may itself constitute a threat sufficient to satisfy the second element of forced labor. United States v. Calimlim, 538 F.3d 706, 713 (7th Cir. 2008); see also United States v. Kozminski, 487 U.S. 931, 948 (1988) ("[T]hreatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even

6

though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude."). In <u>Calimlim</u>, the defendants retained the victim's passport, never informed the victim that they were themselves breaking the law by employing her, and never offered to regularize her presence in the United States. The court explained that the defendant's "vague warning that someone might report [the victim] and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave." "That is all the jury needed to convict." <u>Calimlin</u>, 538 F.3d at 713.

Defendants argue that the threat of deportation was not sufficient because plaintiff testified that he wanted to return to India, (Tr. 153). But returning to India lawfully and being subjected to deportation are clearly distinguishable. As plaintiff himself testified, "I came from India here not to get arrested here." (Tr. 154). Defendants also argue that because Geeta Sharma is an immigrant with a language barrier, it is not plausible that she was sufficiently connected to authorities that she could have had plaintiff sent away. But it was not unreasonable, considering his background and circumstances, that plaintiff lacked the courage to call her bluff. And even if plaintiff did recognize Geeta's specific threat as puffery, a reasonable person of plaintiff's background and circumstances could still fear that Geeta Sharma might contact the authorities if plaintiff was uncooperative.

Defendants also argue that a reasonable person in plaintiff's circumstances would not have been compelled to continue to provide labor or services. Defendants attempt to characterize plaintiff as a community leader who could easily turn to his congregants for help, as indeed he did in 2007. But defendants again fail fully to appreciate that the jury could have considered plaintiff's background and circumstances. The jury could have concluded that

plaintiff was an immigrant without his passport, that he had no money, and that that he did not speak English. Under the circumstances, a rational jury could find that a reasonable individual in plaintiff's position would feel compelled to provide the labor and services in question.

### 2. Trafficking

Defendants were also found liable for trafficking plaintiff for forced labor or involuntary servitude.  An individual has committed trafficking, in violation of 18 U.S.C. § 1590, where that person "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services [for the purpose of forced labor or involuntary servitude]."  Samirah v. Sabhnani, 772 F. Supp. 2d 437, 448 (E.D.N.Y. 2011). Defendants do not dispute, for purposes of this motion, that they knowingly harbored plaintiff.  As the Court has already found that a reasonable jury could find that defendants subjected plaintiff to forced labor, the Court finds that the elements of trafficking are satisfied.

### II.     Motion for a New Trial as to Liability

Defendants next move for a new trial pursuant to Federal Rule of Civil Procedure 59. Defendants argue that they are entitled to a new trial because: (1) plaintiff's testimony was in part perjured; (2) trial counsel failed to introduce certain evidence; (3) plaintiff's testimony was not credible; and (4) the jury's verdict was inconsistent.

Under Rule 59(a) of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed R. Civ. P. 59(a). A court "has significant discretion in deciding whether to grant a Rule 59 motion for a new trial." Manganiello v. Agostini, 2008 WL 5159776, at *8 (S.D.N.Y. 2008) (citing Amato v. City of Saratoga Springs, 170 F.3d 311, 314 (2d Cir. 1999)).  Unlike a Rule 50 motion, which calls upon

a court to view the evidence in the light most favorable to the verdict winner, a court considering a Rule 59 motion "may independently weigh the evidence." Id.  Nonetheless, a court should not grant a new trial unless the "court determines that, in its independent judgment, the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks omitted).

### 1.  Plaintiff's Testimony

Defendants contend that they are entitled to a new trial because plaintiff's testimony was perjured.  Defendants argue that plaintiff perjured himself when he stated that he never received any salary for the work he performed, that he was too "mortally scared" to reach out to the Indian embassy for help, that his bedroom in the basement had a "truncated pipe" protruding from the wall directly above his head where he slept, and that he could not speak English.

### a.  Salary

Defendants argue that plaintiff perjured himself by stating that "he never received any salary for any of the work he performed."  Defendants misstate the record.  Although plaintiff did state, as translated, "I never got a salary," (Tr. 115), in the part of the record cited by defendants, plaintiff's full testimony was as follows:

Q: When was the first time when you received your salary Mr. Shukla?

A:  I never got a salary.  Maybe $50 when he came back from India.

THE INTERPRETER:  I'm sorry, your Honor, can I ask him to repeat the answer?

THE COURT:  Yes.

A:  Well, after I made a demand when they came back from India and I asked for it they gave me $50.

Q:  So, you are telling us that was the only compensation you got or that will be the only salary which you will receive?

A:  Well, the first time that is all I got.

Q:  After their return, did you ever get any other monies paid by your employers for your salary?

A:  Well, every month they would give me $50 from 2000 onwards.  From 2001 onwards, they raised to to [sic] 100.  After about a year, let's say, in 2001, they for the first time sent some money to my home.

Q:  Do you recall what was the amount?

A:  Well, that will convert to something like one Lakh of Indian Rupees at the currency value at that time.

Q:  Do you know how many dollars it would make 100,000 Indian Rupees?

A:  At that time, as far as I recall, the rate at that time was about 42, 43 Rupees to a dollar.

THE COURT:  How much money did they send to your family?

THE WITNESS:  One Lakh, a hundred thousand Rupees, the first time.

. . . .

Q:  So would it be correct to state that after a year your family received approximately $2,200?

A:  By that math, yes.

(Tr. 115-116).

As the above cited testimony shows, plaintiff testified that he did receive some salary.  His testimony was that he did not receive any salary at first, but that subsequently he received $50 per month and later $100 per month personally, with an additional $2,200 per year being sent to his family.

Defendants note that plaintiff testified at his deposition that his family had received 949,000 rupees, which, by their calculation, equaled roughly $20,100.  By contrast, $2,200 per year for seven years equals $15,400.  The Court does not find this disparity troubling, however,

especially in light of the qualification "approximately."   Moreover, elsewhere in plaintiff's testimony, he stated that his family in India received approximately $20,000.  (Tr. 225).

      *b.   "Mortally Scared" to Contact the Indian Embassy*

Defendants argue that plaintiff perjured himself by testifying that he was too "mortally scared" to reach out to the Indian embassy for help.  Defendants argue that plaintiff's testimony must be perjured because he did eventually contact the Indian embassy in 2007.  This logic is not persuasive. The fact that plaintiff finally mustered the courage to contact the embassy does not mean that he was not afraid to do so at an earlier point in time.

      *c.   Truncated Pipe*

Next, defendants argue that plaintiff perjured himself by testifying that there was a "truncated pipe" in his basement bedroom, protruding from the wall directly above his head where he slept.  Defendants have submitted an affidavit from Theodore Wagner, who states that he is a licensed master plumber, that he installed plumbing in the basement of the Ashram in 1993, and that no pipes were installed in any room other than the kitchen and bathroom.  (Def. Mot., Ex. A.)  Wagner affirms that he inspected the premises on January 6, 2011, and states that "there has been no alteration to the plumbing in the Temple's cellar since I initially installed it in 1993."  (Id.)  Defendants also submit an affidavit from Mario Anthony Pesa, who states that he worked on the Ashram in 1994.  (Defs. Mot., Ex. B.)  Pesa stated that "there is no indication that any plumbing work was performed on Mr. Shukla's room in the basement."  (Defs. Mot., Ex. B.)

To begin with, defendants have proffered no reason why the testimony of Wagner and Pesa could not have been introduced at trial.  At trial, defendants did in fact introduce testimony from Willie Pearson, a "handyman, carpenter, [and] plumber," (Tr. 528), who testified that he had performed repairs at the Temple since 1999 (Tr. 529), that he had visited the plaintiff's room

11

(Tr. 530), and that he had never seen the pipes depicted in the pictures introduced by plaintiff. (Tr. 531.)  He further testified, however, that he had observed damage on the wall in plaintiff's bedroom indicating that the wall had been cut "at the front where I'm thinking the head of the bed would be.  Like on the pictures where you saw the pipes coming out."  (Tr. 544-45).

The affidavits provided by defendants indicate that at the time renovations were performed in 1993-94, no plumbing was installed in plaintiff's bedroom, and that when Wagner and Pesa returned in January 2011 there had been no change to their work.  The affidavits do not establish, however, that there had never been a pipe in plaintiff's bedroom. Indeed, the fact that Pearson saw damage to the wall where plaintiff had indicated the pipes were located could indicate that pipes had been removed and the wall patched up.  And in any event, even if Wagner's and Pesa's testimony were persuasive, defendants have not explained why these statements, having never been subjected to adversarial testing, should be considered so weighty as to warrant a new trial.

In sum, the Court does not find that this dispute over the truncated pipe rendered the result seriously erroneous or a miscarriage of justice.

### d. *English Language Skills*

Finally, defendants argue that plaintiff's reliance on a translator at trial was "perjury at worst and grossly misleading at best."  (Tr. 18-19).  Defendants base this assertion on a DVD video of a prayer service submitted to the Court in which plaintiff conducted prayer in English (Def. Mot., Ex. D). They also provide yet another post-trial affidavit, this time from Dolsi Sen, who states that he is a devotee at the Ashram, that he has known plaintiff since he arrived in the United States, and that he has observed plaintiff writing in English, speaking English during a prayer at Sen's house, translating for his sisters, who do not speak Hindi, and explaining

religious concepts to them in English.  (Def. Mot., Ex. D).

The fact that plaintiff has some English language facility, however, would not indicate that plaintiff was so fluent in English that a translator was not required at trial.  With respect to the DVD, clerics in many faiths conduct services in languages in which they would not be able to testify. And other evidence in the record corroborates that plaintiff's Engligh language skills are somewhat limited.  Priya Sahani Sood testified that she gave plaintiff weekly English lessons for a period of time, but that this ended abruptly in 2004 when plaintiff stopped contacting her. (Tr. 512-14).  Sood further testified that when she and plaintiff speak now, she tries to force him to speak English and "felt good that he's learning a little English." (Tr. 516). The testimony of another devotee, Aresh Sahani, indicates that plaintiff lacked English language skills at least as late as 2005, (Tr. 415), contradicting testimony that he could speak English at the time he arrived in the United States.

The Court finds that defendants have not submitted evidence showing either that plaintiff perjured himself by using a translator, or that such use was misleading.

### 2.  Counsel's Failure to Introduce Certain Evidence

Defendants next argue that they are entitled to a new trial because of trial counsel's failure to introduce certain evidence.  Specifically, they argue that their trial counsel should have introduced "voluminous construction contracts, invoices, receipts, and checks to pay for construction work that the Sharmas had done on their various properties between 2000-2007" (Def. Br. 20), testimony from an expert witness as to the typical duties of a Hindu priest, and "evidence that plaintiff had at least four more email addresses than the one he acknowledged at trial."  Additionally, defendants argue that trial counsel "failed to introduce into evidence an invoice indicating that mikitivari@hotmail.com ordered penis enlargement [p]ills."  (Defs. Br.

20.)

As an initial matter, defendants have not established that they may attack the jury's verdict on the ground that their trial counsel decided not to advance certain evidence.  Civil litigants are "held accountable for the acts and omissions of their chosen counsel." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 397 (1993); see also Hoodho v. Holder, 558 F.3d 184, 192 (2d Cir. 2009) ("[A] party who voluntarily chose an attorney as his representative in an action cannot avoid the consequences of the acts or omissions of this freely selected agent." (internal quotation marks, citation, alterations omitted)).  Put simply, defendants cite no case in which a court found that an attorney's allegedly unreasonable decision not to introduce certain evidence requires a new trial.   Second, even assuming some egregious oversight by counsel would warrant a new trial, defendants have not made such a showing.

    *a. Construction Records*

Counsel's failure to introduce "construction contracts, invoices, receipts, and checks to pay for construction work that the Sharmas had done on their various properties between 2000-2007" did not result in a seriously erroneous result or a miscarriage of justice.  Defendants argue that such documents would rebut plaintiff's claims that the Sharmas took him out of the Ashram to perform construction work late at night. They reason that "if the Sharmas were already paying trained professionals to do that work, they lack any motive to have an untrained amateur perform those same services." (Def. Mot. 20.)  It is not inconceivable, however, that defendants paid professionals to perform some work, while attempting to save money or speed the process by requiring plaintiff to perform other work.  The documents in question would therefore not even contradict plaintiff's testimony.

### b. *Expert Witness Testimony*

Defendants next complain that counsel did not introduce evidence from an expert witness. Defendants argue that because plaintiff testified that certain tasks made him miserable or were performed only because defendants required it, trial counsel should have called an expert witness on the duties of Hindu priests who would have testified that the tasks in question were not unusual. Defendants provide an affidavit from Pardeep Sharma, who states that he is a Hindu priest and who further states that tasks such as cleaning deities, visiting devotees' homes, and conducting services until late at night are standard for Hindu priests. (Def. Mot., Ex. H.)

The fact that certain tasks are frequently performed by Hindu priests does not show that plaintiff was not forced to perform them through threats of serious harm or the abuse of legal process. And although the testimony from an expert witness might have aided the jury in evaluating plaintiff's testimony, this Court is left only to speculate about precisely how helpful it would have been to defendants' case. Perhaps counsel concluded that such testimony would not stand up to cross-examination, or that it might contain other revelations that would do more harm on balance. The absence of one-sided expert testimony, considered in the abstract, is not enough to warrant a new trial.

### c. *Email Addresses and Penis Enlargement Pills*

Trial counsel's failure to introduce evidence that plaintiff had more than one email address and that plaintiff used one email address to purchase "penis enlargement pills" also did not lead to a seriously erroneous result or a miscarriage of justice. Defendants argue that this evidence would rebut plaintiff's allegation that he was too "mortally scared" to leave the Ashram. Apparently, defendants' argument is that if plaintiff was too scared to leave the Temple, he should also have been too scared to order sexual material, like penis enlargement

pills.

Even if this logically followed, defendants did submit evidence showing that plaintiff had ordered pornographic movies, (Tr. 564), and called sexually explicit (900) phone numbers, (Tr. 781-82, 784). Accordingly, even if the email addresses and penis enlargement pills were somehow relevant, this evidence would be little more than cumulative. The jury obviously was not persuaded that this type of evidence undermined plaintiff's claims. A new trial is not warranted on this basis.

### 3.  Trial Counsel's Cross-Examination

Defendants argue that a new trial is warranted because trial counsel "failed to adequately cross-examine the plaintiff on the inconsistencies between plaintiff's trial testimony and his deposition." (Def. Br. 21.)  Defendants do not indicate precisely which deposition testimony counsel should have cross-examined plaintiff about. Defendants do make reference to their prior argument about plaintiff's allegedly perjured testimony. But the only arguable inconsistency noted in this section between plaintiff's deposition and trial testimony involved the amount of his salary. As already stated, it is not clear that such statements were in fact inconsistent or even misleading. Even assuming defendants could move for a new trial on this ground, the Court finds that trial counsel's cross-examination did not lead to a seriously erroneous result or a verdict that is a miscarriage of justice.

### 4.  Plaintiff's Credibility

Defendants next attack the verdict on the ground that plaintiff's testimony was generally not credible. They point to a series of facts that they believe severely undermine plaintiff's claim that he was "mortally scared." First, they argue that plaintiff's claim that he was afraid to call for help on the phone because he believed Geeta Sharma was eavesdropping is undermined by (a)

16

his admission that he did not think she listened to every phone call; (b) that he did not know how Geeta Sharma was recording his phone calls; and (c) that he had at least one email address, so he could have emailed for help.  Second, they argue that plaintiff's claim that he was scared to call for help is undermined by the fact that plaintiff did indeed complain about some of the conditions in the Temple to another devotee, Arish Sahani, who testified at trial.  Third, they argue that plaintiff's alleged fear to go to the Indian Embassy is undermined by the fact that he did in fact go to the U.S. Attorney's Office and the police, and that surely he would have been more comfortable going to the Indian Embassy given his English language deficiency.

Fourth, defendants complain that it is implausible that plaintiff would report his stolen passport to the authorities but not also tell them that he was subject to forced labor. Fifth, they again argue that ordering adult films and dialing (900) sex numbers is inherently inconsistent with being subjected to forced labor. Sixth, they argue that the fact that plaintiff, according to his testimony, was aware of the "freedoms and liberty" available in the United States makes it implausible that he would be scared to seek help. And lastly, they argue that plaintiff's decision finally to leave the Temple was in fact motivated by the installation of a security camera designed to thwart his independent astrology business.

These inconsistencies are not nearly as damning as defendants suggest.  Each is targeted primarily at one isolated (and translated) phrase—"mortally scared"—which defendants apparently take as plaintiff's assertion that he was at all times between 2003 and 2007 paralyzed with fear.  The Court does not find the phrase "mortally scared," when compared with the remainder of plaintiff's testimony, so troubling.   Indeed, the purportedly uncomfortable inconsistencies pointed to by defendants could just as easily be seen as forthright qualifications of plaintiff's assertion of "mortal fear."  The jury, apparently, read them this way, for it credited

17

plaintiff's testimony.  The Court sees no reason to upset the jury's considered judgment.

### 5.  *Weight of the Evidence*

Defendants next ground for a new trial is that the verdict is against the weight of the evidence.  It is well-recognized that a district court has discretion to order a new trial on this ground. Byrd v. Blue Ridge Rural Elec. Co-op, Inc., 356 U.S. 525, 540 (1958).  Defendants argue (a) that two witnesses saw plaintiff with his passport at certain times and that two others saw the passport in the Temple with statues of Hindu deities; (b) that plaintiff's room was larger than he alleged, that he had another living quarters, and that no pipe was protruding from the wall; and (c) that plaintiff was paid for his work because he signed a ledger each month indicating that he had received his salary, and that his family in India did indeed receive their half of his salary.

These arguments are little more than recapitulations of those discussed above, and again the evidence pointed to by defendants is far less compelling than they suggest.  As to the passport, none of the individuals who allegedly saw plaintiff's passport provided direct evidence that it was in fact plaintiff's passport.  As to plaintiff's living quarters, another witness, Priya Sood, corroborated plaintiff's estimate on the size of the room, (Tr. 516), and Ron Luther's assertion that plaintiff had another apartment upstairs was mostly surmise (Tr. 608).  And as to whether plaintiff received a salary, the defendants' circumstantial evidence is simply not enough to upset the jury's decision that plaintiff's account at trial was the truthful one.

### 6.  *Jury's Verdict*

Finally, defendants argue that a new trial is required because the jury's verdicts are internally inconsistent.  The jury found by a preponderance of the evidence that defendants had committed forced labor in violation of 18 U.S.C. § 1589 and had trafficked plaintiff for

involuntary servitude or forced labor, in violation of 18 U.S.C. § 1590.  The jury also found, however, that plaintiff libeled defendants by making oral statements to Kathianne Bonniello of the New York Post and George Joseph of India Abroad, which were subsequently published by those newspapers, including:

- Defendants kept plaintiff as a slave since 2000, repeatedly told plaintiff "this is what happens to people with brown skin," and showed news clippings to plaintiff of terrorists jailed at Guantanamo Bay;
- Defendants, since 2000, forced plaintiff to work 16-hour days, forbade him from leaving the Ashram, and constantly threatened him physically and emotionally.

Although a party may challenge inconsistent general verdicts on the ground of an alleged error in the trial court's jury instructions,[2] see Jarvis v. Ford Motor Co., 283 F.3d 33, 56 (2d Cir. 2002), many courts have expressed doubt whether the inconsistency of a civil verdict itself is grounds for a new trial. In re Vivendi Universal Sec. Litig., 765 F. Supp. 2d 512, 554 n.33 (S.D.N.Y. 2011) (collecting cases). Compare Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003) ("We have found no Supreme Court or Ninth Circuit case in which an appellate court has directed the trial court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit precedent dictates that we cannot do so."); Merchant v. Ruhle, 740 F.2d 86, 91 (1st Cir. 1984) ("We subscribe . . . to a substantial reluctance to consider inconsistency in civil jury verdicts a basis for new trials."); Malm v. U.S. Lines Co., 269 F. Supp. 731, 731-32 (S.D.N.Y. 1967) ("Inconsistent jury verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law."), with Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd., 791 F.2d 1416, 1423 (10th Cir. 1986)

---

[2] Defendants do not assert that the Court's jury instruction was error. Nor could they, because any such objection is waived by their failure to object to the instructions before the jury retired to deliberate. See Jarvis v. Ford Motor Co., 283 F.3d 33, 56 (2d Cir. 2002) ("Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed. R. Civ. P. 51," but "a party must object before the jury retires to deliberate.")

(recognizing that facially inconsistent general verdicts may be grounds for a new trial); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 677 & n.5 (7th Cir. 1985) (same).

In any event, it is clear to this Court that if it does have the authority to order a new trial on this ground, it also has the duty to "adopt a view of the case, if there is one, that resolves any seeming inconsistency." Cf. Brooks v. Brattleboro Mem'l Hosp., 958 F.2d 525, 529 (2d Cir.1992); Munafo v. Metro. Transit Auth., 381 F.3d 99, 105 (2d Cir. 2004) ("To justify setting aside an otherwise valid jury verdict, the special verdict answers must be 'ineluctably inconsistent.'")

The jury's verdicts are not without tension, but the Court finds that they can be harmonized.  First, although trafficking and forced labor are often described as "modern slavery," e.g. United States Dep't of State, What is Modern Slavery, http://www.state.gov/ g/tip/what/index.htm (last visited January 22, 2012), a reasonable juror's conception of slavery may not be perfectly congruent with the conduct proscribed by the TVPA.  As defendants point out, a "slave" is traditionally understood as "a person held in servitude[;] one that is the chattel of another," Webster's Third New International Dictionary 2139 (3d ed. 1986).  The latter half of this definition connotes the atrocity of holding an individual as property, a practice sadly familiar to anyone with even a passing knowledge of American history, and one that continues today, see United States Dep't of State, Trafficking in Persons Report 2011, at 19 (2011), available at http://www.state.gov/documents/organization/164452.pdf ("People are bought and sold as commodities within and across borders to satisfy demand from buyers.").  But liability under § 1589 does not require that the victim be the defendant's chattel.  That is, liability does not require that the victim be the defendant's property in the sense that he was purchased by defendants or that he could have been marketed or sold by defendants to another.  The jury could

20

have seized on this distinction in rendering its verdicts.

Accordingly, defendants are not entitled to a new trial.

**III.     *Motion for a New Trial as to Damages, or for Remittitur***

Defendants also challenge the damage awards in this case.  As explained above, the jury awarded compensatory damages of $250,000.00 total on the forced labor claim, compensatory damages of $750,000.00 total on the trafficking claim, and punitive damage awards on the trafficking claim of $750,000.00 against both Geeta and Sat Sharma and $1 million against the Ashram.  Defendants argue that the compensatory damage awards—$250,000.00 for the forced labor claim and $750,000.00 for the trafficking claim—are duplicative of each other, and that, in any event, both the compensatory and punitive damage awards are excessive.  The Court does not find that the compensatory damage awards are duplicative or excessive, but does find remittitur appropriate on the punitive damage awards.

### 1.  *Duplicative Compensatory Damages*

Defendants argue that the Court must conduct a new trial on damages because the "compensation for the alleged violation of the forced labor statute essentially compensates for the same injuries that were the result of the alleged violation of the trafficking statute." (Def. Br. 40).  For three reasons defendants' argument fails.

First, despite ample opportunity, defendants did not object to the jury instruction or verdict form, nor did they object to the jury's verdict after it was rendered and before the jury was discharged.  Their objection is therefore waived.  See Bseirani v. Mashie, 1997 WL 3632, at *1 (2d Cir. 1997) ("By not objecting to the instructions . . . or requesting that the jury be questioned before being discharged, [defendant] has waived the argument that the damages are duplicative.").

21

Second, the Court specifically warned the jury not to duplicate its award:

> [Y]ou should not award compensatory damages more than once for the same injury. For example, if a plaintiff were to prevail on two claims and establish a one dollar injury, you could not award him one dollar compensatory damages on each claim—he is only entitled to be made whole again, not to recover more than he lost. Of course, if different injuries are attributed to the separate claims, then you must compensate him fully for all of the injuries. (Tr. 1222).

Accordingly, the Court's instruction was not improper.

Third, there is at least "a hypothetical scenario on which the damages are not duplicative," see Bseirani, 1997 WL 3632, at *2. As the jury was instructed, the trafficking claim involves the extra requirement that the defendant "harbored" the victim. As such, the jury could have rationally split the harms for forced labor and trafficking into those flowing from the services obtained through defendants' compulsion and those flowing from the conditions of harboring to which plaintiff was subjected, both of which were supported by record evidence. This would explain why the two compensatory damage awards were not the same values, as one might expect if the jury had considered the injuries for both counts to be the same.

This is not a case in which one, indivisible injury is compensable through alternate legal theories. Accordingly, even if defendants have not waived their duplication argument, the Court is confident that its instruction properly warned the jury and that, at worst, the jury rationally divided several years' of harm across somewhat overlapping claims. See Bender v. City of New York, 78 F.3d 787, 794 (2d Cir. 1996) ("In some cases, seemingly duplicative awards made separately for overlapping causes of action or against different defendants have been sustained where it appeared that the jury intended to award the aggregate sum.").

## 2. *Amount of Compensatory Damages*

Defendants next seek a new trial or conditional remittitur. A district court may, consistent with the Seventh Amendment, either order a new trial or order a conditional remittitur, "giv[ing] the plaintiff the choice of voluntarily remitting his award to a set lesser amount in lieu of a new trial." Thomas v. iStar Fin., Inc., 652 F.3d 141, 146 (2d Cir. 2011). "Where there is no particular discernible error," as is true here, "a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998).

The Court's instruction on compensatory damages was as follows:

> The purpose of the law of damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from the forced labor or harboring of the plaintiff. If you find that the defendant is liable on the claims, as I have explained them, then you must award the plaintiff sufficient damages to compensate him for any injury proximately caused by the defendants' conduct. These are known as "compensatory damages." Compensatory damages seek to make the plaintiff whole—that is, to compensate him for the damage suffered. Compensatory damages are not limited merely to expenses that plaintiff may have borne. A prevailing plaintiff is entitled to compensatory damages for the pain and suffering, mental anguish, shock and discomfort that he suffered because of a defendant's conduct. (Tr. 1223-24).

Defendants are likely correct that most, if not all, of the $1 million compensatory damage award in this case is for pain and suffering, mental anguish, shock, and discomfort because the record evidence would not otherwise support such a substantial recovery. As a general matter, such damages include "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror, or ordeal." 22 Am. Jur. 2d Damages § 201. Courts and commentators have long recognized that "the law does not provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value," Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001), and the Second Circuit has indicated its willingness "to uphold substantial

damage awards [for mental distress] where warranted," <u>Ismail v. Cohen</u>, 899 F.2d 183, 187 (2d

Cir. 1990).

   To determine whether an award is excessive, the Court must "look to other awards in

similar cases" to ensure that the award is "within reasonable range." <u>Sinkov v. Americor, Inc.</u>,

419 F. App'x 86, 93 (2d Cir. 2011).  As defendants point out, the TVPA's civil cause of action is

too new to have generated a body of case law on damage awards.  Defendants offer the Court

two non-TVPA cases as reference points.  In the first, <u>Schramm v. Long Island R.R Co.</u>, 857

F. Supp. 255 (E.D.N.Y. 1994), the court held that a $232,500.00 award for pain and suffering

was excessive.  The plaintiff had been struck in the head with a tree limb through the defendant's

negligence.  He suffered a concussion and ongoing symptoms related to "post-concussion

syndrome," and he testified that his condition prevented him from fully enjoying his life." <u>Id.</u> at

258.  In the second case cited by defendants, <u>DiSorbo v. Hoy</u>, 343 F.3d 172 (2d Cir. 2003), the

Second Circuit reduced a damage award of $400,000.00 to $250,000.00. <u>Id.</u> at 185-86.  The

plaintiff in that case sustained serious physical and psychological injury as a result of the

defendants' use of excessive force and battery. <u>Id.</u>

   These cases, which involve serious injury or indignity, are not wholly unhelpful, and the

Court has identified similar federal and state cases with awards in a similar range.  <u>See</u> <u>Bender v.</u>

<u>City of New York</u>, 78 F.3d 787, 792 (2d Cir. 1996) ($150,000 for blow to the mouth with no

lasting physical injury, 24 hours' confinement, the pendency of criminal proceedings for six

months, and sleep problems); <u>Gardner v. Federated Dept. Stores, Inc.</u>, 907 F.2d 1348, 1353 (2d

Cir. 1990) ($150,000 for psychiatric issues including personality change arising from false

imprisonment and battery by department store security guard); <u>Bert v. Port Auth. Of N.Y. &</u>

<u>N.J.</u>, 561 N.Y.S.2d 416 (1st Dep't 1990) ($100,000 for 3.5 hour detention and humiliation in

front of family).

Another helpful line of cases contains awards in a slightly higher range for mental anguish resulting from lengthy and concerted harassment. See Town of Hempstead v. State Div. of Human Rights, 649 N.Y.S. 2d 942 (2d Dep't 1996) ($500,000 for nine months of extreme sexual harassment); Tiffany & Co. v. Smith, 638 N.Y.S.2d 454 (1st Dep't 1996) ($300,000 under state human rights law for "constant, egregious, and blatant conduct"); Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 362 (E.D.N.Y. 1999) ($250,000 for nine years' sexual orientation discrimination, including tormenting plaintiff with pornographic cartoons and making anti-gay remarks); Hughes v. Patrolmen's Benev. Ass'n of City of N.Y., Inc., 850 F.2d 876 (1988) ($225,000 for sustained harassment and adverse employment decisions over a period of two years).

Based on these two lines of cases, the Court cannot conclude that the jury's $1 million verdict was unreasonable. The plaintiff in this case was subject to the conduct for which defendants are liable for far longer than in the line of cases cited by defendants, which generally involve discrete, relatively brief incidents. The jury in this case predominantly awarded pain and suffering damages not for proximate symptoms that degrade one's enjoyment of the remainder of life—conditions like post-traumatic stress disorder—but for the humiliation, indignity, and ordeal directly inflicted over three-and-one-half years of compelled labor. Accordingly, one would expect pain and suffering damages in this case to be substantially higher than the several hundred thousand dollar awards in the first line of cases.

And one would also expect a larger award here than in the second line of cases, which do involve a longer course of conduct by the defendants. That is because the harms inflicted by even extreme workplace harassment, although obviously serious, are not as grave as the

extraordinary indignity of compelled labor.  Even if the jury's award was for only pain and suffering, mental anguish, shock, and discomfort for the roughly 1300 days of defendants' conduct, compensation would work out to under $800 per day.  Given the difficulty of affixing a mathematical value to such injuries, the Court cannot find that this result is unreasonable.

### 3.  *Amount of Punitive Damages*

Finally, defendants move for a new trial or remittitur as to the jury's $2.5 million award of punitive damages.  As with compensatory damages, courts must not disturb a jury award unless it "shocks the judicial conscience." Paterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006).  This inquiry is guided by the three factors identified by the Supreme Court in BMW of North America., Inc. v. Gore, 517 U.S. 559, 575 (1996): "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  In addition to the Gore factors, district courts must consider the financial circumstances of the defendants. Paterson, 440 F.3d at 121.  As the Second Circuit has recognized, "one purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay." Id. at 122.  Accordingly, a punitive damage award that "result[s] in the financial ruin of the defendant" cannot stand.

The first Gore factor, the reprehensibility of the defendant's conduct, is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575.  This "reflects the accepted view that some wrongs are more blameworthy than others." Id. Forced labor is, of course, extremely reprehensible.  This would ordinarily favor a very large punitive damage award.  But this case is an unusual one, because here the jury found both that defendants were liable for forced labor and trafficking and that plaintiff had libeled defendants.

26

This result can be reconciled only by concluding that the jury found each element of forced labor and trafficking satisfied, but found that plaintiff's description of defendants' conduct as "enslavement" was overstated to the point that it injured defendants.  Given this, the first <u>Gore</u> factor does not weigh as strongly in favor of the $2.5 million award as it otherwise might.

The second <u>Gore</u> factor is the ratio of punitive to compensatory damages, which in this case is 2.5:1.  The Supreme Court has been "reluctant to identify concrete constitutional limits" for the ratio of punitive to compensatory damages. <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 424 (2003).  It has recognized that an important consideration in determining whether the ratio is permissible in a given case is the size of the compensatory damage award. <u>Id.</u> at 425.  That is, although a higher ratio may be appropriate where "a particularly egregious act has resulted in only a small amount of economic damages," "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." <u>Id.</u>  The $1 million compensatory damage award in this case is quite substantial.  As such, the 2.5:1 ratio seems excessive and a 1:1 ratio would appear more appropriate. <u>See</u> <u>Thomas v. iStar Fin., Inc.</u>, 652 F.3d 141, 146 (2d Cir. 2011) (affirming district court's conclusion that 1:1 ratio was appropriate because of substantial $190,000 compensatory damage award).

The third <u>Gore</u> factor considers the "difference between this remedy and civil penalties authorized or imposed in comparable cases."  Just as above, this inquiry is a difficult one because of the dearth of reported awards under the TVPA.  But the Court cannot find, and plaintiff has not cited, analogous case law imposing a punitive damage award as enormous—both generally and in proportion to the compensatory damage award—as that returned by the jury here.  The sorts of harassment and discrimination verdicts that the Court used as reference points above

generally impose punitive damage awards in the range of $50,000 to $300,000. See Ortiz-Del Valle v. National Basketball Ass'n, 42 F. Supp. 2d 334 (S.D.N.Y. 1999) (remitting $7,000,000 award to $250,000); Tse v. UBS Fin. Servs., Inc., 568 F. Supp. 2d 274 (S.D.N.Y. 2008) (remitting $3,000,000 award to $300,000); Manzo v. Sovereign Motor Cars, Ltd., 2010 WL 1930237 (E.D.N.Y. 2010) (upholding $200,000 award); see also Thomas v. iStar Fin., Inc., 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) (noting $50,000 to $300,000 punitive damage cap in Title VII claims). Accordingly, even after accounting for the greater reprehensibility of defendants' conduct in this case, a $2.5 million punitive damage award is excessive.

Lastly, the Court must consider the defendants' financial circumstances. Although it is true that "it is the defendant's burden to show that his financial circumstances warrant a limitation of the award," Paterson, 440 F.3d at 122, and although the evidence in the record on this issue is not extensive, the Court thinks it is sufficient to establish that the individual defendants and the Ashram are of modest means. Sat Sharma owns a construction business, is the sole stockholder in another corporation called De-Temps, Inc. (the nature of the corporation's business does not appear in the record), and owns a small property in upstate New York. (Tr. 911). Geeta Sharma has no independent income. (Tr. 1018). The Ashram, for all it appears, has always struggled to remain afloat. (Tr. 796, 992-93). In short, the Court has every reason to believe that the massive punitive damage awards returned by the jury would cause financial ruin to the individual defendants and the Ashram. In such circumstances, remittitur is appropriate. Id. at 122.

In sum, the Gore factors and defendants' financial circumstances indicate that the $2.5 million award of punitive damages is excessive. The awards against all three defendants are reduced by $500,000. The result is a punitive damage award of $250,000 against Sat Sharma;

28

$250,000 against Geeta Sharma; and $500,000 against the Ashram.  This award is certainly sufficient to deter similar conduct by these or similarly situated individuals, and the resulting 1:1 ratio of punitive to compensatory damages comports with due process.  Plaintiff may either elect to accept the remitted award or the Court will hold a new trial on punitive damages.

### *Conclusion*

For the reasons stated above,

Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 is DENIED;

Defendant's motion for a new trial on liability under Fed. R. Civ. P. 59 is DENIED;

Defendant's motion for a new trial on damages under Fed. R. Civ. P. 59 is DENIED with respect to the compensatory damage award and GRANTED with respect to the punitive damage award unless plaintiff elects to accept a remitted punitive damage award of $250,000 against Sat Sharma; $250,000 against Geeta Sharma; and $500,000 against the Vishva Seva Ashram.

SO ORDERED.

Dated:  February 14, 2012
          Brooklyn, N.Y.

_____/s/_____
Carol Bagley Amon
Chief United States District Judge
